# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| **BLACK 13 ENTERPRISE, INC.** | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No. _____** |
| | § | |
| **TFL FRANCHISE SYSTEMS, LLC,** | § | |
| **Defendant.** | § | |

## ORIGINAL COMPLAINT

COMES NOW Plaintiff, Black 13 Enterprise, Inc., and files this petition against Defendant, TFL Franchise Systems, LLC.

SUMMARY - Plaintiff purchased a Flying Locksmith franchise in the Dallas-Fort Worth area from TFL Franchise Systems, LLC ("TFL") in 2018, which Plaintiff later recognized as a fraudulently induced sale and followed by contract breaches by the franchisor. Concurrently with the franchisor's fraud and contract breaches, a second local franchisee in DFW defrauded Plaintiff with TFL's assistance during a multi-apartment project involving the installation of smart locks with ADT. TFL's failure to provide the support and proper management of the project resulted in the financial demise of the franchise ended in 2020.

Plaintiff sued TFL and the second franchisee in Texas, but that court dismissed TFL on motion based on a venue clause in the franchise agreement, resulting in this suit. Plaintiff herein asks the Court to grant transfer of the case back to Texas, and if not, to adjudicate its claims.

## I.    PARTIES

1.     Black 13 Enterprise, Inc. ("Black 13" or "Plaintiff") is a Texas corporation operating in Tarrant County, Texas.

2.     TFL Franchise Systems, LLC ("TFL Franchisor" or "TFL Corporate" or "TFL") is a Massachusetts limited liability company operating its home office from 100 Grossman Drive,

Suite 305, Braintree, Massachusetts 02184.

## II.   JURISDICTION & VENUE

3.      The Parties' Franchise Agreement states at § 23.13 Jurisdiction and Venue, "In any suit over any claims, venue shall be proper only in the state and federal courts closest to our corporate office." Defendant's business operates out of Braintree, Norfolk County, Massachusetts.  See Franchise Agreement, attached hereto as Exhibit 4.

4.      Diversity jurisdiction exists pursuant to 28 U.S. Code § 1332.

5.      This Court has jurisdiction over this matter because the amount in controversy exceeds the $75,000 minimum jurisdictional limits of this Court.

6.      Venue is proper in Massachusetts because TFL operates there; however, Plaintiff will also assert that the case belongs in Texas based on forum non conveniens factors and seek the Court's agreement that it should be in Texas.

7.      This Court has personal jurisdiction over TFL because it resides in this Court's district.

**A. Jurisdiction and Venue would be more appropriate in Texas.**

8.      On April 6, 2020, the 96th District Court in Texas allowed TFL Franchise System, LLC's Motion to Enforce Forum Selection Clause and to Dismiss based on the franchise agreement between TFL and Plaintiff.

9.      The outcome of that dismissal lead Plaintiff to bring suit in Massachusetts. However, that dismissal assumed that a court in Massachusetts would deny transfer to Texas or adjudicate the best venue to be Massachusetts. Plaintiff believes that the public policy of Massachusetts would lead this Court to transfer this suit to Texas from Massachusetts, because the suit revolves around the rules of the heavily regulated Texas locksmith industry and involves two Texas franchisees and a franchisor. Under such circumstances, a venue change from Massachusetts, where

locksmiths are not regulated, means that the litigation moves to a state whose public policy is directly contrary to that of Texas. According to Massachusetts law, the venue clause in the Parties' contract should be set aside.

10.     Black 13 does not argue with the general contention that venue clauses are generally enforceable. The question here is whether Massachusetts law and other public policy considerations warrant setting aside the venue clause, assuming the venue clause is interpreted as a matter of law to mean venue must be in Massachusetts. The rest of this section will assume that the Court has determined that the venue clause should be interpreted against Black 13.

11.     Black 13 argues that the circumstances of this case, which includes Massachusetts treatment of venue clauses, witness location, and the militantly different public policy approaches to locksmith regulation and rules of evidence between the two states support setting aside the venue clause based on case law.

12.     Black 13 agrees that forum selection clauses are enforceable in Texas when: a) the parties have contractually consented to submit to the exclusive jurisdiction of another state; and b) the other state recognizes the validity of such provisions. *Calstar Props., L.L.C. v. City of Fort Worth*, 139 S.W.3d 433, 441-42 (Tex. App.—Fort Worth 2004).

13.     To adjudicate this matter, then, this Court must consult how Massachusetts treats forum selection clauses, as TFL wishes to enforce Massachusetts law in this case. Fortunately, the Massachusetts Supreme Court as recently as 2018 issued a substantive opinion covering this question, stating:

> "In deciding whether the result of a choice of law agreement is contrary to public policy, Massachusetts courts conduct the following two-tiered analysis: they will not honor the parties' choice of law where (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice; or (b) where application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the

determination of the particular issue and is the State whose law would apply in the absence of an effective choice of law by the parties."

*Oxford Glob. Res., LLC v. Hernandez*, 480 Mass. 462, 463, 106 N.E.3d 556, 560 (2018).

14.     To argue that Massachusetts has no substantial relationship to the parties would be a failure of Black 13 to be candid with the Court. However, the second tier of the analysis asks whether application of the law of Massachusetts would be contrary to a fundamental policy of Texas, assuming Texas has a materially greater interest than Massachusetts in the determination of the particular issue and if Texas law would apply if no choice of law contract term existed.

    i)   <u>Texas has a materially greater interest than Massachusetts in this dispute.</u>

15.     First, the Court must resolve the question of whether Texas has a materially greater interest than Massachusetts in the determination of the issues. In identifying the state with the most significant relationship to the transaction and the parties, Massachusetts courts evaluate "(a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicile, residence, nationality, place of incorporation and place of business of the parties. *Id*. at 467. This case involves Texas regulation of locksmiths, involves two locksmith franchisees who are both managed in Texas by a TFL manager in Texas, who is a certified manager of locksmith operations in Texas, for which he is qualified by taking a test in Texas. The contract was negotiated in Texas, the place of performance is in Texas, the location of the subject matter of the contract is locksmithing work in Texas.

16.     The only factor supporting venue in Massachusetts is that TFL is in Massachusetts, but even then, TFL's management operates in Texas and manages more than a half-dozen franchises in a direct management role in Texas. When this suit is over, TFL will still be in Texas with

those franchisees, one of which is also a defendant in a companion suit in Texas. When this suit is over, Massachusetts will continue to have no significant impact on any party other than the franchisor, TFL; no client or franchisee of TFL's in Massachusetts is impacted by this suit.

ii) <u>Fundamentally, Massachusetts and Texas have contrary locksmith policies.</u>

17.     Texas has a substantial regulatory framework for locksmiths, incorporating stringent educational and work experience prerequisites. The Regulatory Services Division of the Texas Department of Public Safety performs background screening, ensures that each locksmith has spent 600 hours of class time in an approved trade school and has served an apprenticeship to a licensed locksmith for at least one year, and must pass the Private Security Bureau's Qualified Managers Exam. After all that, Texas requires continuing education for all locksmiths who wish to remain certified.

18.     Unlike Texas, Massachusetts has no substantive locksmith regulations. A search performed by the undersigned of regulations or discussion of locksmiths in the online Massachusetts legislature reveals one bill that attempted to regulate locksmiths filed in 2012 that was never passed into law, and zero mentions of the phrase "lock smith" or word "locksmith" in Massachusetts law. Anyone can set up a locksmith business in Massachusetts. (Exhibit 1, search of "locksmith" in MA legislative records; Exhibit 2, Declaration of Gilman; and Exhibit 3, "How to be a Locksmith," showing that Texas is one of 14 states that regulate locksmiths and Massachusetts is not).

iii) <u>The Court should return this case to Texas, based on Massachusetts law.</u>

19.     In *Oxford Glob. Res., LLC v. Hernandez*, 480 Mass. 462, 463 (2018), the Massachusetts Supreme Court found that the policy differences between Massachusetts and California were significant with regard to use of confidential information, and the dispute between the parties

was significantly based on the policy differences between the two states.

20.     Similarly, the significant issues already alleged in this suit demonstrate the importance of the Texas regulations to Plaintiff's claims. Black 13 has alleged that TFL failed to enforce its own rules regarding compliance with Texas law, which requires background checks and locksmiths who are trained and can demonstrate such training. Massachusetts does not require such assurances and allows anyone to call himself a locksmith. Massachusetts courts will not have experience with Texas regulations or the public policy behind such regulations and will naturally be more inclined to consult their own framework on such matters. Application of the law of Massachusetts would be clearly contrary to these fundamentals of Texas law. This is exactly the type of reasoning used by the Massachusetts Supreme Court to send *Oxford Glob. Res. LLC v. Hernandez* back to California.

21.     Additionally, the policy differences between the two states with regard to the treatment of evidence is significant, as Plaintiff has recordings of phone calls with TFL agents in which they promise actions that they later deny. Massachusetts does not allow parties to be recorded without consent (Mass. Ann. Laws c. 272, § 99), but Texas is a one-party consent state (see Texas Penal Code §16.02(c)(4)). If this case is taken to Massachusetts, the policy there will assist to protect individuals who have already demonstrated a willingness to lie, then show umbrage at the idea that their recorded statements would be used against them.

   iv)   Fraud Supports Setting aside the Forum Selection Clause

22.     A forum selection clause may be set aside if it is induced by fraud. The elements of fraud and fraudulent inducement are: (1) a material misrepresentation, (2) which is false, and (3) which is either known to be false when made or is asserted without knowledge of the truth, (4) which is intended to be acted upon, (5) which is relied upon, and (6) which causes injury. *My Cafe-CCC,*

*Ltd. v. Lunchstop, Inc.*, 107 S.W.3d 860, 862 (Tex. App.—Dallas 2003).

23.     In this case, Plaintiff can show that he conducted reasonable due diligence, and TFL demonstrated reasonably that its agents were engaged in Texas and employing Texas law, having taken the Texas examination. Plaintiff had every reason to believe that TFL was acting as though Texas law was the law by which they abided in Texas. Now, after their fraud is exposed and their failure to provide the promised management, oversight, and support is brought to light, TFL wants to hold up a venue contract clause they have already violated to force a case regarding locksmith regulation to be heard in a state with no locksmith regulation.

24.     TFL represented that it would provide management guidance, which it did not do, and could not legally perform when it made that promise. TFL knew it could not perform the actions promised, but TFL wanted Black 13's franchise payment of more than $150,000.00. Because TFL operates in a state that does not regulate locksmiths, TFL did not care about following Texas law. The resulting failure to assist Plaintiff as promised caused the downfall of Plaintiff's business; Plaintiff invested significant capital in opening his franchise, relying on TFL's assertions that this was the correct course of action and that Plaintiff would recoup the cost of set-up quickly. TFL failed to take the actions necessary on their part for Plaintiff to begin doing business and making revenue in a timely manner. Plaintiff was damaged by this inability to rover his set-up expenses. Thus, all the elements of fraud in the inducement concerning the forum execution clause are met.

25.     The Texas Supreme Court has provided additional instructions regarding enforcement of forum-selection clauses, allowing them to be set aside when the party opposing enforcement can clearly show that: (1) enforcement would be unreasonable or unjust; (2) the clause is invalid for reasons of fraud or overreaching; (3) enforcement would contravene a strong public policy of the

forum where the suit was brought; or (4) the selected forum would be seriously inconvenient for trial. *In re Lyon Fin. Servs.*, 257 S.W.3d 228, 230 (Tex. 2008).

26.     As the pleadings and the prior argument above indicates, giving jurisdiction over this case to Massachusetts would deny Plaintiff his day in court by doubling the cost of the dispute, as the other defendant in this case is in Texas and cannot be forced to go to Massachusetts, most of the witnesses are located in Texas, and Massachusetts will not allow Plaintiff to use his recordings (and could even charge him with violations of Massachusetts law). Most importantly, the Massachusetts court would be evaluating the parties' actions with regard to a regulatory framework that is foreign and directly contrary to the approach of Massachusetts.

### III.     FACTUAL BACKGROUND

**A.     The Franchise Agreement Formation and Start Up Process**

27.     From August through October of 2018, Plaintiff began a discussion with Geoff Batchelder, Franchise Development Consultant for TFL Franchisor. The discussion included the history of the Flying Locksmiths, the availability of open territory in the Dallas-Fort Worth metroplex area, the TFL Franchise Disclosure Document, and territory mapping, which included the discussion of the cost of exclusive territories of varying population size. In three separate online mapping discussions with Geoff, it was clear to Plaintiff that the territory a person bought was the territory and accompanying population that was specified in the purchase—nothing more, nothing less. The three other existing territories in DFW at that time were discussed in these mapping discussions, and Plaintiff was told that, "while other owners have been 'working in' his proposed territory," up to that point, his purchase would preclude them from doing so after he signed his Franchise Purchase Agreement. In addition, neither Batchelder nor any TFL Franchisor agent informed him during the purchase decision process that, "any unowned territory

in the areas adjacent to my exclusive territory would generate leads, and hence more available work," by assignment to the nearest owned franchise territory owner. (Exhibit 2).

28.     Plaintiff performed due diligence regarding the TFL Franchise and the requirements to operate a locksmith business in Texas. After learning of the regulatory hurdles, he learned that he would need assistance because he was not licensed to operate without oversight by a licensed, qualified manager, as codified by Texas DPS licensing rules. At an event designed for potential TFL franchisees held September 19, 2018, known as "Discovery Day", Gilman met with, Batchelder, Buzz, Brett, and Barry McMenimon. These individuals assured him that they could assist with these matters, thus promising a State of Texas DPS approved and licensed overseer that could ensure a fast start up in a manner that met all Texas locksmith licensing requirements. In fact, on Discovery Day, potential owners from three different states were told, "not to worry about meeting licensing requirements in your particular state, as we have helped all previous new owners who required such, and it's no big deal. We'll get you all properly licensed." (Exhibit 2).

29.     On October 24, 2018, discussions between TFL Franchisor agents and Plaintiff led to his decision to purchase a TFL Franchise, covering a portion of the DFW area. He signed the contract on October 24, 2018 ("Franchise Agreement"), paying an initial $20,000.00 deposit, and then the remainder of the purchase price totaling $159,780.00, upon obtaining adequate financing in December of 2018. (Exhibit 2).

30.     Batchelder and TFL Franchisor agents, including the McMenimons and Steve Quinn, never revealed a material fact regarding the unavailability of any licensing slots in the State of Texas, nor did they share anything about the very lengthy process to obtain licensing under the Texas Department of Public Safety and obtaining the rights to legally open a locksmith business in Texas. Plaintiff was instead led to believe that the process of getting licensed would be minor

and easily achieved. (Exhibit 2).

31.     Batchelder and TFL Franchisor withheld key information about TFL Franchisors' lead assignment policies. Plaintiff could have purchased a much smaller assignment and still enjoyed first rights to all leads in the southern half of DFW based upon TFL Franchisor's lead assignment policies. Plaintiff was led to believe that the only way he would receive adequate leads was to purchase a much larger, and correspondingly more expensive, territory than Plaintiff truly needed. After he paid for the territory and was receiving training in Braintree, Massachusetts, around March 24, 2019 he learned that he would have received the leads he needed irrespective of whether he had paid for the territory, because his purchased area would have been the closest to the unclaimed areas where the leads originated. One of the very first actions that COO Brett McMenimon took during Plaintiff's training week was to provide him with a map of all the zip codes (outside, but adjacent to his purchased territory), which the TFL call center would direct to him, as locksmith needs arose. TFL Franchisor benefits greatly from such an arrangement, as they can represent to new clients that TFL can service them, and as such, TFL gains access to an even larger source of potential franchise fee payments. Had TFL Franchisor told him this at the outset of his purchase decision, Plaintiff could have purchased a much smaller territory bordering the southern edges of each of the three existing DFW based franchises, and still obtained all of the adjacent zip codes that he ended up paying a substantial sum for in the larger territory that he eventually purchased. (Exhibit 2).

32.     After payment of the deposit on October 24, 2018, Plaintiff was provided with a copy of the Flying Locksmiths' Operation Manual. On pages 12-18, there is a very specific pre-opening checklist outlining a series of sequential steps for him to execute in order to open his territory for business within 12-14 weeks, at the outside. Plaintiff worked diligently to attempt to open by

January 1, 2019, and prepared an annual budget for 2019, based upon that goal and as required by United Midwest Savings Bank, his SBA Loan processor. (Exhibit 2).

33.     Step Six of the "Week One" to-do list from the Flying Locksmiths' Operation Manual included a line item that simply stated, "Obtain State Required Locksmith License (if applicable)." There was no mention in the Operation Manual, or corporate presentations, that TFL Franchisor was limited in the number of franchise owners it could assist through the licensing process in the State of Texas, nor were any of the many steps necessary to becoming licensed as a locksmith in Texas detailed, or even outlined. The Operation Manual was comprehensive in most other regards, including elaborate details like how many paperclips or pencils or sheets of paper to buy for his new office, or every single item that was required to be purchased in the initial office inventory and truck inventory—but nothing was spelled out about licensing steps to be taken in Texas, which TFL Franchisor was extremely well aware of, as they had helped with the licensing of the nine Texas based franchise owners which preceded his franchise purchase—some by a number of years. TFL Franchisor agents, principally Brett McMenimon, as evidenced by several non-urgent and mundane e-mails in December of 2018 and January and February of 2019 along with Batchelder, Director of Sales Steve Quinn, and Buzz McMenimon in the course of Discovery Day, characterized the licensing process as relatively mundane drudgery, a process through which TFL Corporate could and would assist Plaintiff, which was supported by existing relationships between other TFL franchisees and TFL Franchisor that Plaintiff observed. (Exhibit 2).

34.     After encountering great difficulty with the process required by the State of Texas to obtain a locksmith license, Plaintiff sought assistance from Deb Breen, a TFL franchise owner covering San Antonio and Master Franchise Developer for all of Texas, and from TFL COO

Brett McMenimon. (Exhibit 2).

35.     On November 1, 2018, Plaintiff was informed by Brett McMenimon that the complexity of Texas regulations was a known challenge, and that TFL Corporate had only three individuals who had passed the Texas DPS licensing exam and obtained the requisite experience to be allowed to supervise new franchise owners and that each supervisor could oversee a maximum of three franchise owners. Plaintiff would be the tenth franchise in Texas (a fact that TFL Franchisor knew) to need such assistance, meaning there was no other licensed and approved supervisor, as required under Texas law. (Exhibit 2).

36.     Upon additional inquiry, Plaintiff learned that no one at TFL Franchisor could guess when a new licensing slot would open and be awarded to him so that Plaintiff could legally open his business when he had expected and planned, based on the instructions given to him by TFL Franchisor, though Plaintiff had paid a considerable sum for the franchise and incurred significant costs and ultimately would not be able to operate until April 1, 2019, many months longer than expected. (Exhibit 2).

37.     From December 15, 2018, through March 22, 2019, Deb Breen sought to have the Texas DPS certify that she had the requisite number of years of experience in five enumerated locksmith and private security areas in order to be licensed in her own right without having to be under Brett McMenimon's "management" license. Additionally, Deb Breen was required to pass the Texas DPS licensing exam. She expressed two major concerns: (1) she would not give up her subordinate, supervised status under Brett McMenimon until she passed the exam, since her licensing would lapse within sixty days if she did not pass the exam and was no longer under Brett's supervision; and (2) she asked Brett what his "Plan B" was to get Plaintiff properly and effectively licensed, should she fail the licensing exam, and therefore could not, and definitely

would not, come out from under Brett's supervision. Brett could not respond with any "Plan B," so Plaintiff had to assume that there was not one yet contemplated. (Exhibit 2).

38.    Because TFL Franchisor had assured Plaintiff that TFL Franchisor could assist with the regulatory supervision but did not have sufficient open slots among its supervisors, he was unable to be supervised, and thus unable to operate legally until April 1, 2019, when Breen eventually passed the Texas DPS licensing exam and no longer needed TFL's regulatory supervision, and Plaintiff's franchise could be added to TFL's list of supervised franchises in Texas. (Exhibit 2).

39.    During this wait, Plaintiff continued to follow the 12-14 week opening timeline prescribed in the TFL Operating Manual in order to open his business with an office, employees, inventory, and purchased vehicles, etc. By January 1, 2019, Plaintiff had completed every step except the regulatory hurdle of procuring a valid Texas Private Security/Locksmith license, which he could not obtain without TFL Franchisor's oversight, which had been promised but not delivered. (Exhibit 2).

40.    Since he could not open until such time as a space was made in the TFL Franchisor supervisor matrix, he incurred all the costs of operating a business but was unable to earn income. These costs included overhead such as his office lease, inventory purchase requirements, van lease requirements, and payroll in order to keep the experienced technicians he had hired to meet the requirements of Plaintiff's Franchise Agreement. Plaintiff was forced to incur more than $80,000.00 in expenses in the first quarter of 2019, during which time he could not legally operate. (Exhibit 2).

41.    TFL Franchisor represented to Plaintiff that it would assist him with regulatory hurdles, which he reasonably believed because they had and were assisting several other Texas TFL franchisees prior to this time. (Exhibit 2).

42.    The TFL Franchisor's representations were deliberate and incorrect. TFL Franchisor did not assist him with regulatory hurdles until early 2019, which resulted in an insurmountable loss of capital. (Exhibit 2).

43.    In addition to the licensing misrepresentations, TFL performed many other tasks contrary to the Parties' agreement (Exhibit 2):

a.    TFL Corporate violated Plaintiff's exclusive territory by forcing him to work with J Hanging. (Exhibit 2).

b.    TFL's mystery "precedent" (which was never communicated to Plaintiff in either a written or verbal communication) of two franchise owners working together on a large project, with one being designated as the "point person" in a way that gave them complete control over all project documentation, and most importantly, total control of project payments received, including distribution of the same. (Exhibit 2).

c.    TFL Corporate, upon Plaintiff's informing them of J Hanging's shoddy and non-compliant work product, did not modify the work arrangement, control of funds received, and did not inform the ultimate client, ADT, of all the issues of noncompliance with contract terms at the six interrelated work projects at issue here. Plaintiff believes that TFL was very much afraid of this trial project with ADT going off-track, and that TFL feared losing a shot at the much larger National Contractor designation they were undeniably pursuing and ultimately received a few months after the trial projects were completed. (Exhibit 2).

d.  Once Plaintiff alerted them to the many problems, TFL promised a 50/50 payment split on the six projects, as well as specific promises of a $20,000.00 payment, as well as a subsequent payment to be forthcoming from the TFL Corporate Controller in e-mails sent to him from Steve Quinn. In addition, Plaintiff had innumerable direct assurances from Buzz McMenimon, Steve Quinn, and Meschel Harvey, with respect to having his back with a commitment to see that he would be paid equitably on all six contracts, as they had the authority to do under the clause of the Franchise Agreement that gave them full discretion to resolve any franchise versus franchise disputes. Plaintiff fully relied upon all of these promises and assurances, and kept his franchise going as long as he was financially able, to his great detriment and ultimate demise. (Exhibit 2).

e.  During Steve Quinn's July 2019 visit to DFW, Plaintiff's one-on-one conversations with him alerted Plaintiff to the fact that Steve personally was aware of many, many territory incursions from one franchise owner into another owner's territory, including the egregious incursions by Robert Ferguson as far as half the country removed from his own DFW territory. In addition, the TFL Corporate job tracking system would show where every single job occurred, and whether it was in an owner's territory, or someone else's territory. Steve verified with him personally, that even though he and TFL Corporate were aware of this number of incursions, there was no mechanism to remedy/stop such incursions, much less to penalize any owner for any incursion into any other owner's exclusive territory. The Operations Manual was modified in the middle of his dispute with J Hanging to first allow three annual incursions, and once again to finally say that exclusive territory meant exclusive territory, and that no owner could enter another's territory without explicit permission of the incurred-upon owner. Still, there was no

enforcement mechanism, nor punishment outlined, should these rules continue to be violated. (Exhibit 2).

44.    Had TFL Franchisor honestly informed Plaintiff that it could not assist him with the regulatory hurdles that it had given to nine other franchise owners when he was conducting his due diligence, he could have delayed the opening of his business to avoid these losses. The result of TFL Franchisor's combination of actions and inactions has been a complete exhaustion of his capital, making it impossible for him to continue operations. (Exhibit 2).

**B.    Casey Ewing and TFL Systems, Inc.**

45.    In early 2019, TFL corporate informed Plaintiff that his newly minted franchise would be participating in a pilot project to install locks on behalf of ADT. Plaintiff initially understood that he would be working on six job sites for ADT and that his franchise would handle the work alone. (Exhibit 2).

46.    All franchise owners affected by this "trial run" project for ADT involving US-based apartment complexes had been included in numerous calls and e-mails with TFL's Meshel Harvey, who was coordinating the entire relationship and trial contract with ADT on behalf of the affected franchise owners (in DFW, Tampa, and Memphis, among others). This discussion did not include any amendment or change from TFL's standard operating procedures ("SOP"). (Exhibit 2).

47.    From TFL Corporate to each franchise, SOP on other jobs—before or after the six ADT work orders had consistently been direct notification of the commencement of each project to each respective franchise owner, and the concurrent direct scheduling, by the Call Center, on each owner's respective calendar in the shared Flight Control System. In Plaintiff's group communications with Meshel, not one mention was made of any owner having to work with any

other owner. The conference calls indicated jobs under the ADT contract would be handled by the franchise in whose territory the ADT facilities were located. (Exhibit 2).

48.     In addition, and concurrently, Meshel was directly communicating to Plaintiff, in direct one-to-one emails, phone calls, and voicemail messages, the names of relevant apartment complexes and their addresses, relative number of locks to be installed at each project, and progress updates on "per lock" installment price negotiations. (Exhibit 2).

49.     On April 22, 2019, Plaintiff learned that Black 13 would be jointly performing the Dallas portion of the ADT job with another TFL affiliate, J Hanging Investments Inc., d.b.a. The Flying Locksmiths Fort Worth, owned by Casey Ewing. (Exhibit 2).

50.     No one at TFL Corporate, at the point that Casey Ewing was apparently assigned to be the "point person" for all six projects in the DFW Metroplex, made any effort to inform Plaintiff that TFL Corporate really has no affinity for Casey at all, as she even tried to defraud Black 13 in the past, as was finally definitively stated to Plaintiff by Barry McMenimon in a call made to him much later that year on Friday, September 13, 2019. (Exhibit 2).

51.     Without question, if Corporate had told Plaintiff this at the time of Casey's mysterious "assignment" to these six projects, he would have screamed bloody murder, and vociferously objected to such an assignment. Of course, as Plaintiff later learned a few weeks into the six projects, Casey was fine with such an assignment, as it gave her access to six projects, none of which were in her purchased franchise territory, along with absolute control over the funds that would be earned from ADT upon project completion. (Exhibit 2).

52.     On April 6, 2019, when the six jobs were about to commence in the DFW Metroplex, Bart Malveaux (Operations Manager of Nat'l Accounts at ADT, LLC) called Robert Ferguson (neighboring Franchise Owner of TFL North Dallas, with his business office in Farmers Branch,

TX) to ask Robert to provide a single point of contact. Robert recommended Casey Ewing (neighboring Franchise Owner of TFL Fort Worth) to Bart, as Robert had known Casey for about three years, and had only met Plaintiff once or twice before he opened his franchise on April 1, 2019. Plaintiff was not notified of Bart's request to Robert. (Exhibit 2).

53.     None of the six apartment complexes where work orders were consummated in the DFW Metroplex were in Casey's territory. As three were in Plaintiff's territory, the TFL Franchise Agreement gave his business exclusivity and refusal rights over these projects. (Exhibit 2).

54.     Around this time, Plaintiff began to become aware of two principal concerns of many other established franchise owners. First, many franchise owners were seeing incursions in their "exclusive territories," as a result of various contractors requesting a specific franchise owner, regardless of territorial boundaries. TFL Corporate was allowing this to happen in violation of exclusive territory purchase rights, with no consequences for the transgressors or recompense to the victims. Second, Robert Ferguson had been noted by many other franchisees as a major source of incursion into territories as far north of the DFW Metroplex as the state of Ohio. When Plaintiff asked TFL Director of Sales, Steve Quinn, about this upon his visit to Texas in July of 2019, his weak response to Plaintiff was, "Yeah, we (he and TFL Corporate) know a lot of this has been going on, and we really need to do something about it." (Exhibit 2).

55.     Related to territory incursions, Casey had her own designs, as it turned out, since she was fully aware that Corporate had allowed territory incursions in the past with no consequences to the offending owners. She had even told Plaintiff in early April of 2019 that Robert Ferguson "took over" the Navco (organic vendor) relationship and entered other owners' territories at will, not only throughout Texas, but as far north as Ohio, without any apparent consequence. Even Deb Breen, Master Franchise Developer for TFL for the State of Texas, had voiced her own

concerns about this territorial incursion practice to Plaintiff on at least three occasions. (Exhibit 2).

56.     From April 5-21, 2019, unknown to Plaintiff, Casey started a daily dialogue with Bart to take control of the relationship and all six DFW projects, without sharing information with Plaintiff about details affecting these six projects, and how they would be executed. Plaintiff was just as responsible for proper execution of these projects but was kept in the dark until April 22, 2019. (Exhibit 2).

57.     On April 22, 2019, Casey Ewing confirmed his phone call with Plaintiff on that day, with an email that stated the location where they would be meeting Bart Malveaux to install the first demo Smartlock locks on the first apartment complex work order at Crestmont Reserve. (Exhibit 2).

58.     Plaintiff also asked her, on the referenced call that day, about their financial arrangement for working these six work orders together. She stated that her view was based upon a per-lock contract with ADT, and they would each take a portion equal to the number of locks that each of their respective techs installed. Plaintiff stated that was a good starting point, but most of all he expected the division to be equitable and they should be prepared to accept modifications to the initial arrangement, because they had no idea how the six projects might go and what unexpected factors might crop up. This was the first of three total conversations that Plaintiff had with Casey on this topic of the proposed financial arrangement between the two of them for these six projects. The second conversation was in the week that Bart told Plaintiff of the request and assignment of Casey as "point person," as laid out above. That second conversation was basically a word-for-word repeat of the first conversation. (Exhibit 2).

59.     This was a few weeks before it began to dawn on Plaintiff that Casey would "game the

system" by just throwing any number of inexperienced day laborers that she could hire to do the work at these six work orders. (Exhibit 2).

60.    Plaintiff asked Casey for any paperwork, agreements, purchase orders, etc., with ADT at that time and she declined to share any of that with him because she was Bart's primary contact. Upon questioning Corporate about this arrangement, Plaintiff received weak, offhanded responses about "too much work for one franchise owner to handle" and some unwritten "precedent" that had never been written nor disseminated, nor even verbally communicated to the franchisees, about how when two or more owners had worked together in the past on various large work orders, one owner was the "point person" and collected all payments to then distribute fairly to other involved owners. (Exhibit 2).

61.    No supporting paperwork, agreement, or directive for such a "precedent" was ever produced. As far as Plaintiff knows, to this day, no written version of this supposed "precedent" ever existed. Plaintiff was not given any choice in Casey being the "point person" with Bart from ADT, and no one from Corporate, nor Casey, ever let him see the purchase orders, work orders, etc., that they would be working on, even though Plaintiff asked for all of these standard work order documents multiple times. (Exhibit 2).

62.    On April 23, 2019, Casey Ewing, David Revilla (one of Plaintiff's two full-time, employed techs for his Arlington/Ft. Worth franchise), and Plaintiff met Bart Malveaux at Crestmont Reserve Apartments to install two demo locks. They discovered that the original negotiated contract price of $25/lock would be insufficient, as some doors would need more work (drilling out, installing privacy locks, bad door conditions, etc.), due to more labor and time per "difficult" doors. Bart agreed that they needed to adjust pricing to a two-tier model, where easy installs would remain at $25/door, and difficult installs would be around $45/door. Further

negotiations were turned back over to Meshel Harvey at Corporate. (Exhibit 2).

63.    On April 23, 2019, Casey, Bart and Plaintiff were discussing manpower for this project, and Casey stated that she would have at least four licensed technicians when the first work at Crestmont Reserve started. (Exhibit 2).

64.    Plaintiff found out later that Casey only had one experienced employee at the time, who would later quit on Monday, May 13, 2019, before the Crestmont Reserve work order actually began. (Exhibit 2).

65.    On May 1, 2019, Meshel confirmed that she was in the final stages of price negotiations with Bart for "per lock" pricing on work orders for DFW area apartment complexes. Eventually, $25/easy installs and $45/difficult installs was mutually agreed upon and work was set to commence on the first DFW area work order (Crestmont Reserve) the week of May 20, 2019. (Exhibit 2).

66.    On May 17, 2019, Plaintiff called Deb Breen to voice his concern that Casey had no employees as of that date, and the first work order was supposed to begin three days later with four experienced technicians: two from Toby, and presumably two from Casey. Deb said she would call Casey to discuss this. After that call, Deb reported back to Plaintiff that Casey assured her that she would have laborers and not to worry about it. (Exhibit 2).

67.    On May 20, 2019, the Crestmont work order commenced. Plaintiff and his technician, David Revilla, showed up the first day. Plaintiff's other technician, Andras, had to finish up on prior contracts and did not work on this work order, which had been scheduled for just four days onsite. David had been background-checked upon Plaintiff's hiring of him four months prior and could apprentice under him, as Plaintiff was properly licensed. On subsequent jobs, David could be supervised by Andres or Plaintiff. Casey showed up with no more than five day-laborers, all

with no locksmith training or experience, contrary to what she had told Plaintiff and Bart on April 23, 2019. Most importantly, no background checks had been performed on any of her laborers. (Exhibit 2).

68.    Experienced locksmiths are required by the Franchise Agreement that each owner signs, and even more stringent requirements were included in the ADT Vendor Agreement, including mandatory background checks for each worker the signing of which was also a requirement for any subcontractors working on any ADT projects. (Exhibit 2).

69.    From this point forward, the technicians that Plaintiff supplied were his licensed or apprenticed, experienced techs, David and Andras. At the same time, Casey began supplying a revolving door of nothing but inexperienced day laborers, most of whom departed after only a day or two on the job, never to be seen again. (Exhibit 2).

70.    In all, somewhere between 15-20 inexperienced day laborers came and went over the three months working on the six work orders. When Plaintiff brought this behavior up with Casey, her response was, "You know, you could also hire any number of day laborers yourself, if you want to get paid as much as me." Plaintiff told her that he was not going to purposely violate the Franchise or ADT contracted terms of service with respect to experienced, background-checked technicians. (Exhibit 2).

71.    Casey repeated this proposition, suggesting hiring day laborers to maximize each other's share of income, in a phone call with Plaintiff on September 6, 2019, when Corporate informed everyone that all of the funds received from ADT would be going directly to Casey. (Exhibit 2).

72.    From May 20 through July 18 of 2019, Casey and Plaintiff worked on the six work orders for ADT-related apartment complexes. About three work orders in, Plaintiff began to notice that Casey was gaming the system to maximize her income on a per lock basis, while using a

revolving door of various day laborers (many from Craigslist), as well as providing substandard customer service, a multitude of incomplete and incorrectly installed Smartlocks, and refusing to take troubleshooting calls from various apartment managers regarding incorrect lock installation. (Exhibit 2).

73.     During this time, Casey and Plaintiff received a plethora of e-mails from ADT/BH executives related to requests for warranty troubleshooting of improperly installed locks. Plaintiff received all of these requests after the first few e-mails, because Casey refused to do troubleshooting without getting extra pay from ADT, since in her words she was "only getting $25 per lock." Plaintiff forwarded most, if not all, of these troubleshooting e-mail requests to Steve Quinn at TFL Corporate, at his request. (Exhibit 2).

74.     In mid-June, once Plaintiff was made aware of many missing strike plates at the Versailles complex, he alerted TFL Corporate and agreed to replace all missing strikes at his cost of both parts and labor. Essentially, Casey and Plaintiff were also both required by contract to perform any warranty work for a set period of time after the project if any of the work had been faulty or substandard. Near the end of all six work orders, Plaintiff also alerted Corporate to all these details of shoddy work efforts at all worksites on July 18, 2019, in a detailed e-mail. Finally, Plaintiff ran a total of approximately 35-40 emergency calls, adding the e-mail requests to about 15 requests sent to Plaintiff by apartment managers via text message. (Exhibit 2).

75.     During these installs, various apartment Facilities Managers such as Vincent Jones at Silverbrook, as well as all the Wolf Security personnel who work concurrently with them on all six apartment work orders, noted, "Casey never seems to show up to any of these jobs." The Wolf Security personnel took special exception to Casey's day laborers not having completed

any background checks, as the Wolf Security personnel were each required to have satisfactory background checks done in order to be present on all work order sites. (Exhibit 2).

76.     On July 12, 2019, Stephanie Barr, who was forced to work with Casey Ewing on a new apartment work order in late July in McKinney, TX, e-mailed TFL Corporate to ask what the financial arrangement would be for her and Casey, regarding division of ADT's payment, as well as who would be responsible for related franchise funds when payment was received upon job completion. It was clear from her e-mail that Stephanie, a franchise owner with three years of experience, was unaware of Corporate's unwritten, undocumented "precedent" for when two or more neighboring owners are required to work together, as well as who would decide how payments would be divided. (Exhibit 2).

77.     At this point, Plaintiff became suspicious of TFL Corporate's assertion that its precedent relating to multiple owners working on the same project even existed and had failed to include a revenue-sharing arrangement. It seemed to that Steve and TFL Corporate were making things up as they went along. (Exhibit 2).

78.     On this same day, Casey told Plaintiff that Stephanie had also called Corporate to ask the same questions in Stephanie's referenced e-mail. Casey stated that she did not know why it was not as easy as "who does how many locks/doors." Plaintiff replied that she knows just as much as he does and that they have encountered so many unexpected variables over the course of six joint work orders that a "per door" policy does not begin to represent the proper amount of work, supervision, troubleshooting, emergency calls, and rework that was required on their jobs. (Exhibit 2).

79.     On July 16, 2019, Meshel Harvey, the Primary Account Contact for ADT Nat'l Account, TFL Systems Customer Care Call Center, received a request from Jennifer Johnson, Apartment

Manager at Versailles for Joe Diaz, a high-level executive from ADT, Bart from ADT, and Eva Cruz, a high-level executive from BH Management, to come to Texas for a "walkthrough" to jointly inspect locks that Jennifer, ADT, and BH Management stated were improperly installed. (Exhibit 2).

80.   Corporate decided to send Steve Quinn instead of Meshel as its TFL representative. Steve flew in on Sunday, July 21, 2019, and he met Plaintiff at Versailles, on Monday, July 22, with all interested parties. (Exhibit 2).

81.   Casey Ewing was not invited to this meeting, as Johnson, Apartment Manager at Versailles, had banned her from the original Versailles work site and did not want her onsite for this inspection. (Exhibit 2).

82.   On July 18, 2019, Plaintiff sent an e-mail detailing all of the problems at the six ADT/BH work sites to Meshel who shared it with Steve Quinn, for a conference call the next day. (Exhibit 2).

83.   On July 19, 2019, Plaintiff had the conference call with Steve Quinn and Meshel to discuss his detailed e-mail sent the day before regarding Casey's behavior. Steve and Meshel both said several times that Casey's behavior was appalling and unacceptable, and that they and Corporate "have Plaintiff's back" with regards to seeing that Plaintiff was rewarded fairly and equitably on the six ADT work orders. They conveyed that Plaintiff had gone above and beyond by fixing all the incorrectly installed locks and attempting to maintain TFL's commitment and reputation with ADT. Steve was determined to push for a 50/50 split between Casey and Plaintiff on all funds received from ADT for these six work orders. His desire, and that of Corporate, was that a national TFL standard be set such that big projects requiring multiple neighboring franchisees be paid equally, i.e., 2 franchises - 50/50, 3 franchises - 33.33% each, etc. (Exhibit

2).

84.     On July 22, 2019, Steve and Plaintiff met for three hours with Versailles, ADT, and BH Management, and learned that they were unhappy with the installation of the Smartlock and Privacy Lock deadbolts on about 75% of all unit doors. A plan was discussed to remedy this complaint at a certain cost sometime in September of 2019. (Exhibit 2).

85.     That meeting was significant because Steve got to validate with his own eyes that Casey's day laborers left the screws out of the locks that Plaintiff inspected, and discarded strike plates from doors. Both conditions threatened near-term and future lock failures, and compromised door security. (Exhibit 2, Para. 65.)

86.     In short, Casey defrauded Plaintiff. On April 23, 2019, Casey said that she would provide four licensed technicians, however, she never provided a single one. Plaintiff provided his share of licensed technicians, but he was counting on Casey's team to handle some of the work. Not only did Plaintiff do his share of the work, but he was left footing the bill for her shoddy work and had to fix all of her poor workmanship. (Exhibit 2).

87.     If Plaintiff had known Casey was not going to provide licensed technicians, he would not have agreed to a sharing of the six jobs with his limited manpower in the time they had to get it all done. Casey's actions damaged Plaintiff by effectively stealing funds and creating a need for warranty work in his franchise. Her delay and refusal to pay Plaintiff was a significant factor in the demise of his TFL franchise because he needed the cash flow and could not survive without it. (Exhibit 2).

## IV.   CAUSES OF ACTION

### A.   RESCISSION AGAINST TFL FRANCHISOR

88.   A court may exercise its equitable discretion and rescind an agreement upon a showing of fraud, accident, mistake, or other grossly inadequate conduct. *P.L.A.Y., Inc. v. NIKE, Inc.*, 1 F. Supp. 2d 60, 65 (D. Mass. 1998) (Citing *Kannavos v. Annino*, 356 Mass. 42 (1969). A plaintiff may predicate a rescission action where the defendant fraudulently misrepresented material facts to induce the plaintiff to enter into an agreement. *McGrath v. C.T. Sherer Co.*, 291 Mass. 35 (1935).

89.   On October 24, 2018, Black 13 and TFL Franchisor formed the Franchise Agreement; a copy of that contract is attached as Exhibit 4 and incorporated by reference.

90.   As set forth above, TFL Franchisor made a number of fraudulent misrepresentations to Black 13 regarding its operations. Specifically, TFL Franchisor falsely represented that it provided regulatory supervision satisfying Texas authorities when such supervision was appropriate, that it would pay Plaintiff for work done in its territory and manage national projects so Plaintiff would be paid for its work.

91.   However, TFL Franchisor failed to provide the regulatory framework assistance that many other TFL franchisees have received, failed to properly manage the ADT national account, and failed to pay Plaintiff for its work.

92.   Plaintiff was substantially harmed when it obtained loans and purchased equipment and vehicles based on the promises of TFL Franchisor, as its failure to perform its promises resulted in Plaintiff's inability to operate its business from January of 2019 until April of 2019, even though Plaintiff was able and ready to perform in January of 2019.

93.   Plaintiff had no knowledge that TFL Franchisor's representations were false until

Plaintiff had paid for its franchise and began its training as a franchisee.

94.    The resulting conditions made continuation of the franchise relationship untenable. Plaintiff ran out of working capital in December of 2019, and Defendant TFL terminated the Franchise Agreement in January of 2020.

95.    Plaintiff seeks rescission of the Franchise Agreement and damages from TFL to restore it to its previous condition, including refund of the franchise fees and all costs suffered by Plaintiff in reliance on the promises inherent in the relationship with TFL, including special damages due to expenditures of equipment, trucks, and leases as required under the Franchise Agreement.

96.    Plaintiff has suffered irreparable harm in that it has paid for equipment and taken loans and is now unable to pay back these loans. Additionally, its credit has been ruined.

## B.    FRAUD AGAINST TFL FRANCHISOR

97.    To establish a claim for fraudulent misrepresentation, a plaintiff must prove that the defendant made a false representation of a material fact with knowledge of its falsity for the purpose of inducing the plaintiff to act thereon, and that the plaintiff relied upon the representation as true and acted upon it to his detriment. *Danca v. Taunton Savings Bank*, 385 Mass. 1, 8 (1982).

98.    As set forth herein, TFL Franchisor made a number of fraudulent misrepresentations to Black 13. Specifically, TFL Franchisor falsely represented that it would provide regulatory supervision satisfying Texas authorities, that it would pay Plaintiff for work done in its territory and manage national projects so Plaintiff would be paid for its work.

99.    When TFL Franchisor made these representations, it knew they were false or made the representations recklessly, as a positive assertion, and without knowledge of their truth. TFL Franchisor also concealed material information regarding its ability to provide regulatory

supervision, similar to the supervision it was providing many other Texas franchisees.

100. As TFL Franchisor intended, Black 13 relied upon these representations and omissions of material facts to its detriment when it entered into the Franchise Agreements, which has caused Black 13 injury.

101. As a proximate and foreseeable result of TFL Franchisor's fraudulent conduct, Black 13 has been damaged, for which sums Black 13 hereby sues, in an amount that exceeds the minimum jurisdictional limits of this Court. Black 13 seeks its actual, special, and consequential damages it sustained, including out-of-pocket and benefit-of-the-bargain damages, plus pre- and post- judgment interest at the highest rate allowed by applicable law.

## C.   FRAUDULENT CONCEALMENT/FRAUDULENT INDUCEMENT/FRAUD BY NONDISCLOSURE AGAINST TFL FRANCHISOR

102. Where a claim involves nondisclosure of a fact, it is actionable as fraud when there is a duty to disclose. *Stolzoff v. Waste Sys. Int'l., Inc.*, 58 Mass. App. Ct. 747, 755, (2003). The defendant has a duty to disclose "where (i) there is a fiduciary or other similar relation of trust and confidence, (ii) there are matters known to the speaker that he knows to be necessary to prevent his partial or ambiguous statement of the facts from being misleading, or (iii) the nondisclosed fact is basic to, or goes to the essence of, the transaction. *Id.*

103. TFL Franchisor's wrongful conduct described above (and incorporated herein by reference) constitutes fraud based on nondisclosure. TFL Franchisor had a duty to disclose material facts to Black 13 based on: (i) its relationship with Black 13 (as an interested party to the  Franchise Agreement); (ii) TFL Franchisor's discovery of new information that made a prior representation misleading or untrue; (iii) TFL Franchisor's creation of a false impression by making a partial disclosure; and (iv) TFL Franchisor's voluntary disclosure of information giving rise to a duty to disclose the whole truth.

104.   TFL Franchisor concealed material facts from Black 13 with knowledge that Black 13 was ignorant of the facts and did not have an equal opportunity to discover them, including the prior negative experiences of TFL FW's attempted fraud on TFL Franchisor.

105.   TFL Franchisor was deliberately silent when it had a duty to speak. By failing to disclose the facts, TFL Franchisor intentionally induced Black 13 to enter into the Franchise Agreement.

106.   Black 13 justifiably relied on the nondisclosures and was induced to enter into the Franchise Agreement. As a proximate and foreseeable result of TFL Franchisor's fraudulent nondisclosures, Black 13 has been damaged and therefore sues for an amount exceeding this Court's jurisdiction. Black 13 seeks actual, special, and consequential damages, including out-of-pocket and benefit-of-the-bargain damages, plus pre- and post-judgment interest.

## D.   EXEMPLARY DAMAGES AGAINST TFL FRANCHISOR

107.   Texas Civil Practice and Remedies Code Sec. 41.003(a). provides, "[e]xcept as provided by Subsection (c), exemplary damages may be awarded only if the claimant proves by clear and convincing evidence that the harm with respect to which the claimant seeks recovery of exemplary damages results from:(1) fraud; (2) malice; or (3) gross negligence."

108.   Plaintiff further alleges that the conduct of TFL Franchisor as described above was willful, malicious, or both willful and malicious, in that TFL Franchisor was aware of the difficulties that Plaintiff would face, and yet gave assurances that help from TFL Franchisor would be available, knowing or having responsibility to know that such help was unavailable.

109.   As a result, Plaintiff is entitled to recover exemplary damages to deter TFL Franchisor from further defrauding its franchisees. In this connection, Plaintiff will show that, as a result of TFL Franchisor's conduct, Plaintiff has suffered losses of time and money. Accordingly, Plaintiff asks that exemplary damages be awarded against TFL Franchisor.

## V.    CONDITIONS PRECEDENT

110.  All conditions precedent have occurred.

## VI.    JURY TRIAL

111.  Plaintiff requests a jury trial.

## VII.    PRAYER

**WHEREFORE**, the plaintiff requests that the defendants be cited to appear and answer and that, on final trial, the plaintiff have the following:

a) Judgment ordering rescission of the Franchise Agreement with TFL Franchisor, declaring it void and excusing both parties from all future obligations under the contract;

b) Judgment against TFL Franchisor for funds invested to perform duties by Plaintiff under the Franchise Agreement, including but not limited to funds used to buy or lease inventory, equipment, vehicles, and workspace;

c) Judgment against defendant for a sum within the jurisdictional limits of the Court;

d) Prejudgment interest as provided by law;

e) Exemplary damages against the defendant in a sum determined by the trier of fact;

f) Post-judgment interest as provided by law;

g) Costs of suit; and

h) Such other relief to which plaintiff may be justly entitled.


Respectfully submitted,

NORRED LAW, PLLC
By: /s/ Warren V. Norred
Warren V. Norred, Texas Bar Number 24045094,
wnorred@norredlaw.com
515 E. Border Street; Arlington, Texas 76010
P. 817-704-3984; F. 817-524-6686

/s/ Tiffany L. Stichel
Tiffany L. Stichel (BBO# 672713)
Schlosberg, LLC
35 Braintree Hill Park, Suite 401
Braintree, MA  02184
Tel: (781) 848-5028
Fax: (781) 848-5096
Tstichel@schlossbergllc.com

**EXHIBIT LIST:**
Exhibit 1 (search of "locksmith" in MA legislative records)
Exhibit 2 (Declaration of Gilman)
Exhibit 3 ("How to be a Locksmith")
Exhibit 4 (Franchise Agreement)