DocuSign Envelope ID: E878DB2C-95CF-4659-8031-64CF0644C631

**EXHIBIT C**

**TFL Franchise Systems, LLC**



**FRANCHISE AGREEMENT**

DocuSign Envelope ID: E878DB2C-95CF-4659-8031-64CF0644C631

TABLE OF CONTENTS

| | | |
|---|---|---|
| 1. | DEFINITIONS AND INTERPRETATION | 2 |
| 2. | GRANT OF FRANCHISE AND TERM | 3 |
| 3. | INITIAL FEES | 5 |
| 4. | ROYALTY AND FEES | 5 |
| 5. | SITE SELECTION | 7 |
| 6. | PROMOTION AND ADVERTISING | 8 |
| 7. | PRODUCTS AND SERVICES OFFERED | 8 |
| 8. | OPERATION OF FRANCHISED BUSINESS | 9 |
| 9. | CUSTOMER METHODS OF PAYMENTS; PAYMENTS TO SUPPLIERS | 12 |
| 10. | RECORDS AND REPORTING | 12 |
| 11. | MANAGEMENT AND EMPLOYEES | 14 |
| 12. | LICENSE, USE OF MARKS AND COPYRIGHTED MATERIALS, CONFIDENTIAL INFORMATION AND KNOW-HOW | 14 |
| 13. | FURTHER OBLIGATIONS OF FRANCHISEE | 17 |
| 14. | TRAINING AND FURTHER OBLIGATIONS OF FRANCHISOR | 19 |
| 15. | TERMINATION BY FRANCHISEE | 21 |
| 16. | REMEDIES UPON DEFAULT BY FRANCHISEE | 21 |
| 17. | SECURITY INTEREST | 25 |
| 18. | FRANCHISEE'S OBLIGATIONS UPON EXPIRATION OR TERMINATION | 25 |
| 19. | RENEWAL | 26 |
| 20. | ASSIGNMENT OR TRANSFER | 26 |
| 21 | NON-COMPETITION | 29 |
| 22. | FRANCHISEE ACKNOWLEDGMENTS | 30 |
| 23. | MISCELLANEOUS | 31 |

DocuSign Envelope ID: E878DB2C-95CF-4659-8031-64CF0644C631

<u>ATTACHMENTS</u>

Attachment 1:   Franchised Business – Particulars

Attachment 2:   Marks

Attachment 3:   Holders of Ownership Interest in the Franchisee

Attachment 4:    State Addenda to the Franchise Agreement

DocuSign Envelope ID: E878DB2C-95CF-4659-8031-64CF0644C631

THIS FRANCHISE AGREEMENT ("Agreement"), dated *10/24/2018* (the "Effective Date"), is entered into by and between TFL Franchise Systems, LLC, a Massachusetts limited liability company ("Franchisor" or "we," "us," or "our," and *TOBY GILMAN* ("Franchisee," or "you," or "your").

## RECITALS

**WHEREAS,** Franchisor has created a comprehensive program (the "Program") for the operation of a business that provides locksmith and security services and products, including doors, video cameras, and access control, for commercial, residential, and automotive customers under the name of The Flying Locksmiths (the "Franchised Business"). Your business will consist of a fixed location and one or more service vans.

**WHEREAS,** the Program involves the use of Franchisor's confidential and proprietary methods, equipment, operating procedures, business techniques, and manuals in connection with each Franchised Business (the "Confidential and Proprietary Material") as well as the use of Franchisor's trademarks, service marks, trade names, logos, brands, copyrights and other intellectual property in connection with each Franchised Business ("Intellectual Property");

**WHEREAS,** Franchisee wishes to establish and operate a Franchised Business pursuant to this Agreement using the Program and the Confidential and Proprietary Material in the Territory (as defined in the Agreement), and to derive the benefits of the Program, the Confidential and Proprietary Material, and Franchisor's experience, name, reputation and guidance;

**WHEREAS,** Franchisor wishes to grant Franchisee the right to establish and operate one Franchised Business pursuant to this Agreement using the Program and the Confidential and Proprietary Material in the Territory (as defined in the Agreement), and to derive the benefits of the Program, the Confidential and Proprietary Material, and Franchisor's experience, name, reputation and guidance;

**NOW THEREFORE** in consideration of the foregoing, the covenants and agreements herein contained, and other good and valuable consideration, the receipt, and sufficiency of which are hereby acknowledged, the parties covenant and agree as follows:

DocuSign Envelope ID: E878DB2C-95CF-4659-8031-64CF0644C631

# AGREEMENT

## 1.    DEFINITIONS AND INTERPRETATION

   1.1 ***Defined Terms.*** In addition to the terms defined above, which are incorporated herein by this reference, the following terms have the meanings set forth below:

   (a) **"Affiliate"** of any person means another person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such first entity.

   (b) **"Gross Revenue"** means the aggregate sales price of all products and services sold by the Franchisee or any of its Affiliates, in connection with or arising out of the operation of the Franchised Business. It also includes the retail value of all products and services donated or bartered by the Franchisee or any of its Affiliates, in connection with or arising out of the operation of the Franchised Business. Excluding from these amounts are (1) the amount of any refund or credit given in respect of any services provided to a customer of the Franchised Business for which a refund of the whole or part of the purchase price is made or for which a credit is given in the ordinary course of business, and (2) any amounts collected by Franchisee for any governmental authority and paid out by Franchisee to that governmental authority on account of sales taxes or other taxes imposed upon the sale of goods or services by Franchisee in respect of the Franchised Business and which Franchisee is not entitled to subsequently recover.

   (c) **"Marks"** means the trademarks or trademark applications shown in Attachment 2, as such marks may be changed from time to time. The Marks are one component of the Intellectual Property.

   (d) **"National Account"** means relations with clients with outlets in multiple territories who desire for Franchisor to administer their account at the corporate level.

   (e) **"Operations Manual"** means the manual entitled "'The Flying Locksmiths Operations Manual," including hard copy and online materials, developed and owned by Franchisor, as revised by Franchisor from time to time.

   (f) **"Program"** means the Franchisor's best practices that have been developed and combined into a comprehensive process for operating a Franchised Business. It includes, but is not limited to, franchisee training, marketing, and sales assistance in opening and operating your Franchised Business.

   (g) **"Franchised Business"** means The Flying Locksmiths business you will operate in accordance with the terms of this Agreement.

   1.2 ***Interpretation.*** For purposes of this Agreement:

The singular number shall include the plural, and the masculine gender shall include the feminine and neuter genders, and vice versa.

The article, section and subsection headings are for convenience of reference only and shall not for the purpose of interpretation be deemed a part of this Agreement.

All grammatical variations of defined terms in this Agreement shall have the meaning corresponding to the grammatical variation.

DocuSign Envelope ID: E878DB2C-95CF-4659-8031-64CF0644C631

2.   **GRANT OF FRANCHISE AND TERM**

2.1   ***Grant of Franchise***.  Upon the terms and conditions set forth herein, Franchisor grants to Franchisee, and Franchisee accepts, the right for the Term and any Renewal Term-

(a)   to establish and operate one Franchised Business; and

(b)   to use the Program, the Intellectual Property, and the Confidential and Proprietary Material in connection with the operation of the Franchised Business in accordance with this Agreement, the Software License Agreement and the Operations Manual.

2.2   ***Territory***.  You will receive an exclusive territory in which to operate the Franchised Business in that we will not establish either a company-owned or franchised outlet selling the same or similar goods or services under the same or similar trademarks or service marks as we license you to use here.

The minimum territory contains 125,000 people.  You may purchase a territory in the size range from 125,000 to 2,000,000 people, though we expect our typical territory to contain approximately 500,000 people.  You and we will agree to your territory and it will be described in Attachment 1 to the Franchise Agreement before you execute it.  Your territory will be a geographical area containing a specific number of persons based on the U.S. Census Bureau or such other source as we feel is reliable.

You must locate your Franchised Business office in your territory in a business location. Your Franchised Business office can not be at your home or a residential address.

We may establish franchisor-owned locations, other franchises or sub-franchises outside your exclusive territory, regardless of proximity to the boundaries of your territory.

We may also establish other franchises or company- owned outlets or other channels of distribution offering similar services under names and trademarks which are not the same or similar to the Marks, within or without your territory, provided they are not in direct competition with you.

We or an affiliate may use other channels of distribution, such as the Internet, catalog sales, or other direct marketing, to make sales within your territory using our principal trademarks, though normally we will direct customers gained in this way in your territory to your outlet, but may occasionally direct such customers to another franchisee if we feel business circumstances so require.

We reserve the right to use other channels of distribution, such as the Internet, catalog sales, telemarketing, or other direct marketing, to make sales within your territory of products or services under trademarks different from the ones you will use under the franchise agreement.  We do not pay compensation to you for soliciting or accepting orders from inside your territory.

Unless you receive our prior permission, you are prohibited from soliciting or providing services to customers outside of your exclusive territory, including the use of other channels of distribution, such as the Internet, catalog sales, telemarketing, or other direct marketing.

<u>National Accounts</u>

DocuSign Envelope ID: E878DB2C-95CF-4659-8031-64CF0644C631

We alone retain the exclusive right to establish relations with clients who have locations in multiple franchisee territories who desire for us to administer their account at the corporate level (National Accounts"). Typically, these clients desire to channel their job requests and billing solely through us at the corporate level. We then make these jobs available to franchisees. You may elect to accept such jobs if they become available in your territory or not. When we handle billing or invoicing on national account clients, we mark up the customer invoice typically 1-20% to cover our costs for administering this work and handling the billing and invoicing. In some instances, there may be other fees or fee splits. You agree to these mark ups, fees and fee splits. In addition, if there is a dispute on any work performed for a National Account, you agree that we may mediate and resolve the dispute and you agree to be bound by our decision. If you decline a National Account job made available to you in your territory, then we may offer the job to a nearby franchisee or in some cases, another locksmith company not affiliated with us.

2.3    *Reservation of Other Rights*. Except as set forth above, Franchisor, for itself and its Affiliates and successors, expressly reserves the right to offer the Services under the Marks directly or through other Franchised Businesses at any location.

2.4    *Opening Date and Commencement of Services*. The parties intend that the Franchised Business will commence operation on the date specified for commencement of operations in Attachment 1 (the "Scheduled Opening Date"). Franchisee agrees to use its best efforts to execute a preliminary agreement with a lessor within 30 days of signing the Agreement and to execute a lease for an office location which meets Franchisor specifications within 60 days of signing the Agreement. Further, Franchisee agrees to open the Franchised Business within 120 days after execution of the lease. Franchisee may request an extension in writing from the Franchisor if Franchisee is unable to meet these deadlines. Franchisee further confirms and agrees that it will obtain and maintain all licenses, permits and inspection approvals required by law or regulation, and takes such other actions as may be necessary, to operate the Franchised Business at the Franchised Location from and after the Scheduled Opening Date. Franchisor may extend the Scheduled Opening Date by up to 60 days on written notice to Franchisee.

2.5    *Operation only from Franchised Location*. Franchisee and all employees and other representatives of Franchisee shall operate the Franchised Business at and solely from the Franchised Location, or such other location or locations as the Franchisor may agree to in advance in writing.

2.6    *Term*. The term of this Agreement shall commence on the Scheduled Opening Date (whether or not the Franchised Location is open for business on that date) and, unless sooner terminated as provided herein, shall continue for a term of ten (10) years, subject to renewal pursuant to Section 19.

2.7    *Management Personnel and Guarantee*. The grant of franchise in Section 2.1 is made by Franchisor based on and in reliance on the personal attributes and abilities of the management personnel named in Attachment 1 (the "Management Personnel"). Franchisee confirms and agrees that each of the Management Personnel will actively participate in the management of the Franchised Business. If a company (or other entity) has been designated as Franchisee hereunder, then each of the shareholders, members, managers, directors and officers of the such company will sign Franchisor's current form of guaranty (the "Guaranty") guarantying the full and complete performance of this Agreement by Franchisee, a copy of which is attached as Schedule C.

DocuSign Envelope ID: E878DB2C-95CF-4659-8031-64CF0644C631

## 3.   INITIAL FEES

3.1   ***Initial Franchise Fee.***   The initial franchise fee is $.12 per person in your territory.  The minimum territory size is 125,000 people which would equal a $15,000 franchise.  However, we will not generally sell a territory with fewer than 500,000 people in it, which equates to a $60,000 initial franchise fee.  We use the most recently published data from the U.S. Census Bureau or another source we deem reliable to determine population.

The Initial Franchise Fee is due upon signing of this Agreement and is non-refundable.  The initial franchise fee is fully earned upon receipt.

## 4.   ROYALTY AND FEES

4.1   ***Amount of Royalty.***   Franchisee shall pay to Franchisor a continuing royalty 8% of Gross Revenue.

4.2   ***Calculation and Payment.***   The Royalty and Customer Care Center Fee (discussed below) shall be paid monthly by way of electronic transfer (automatic debit) to Franchisor.  All Royalty and Call Center fees are billed on Gross Revenue two months after the month in which the sale of products or services took place, to aid the franchisee in managing cash flow.  Monthly reports and invoices are due from Franchisee by the 4th day, payments are due on the 8th day, and are delinquent on the 10th day of the subsequent month.  If monthly reports are not submitted by the 15th of the month, a $100 late fee applies.

Payment will be automatically debited from Franchisee's account on the 8th.  If payment is not received by the 10th, then 10% interest (based on estimated or actual amounts) will begin to accrue and an administrative fee of $150 will added to the ACH amount   Franchisee shall execute all banking forms and documents and do all other things necessary to facilitate such payments by way of electronic transfer (automatic debit).

The automatic debit amount for each month shall be calculated by the Franchisor based upon reconciling the Invoices with the Reports submitted by the Franchisee.  Should Franchisee fail to update the FieldLocate or another Scheduling System as required in a timely manner, Franchisor shall calculate the automatic debit amount based upon the most recent Monthly Report.  Any necessary reconciliation will be made during the month following receipt of the Monthly Report that was not timely submitted.

If the electronic transfer of the Royalty transfers are declined by Franchisee's bank for any reason, Franchisee shall reimburse Franchisor for all costs incurred by Franchisor in connection therewith, including any reasonable administrative fee as may be set by Franchisor from time to time.  Payments shall be processed through the Automated Clearing House ("ACH") electronic network.  ACH rules and regulations shall apply.

In addition, Franchisor may withhold and pay to itself or a supplier to whom Franchisee owes money, any amounts due from Franchisee from any monies owed to Franchisee by Franchisor or third parties, which such monies pass through Franchisor.

4.3   ***Customer Care Center***

4.3.1   Customer Care Center.  Franchisor shall maintain a customer care and call center (the "Customer Care Center") to process all orders for Services and to handle customer inquiries on a system-wide basis.  The Customer Care Center is intended to provide an efficient and uniform system for placement and retrieval of orders for Services and handling customers inquiries and complaints, and to provide a mechanism for establishing a client database and providing management reports to The Flying

DocuSign Envelope ID: E878DB2C-95CF-4659-8031-64CF0644C631

Locksmiths franchisees.  The Customer Care Center is for the benefit of all franchisees and providers of Services.  Franchisor undertakes no obligation to ensure that any particular franchisee benefits on a pro-rata basis from the Customer Care Center.

4.3.2    Receipt and Processing of Orders.  Promptly upon receipt of an order for Services within the Territory, Franchisor shall post such order on the Franchisor's system-wide intranet system ("FieldLocate or another Scheduling System").  Franchisee shall promptly retrieve all orders for the Services in the Territory from FieldLocate or another Scheduling System.

4.3.3    Franchisee Access to FieldLocate or another Scheduling System scheduling software.  Franchisee is required to license the appropriate number of users for the FieldLocate or other Scheduling System scheduling software.  It will be used for all scheduling and job reporting.

4.3.4    No Other Sales.  Franchisee acknowledges and agrees that except as explicitly provided for in this Agreement, Franchisee is not permitted to receive or fill any order for the Services within the Territory other than those orders that are placed or processed through the Customer Care Center and posted on FieldLocate or another Scheduling System.  Should Franchisee receive orders with Franchisee's local telephone number or any other method, Franchisee must process these orders through the Customer Care Center and FieldLocate or another Scheduling System.

4.3.5    Unsolicited Orders.  Notwithstanding the provisions of Section 4.3.4, if Franchisee receives a request to provide the Services to a new customer (the "Unsolicited Order") while providing services to another customer, and Franchisee's employees do not have the opportunity to first process the Unsolicited Order through FieldLocate or another Scheduling System before rendering the Services to such new Customer, Franchisee may service such Unsolicited Order provided that immediately after completion of the Unsolicited Order, Franchisee shall process the Unsolicited Order through FieldLocate or another Scheduling System  providing all the particulars of the Unsolicited Order including the name and address of the customer, the amount charged for the Services and the date on which the Unsolicited Order was made and completed.

4.3.6    Customer Care Center Fund.  Franchisee agrees that:

(a)    Franchisor shall maintain a fund to finance the operation of the Customer Care Center and FieldLocate or another Scheduling System (the "Customer Care Center Fund");

(b)    Franchisee shall contribute to the Customer Care Center Fund an amount equal to four percent (4%) of Gross Revenue (the "Customer Care Center Fee").  The Customer Care Center Fee shall be paid to Franchisor monthly in accordance with Section 4.2 of this Agreement;

(c)    except as expressly provided for in this Section 4.3, Franchisor assumes no obligation or liability to Franchisee with respect to the maintenance, direction, or administration of the Customer Care Center, FieldLocate or another Scheduling System, or Customer Care Center Fund. Franchisor shall have the sole right and responsibility to control and direct the policies, direction, administration, and operation of the Customer Care Center and FieldLocate or another Scheduling System. Franchisee is not a third party beneficiary and shall have no right to enforce any contributions from other franchisees or the administration of the Customer Care Center Fund.  Any obligation of Franchisor with respect to the Customer Care Center Fund shall be contractual in nature and it shall not constitute a trust fund;

(d)    Franchisee shall fully participate in all programs established by Franchisor involving the Customer Care Center and FieldLocate or another Scheduling System; and

DocuSign Envelope ID: E878DB2C-95CF-4659-8031-64CF0644C631

(e)      In the event of surplus funds at the end of any year, such funds will be applied to one or more of the following, in any combination as may be determined in Franchisor's absolute discretion: (i) carried forward and applied to the next year's operating costs, (ii) used for general advertising, or (iii) distributed pro rata to Franchised Businesses that contributed to the Customer Care Center Fund for that year. In the event of a shortage of funds in the Customer Care Center Fund at the end of any year, the Franchisor shall have the right to contribute the shortage to the Customer Care Center Fund and deem such contribution an account receivable from the Customer Care Center Fund, to be paid back in the next year, without interest.

4.4      *Van Leasing Management Fee.* You shall pay $10 per month per van to us to manage our outside vendor relation with the provider of service vans for franchisees.

4.5      *Scheduling Software Fees.* You must pay for user license for Scheduling Software and credit card POS systems as we designate. At present, user license are $60 per user per month and you will need at least four licenses to start your business. You will also need two credit card licenses at $10 per month. We reserve the right to vary these terms through our Manual or other notice to you and the dollar amounts charge may change.

4.6      *GPS Tracking with GeoTab.* At present you must pay $30 per month per van to Enterprise Fleet Management for GPS Tracking with GeoTab for your vans. We reserve the right to vary the dollar amount and payee upon a change in the fee or vendor designation.

4.7      *Bookkeeping Software.* You must use Quickbooks online for your business bookkeeping which presently costs $200 per year that you pay to Quickbooks. You must use Qbox to host your Quickbooks files. The monthly cost per user is $50. The fee is paid to Qbox. We reserve the right to vary the vendor designation and their fees may change from time to time.

4.8      *National Account Fees.* For National Account clients, we and the client may negotiate prices. If you accept a job offered by a national account client, you agree to charge the negotiated price. You do not have to accept a national account job offered to you. When we handle billing or invoicing on national account clients, we mark up the customer invoice approximately 1-20% and may impose certain other fees or fee splits. You agree to these mark ups, fees and fee splits.

4.9      *Third Party Charges.* If we pay monies to a third party on your behalf, you agree to reimburse these costs to us plus a reasonable fee for our administrative costs.

4.10     *Flight Control Licenses.* You agree to pay to us $50 per month per license for a minimum of three (3) Flight Control Licenses, for the customer management software that we have developed. We reserve the right to change the designated customer management software and fee amount.

**5.      SITE SELECTION**

5.1      *Site Selection - General.* In conjunction with signing this Agreement, Franchisor and Franchisee shall agree on an area in which the Franchised Business shall be located by Franchisee. This area shall be listed on Attachment 1. Franchisee must locate its Franchised Business within this area. Franchisee shall select a specific location for the Franchised Business using the criteria provided by Franchisor and subject to final approval by Franchisor. Franchisor does not guaranty the success or suitability of any specific location.

5.2      *Site Selection Criteria.* Site selection criteria are set forth in the Operations Manual. Some of the criteria are confidential. However, they include such factors as proximity to parking, street visibility, the demographics of nearby population centers, and so forth.

DocuSign Envelope ID: E878DB2C-95CF-4659-8031-64CF0644C631

6.     **PROMOTION AND ADVERTISING**

6.1     ***Local Advertising***. Franchisee is expected to develop a marketing plan for its local market. In order for the business to reach the maximum potential which the market allows, Franchisee must have an ongoing set of marketing activities designed to generate demand within the local market. Franchisor will provide Franchisee with initial training to help Franchisee implement a local marketing program effectively and in a cost-effective manner. At present, you must also pay $300 per month to our designated vendor to cover website management expenses. We may vary the nature of this program and the dollar amount in the Manual or otherwise over time. In addition:

(a)     ***Approval of Advertising***.  Franchisee must submit to Franchisor for its approval, which approval shall not be unreasonably withheld or delayed, all local advertising and promotional material, including in-store displays and promotions, to be utilized by Franchisee and until such time as Franchisor shall give its prior written approval to the use of such advertising and promotions, Franchisee shall not utilize same in any advertising or promotion. In no event will Franchisor take more than 15 days either to approve or to reject such local advertising or promotions material. Franchisor reserves the right to adopt any such advertising or promotions for general use in advertising or promoting the Services. Franchisee, in submitting any such advertising or promotions, agrees that each such submission shall constitute an irrevocable and perpetual assignment to Franchisor of the copyright with respect to such submission, and upon each such submission the contents thereof shall be deemed the exclusive property of Franchisor;

(b) ***Displays of Signs***. Franchisee shall prominently display, at its expense, in connection with the Franchised Business signs of such nature, form, color, number, location and size and containing such matter as Franchisor may direct or approve in writing from time to time and such signs shall be purchased from Franchisor or from suppliers designated or approved by Franchisor;

(c) ***Franchisor as Owner of Copyrights***. Franchisee acknowledges that Franchisor is the sole and exclusive owner of all copyrights and that all advertising and promotional material (including Copyrighted Materials) prepared by or on behalf of Franchisor shall at all times remain the property of Franchisor; and

(d) ***Prohibited Displays***. Franchisee may not distribute or display at the Franchised Business, or allow to be distributed or displayed at the Franchised Business, any signs, posters, or other items that may (i) associate the Intellectual Property and Program with political, religious, or social groups or movements; or (2) bring discredit to the Intellectual Property or Program.

(e) ***Verification of Spending***. Franchisee agrees to submit proof of adequate spending, which we shall reasonably determine based upon the maturity of your business, on local advertising to Franchisor within ten (10) days of written request by Franchisor.

7.     **PRODUCTS AND SERVICES OFFERED**

7.1     ***Product Mix***. Franchisees must offer to the public all products and services as specified by Franchisor. At present, this includes, locksmith and security services and products for commercial, residential and automotive customers. Franchisee must offer all of the products and services that Franchisor designates are part of the Program, and nothing else, except with Franchisor's written approval beforehand. Franchisor may require Franchisee to (i) change, add or discontinue particular products or services; and (ii) add, modify and discontinue certain designated vendors of designated goods or services or recommended vendors of non-designated goods or services.

7.2     ***Changes to Product Mix***. Franchisor reserves the right to add or delete additional products over time and as market conditions warrant. For example, at a later date, Franchisor may expand the product

DocuSign Envelope ID: E878DB2C-95CF-4659-8031-64CF0644C631

offerings to include other security products or services. These changes may increase Franchisee's operating expenses. Franchisor will communicate all changes by written or electronic bulletins or revisions to the confidential Operations Manual. There is no limit on the frequency that Franchisor may impose these modifications. Franchisee will be given a reasonable time period after notice in which to implement other changes including the introduction of new product offerings. Franchisee may not place new orders with any vendors whom Franchisor removes from the approved list.

7.3     ***Purchase of Products from Franchisor.*** Franchisee agrees to purchase only such products and other items from Franchisor as specified in the Operations Manual and in such quantities as reasonably specified by Franchisor for satisfactory operation of the Franchised Business.

7.4     ***Limitations on Products and Methods of Sale.*** Franchisee agrees to limit sales only to retail transactions of authorized products and services to retail customers. Franchisee agrees not to engage in wholesale sales of any kind without the prior written consent of Franchisor. "Wholesale sales" includes the sale or distribution of products or services to a third party for resale, retail sale or other method of distribution (for example, supplying a hardware store with products). Franchisee is not permitted to engage in online or Internet sales of any products.

7.5     ***Reservation of Franchisor Distributor Rights.*** Franchisee agrees and acknowledges that Franchisee does not have exclusive or preferential rights to Franchisor's Intellectual Property, the Program, or the Confidential and Proprietary Material. Franchisee agrees and acknowledges that this Agreement does not in any way limit Franchisor's use of Franchisor's Marks, intellectual property, the Program, or Confidential and Proprietary Material anywhere or for any purpose that is not reserved to the Franchisee in this Agreement.

## 8.     OPERATION OF FRANCHISED BUSINESS

8.1     ***Standards of Operation.*** Franchisee acknowledges that the Intellectual Property, the Program, the Confidential and Proprietary Material, and every other component of the Program are important to Franchisor and its franchisees, and Franchisee and its general manager(s) covenants and agrees to comply with the Program, in its entirety as outlined in the Operations Manual which may be modified by the Franchisor from time to time, and in particular Franchisee covenants and agrees that Franchisee shall:

(a)     ensure that the operation of the Franchised Business is at all times under the direct control of the Franchisee or General Manager(s) as provided in Section 11.1. When the person exercising direct control is absent from the Franchised Location due to illness, vacation or any other reason, Franchisee shall ensure that the Franchised Business is under the direct control of a member of the Management Personnel or a trained representative or employee of Franchisee approved in advance by Franchisor in its discretion;

(b)     operate the Franchised Business strictly in accordance with the standards of customer service, cleanliness, environmental safety, consistency, operation, advertising, promotion and management prescribed by Franchisor in the Operations Manual and by law;

(c)     comply with all business policies, practices and procedures prescribed by Franchisor and outlined in the Operations Manual and this Agreement;

(d)     keep the Franchised Business continuously open for business during all hours and days specified in writing by Franchisor from time to time, subject to compliance with the hours of operation required by local laws, if applicable;

DocuSign Envelope ID: E878DB2C-95CF-4659-8031-64CF0644C631

(e)     prepare and sell to the public only the products and services designated or approved in writing by Franchisor from time to time;

(f)     maintain the Franchised Business in a clean and attractive condition so as to preserve, maintain and enhance the reputation and goodwill of the Franchisor;

(g)     not alter, modify or otherwise change, add to or delete from any portion of the Intellectual Property, the Program, or the Confidential and Proprietary Material as licensed hereunder;

(h)     maintain at all times a sufficient number of properly trained employees to service customers of the Franchised Business, and maintain an inventory of goods and supplies sufficient to satisfy customer demand;

(i)     hire and supervise efficient, competent, sober and courteous operators and employees for the operation of the Franchised Business and set and pay their wages, commissions, benefits and incentives without any liability or obligation to Franchisor;

(j)     cause all employees, while engaged in the operation of the Franchised Business, to wear uniforms of the color, design and other specifications only in accordance with the provisions of the Operations Manual, or in such manner as may be approved in advance in writing by Franchisor, and to present a neat and clean appearance and render competent and courteous service to the customers of the Franchised Business;

(k)     use, publish or display in connection with the operation of the Franchised Business only the signs, advertising or other materials designated or approved by Franchisor from time to time;

(l)     operate the Franchised Business only under the Marks, as designated by Franchisor, without any accompanying words or symbols of any nature except as designated or approved in writing by Franchisor;

(m)     make prompt payment in accordance with the terms of invoices rendered to Franchisee in connection with the purchase of all inventory, fixtures, equipment, supplies, advertising materials, clothing, products and any other goods, supplies, services or products supplied to Franchisee from time to time;

(n)     obtain and maintain in force all required licenses, permits, approvals, and certificates relating to the operation of the Franchised Business and operate the Franchised Business in full compliance with all applicable laws and regulations, including but not limited to, all governmental regulations relating to environmental safety, occupational health and safety, ERISA, workers' compensation insurance, unemployment insurance, withholding and payment of all federal and state taxes including without limitation FICA, FUTA, income tax, sales tax and personal property tax, use tax and license fees;

(o)     advise all suppliers, contractors, employees and others with whom Franchisee deals, that Franchisee is an independent contractor and that all debts, liabilities and obligations incurred by it are for the account of Franchisee only, and not Franchisor;

(p)     faithfully observe and perform in a timely fashion all covenants to be observed and performed by Franchisee pursuant to any lease for the Franchised Business location or the equipment therein;

DocuSign Envelope ID: E878DB2C-95CF-4659-8031-64CF0644C631

(q)     conduct all advertising and use all media in accordance with lawful business practices and only in accordance with the provisions of the Operations Manual, or in such manner as may be approved in advance in writing by Franchisor;

(r)     attend all franchise conferences and meetings as required by Franchisor from time to time;

(s)     participate in such programs as Franchisor may require from time to time, including the servicing of national, system-wide or other special accounts as may be designated in the Operations Manual, or in such manner as may be approved in advance in writing by Franchisor, including provision of service-levels as may be required for specified accounts and the use and honoring of gift certificates and coupons;

(t)     replace such items of equipment which have become obsolete or otherwise mechanically impaired, to the extent they require replacement, or as required by Franchisor from time to time;

(u)     identify Franchisee as an "independently owned and operated business" on all invoices, contracts, agreements, correspondence and other materials and communications used in the Franchised Business and not make any registration of any of the Intellectual Property that would grant or suggest Franchisee has ownership of the Intellectual Property; and

(v)     use an accounting system and program acceptable to Franchisor.

8.2     ***Proposed Goods and Services***.  If Franchisee proposes to offer for sale through the Franchised Business any good or service not previously designated or approved by Franchisor, then Franchisee must first submit the proposed good or service description to Franchisor for consideration and approval. Franchisor will consider the proposed goods or services and respond to Franchisee within a reasonable time as to whether or not it is approved for sale through the Franchised Business. Franchisor reserves the right to make alterations to the proposed good or service as a condition of approval. Franchisor also reserves the right to adopt any such good or service for use as a standard item forming part of the Services so as to maintain consistency and enhance the Program. Franchisee, in submitting any such proposal to Franchisor agrees that Franchisor may take such action, that each such submission by Franchisee to Franchisor shall constitute an irrevocable and perpetual assignment of the copyright and waiver of moral rights for the service to Franchisor, and upon each such submission shall be deemed to be part of the Program of Franchisor.

8.3     ***Pricing***.  Franchisor will deliver to Franchisee, prior to the Scheduled Opening Date, Franchisor's current list of suggested prices for the goods and services it will sell, which may vary among various franchises. Franchisor will give Franchisee written notice of all changes to suggested prices (including any temporary promotional changes). Franchisee is under no obligation to adhere to the suggested prices, but should be aware that promotional and marketing materials and campaigns prepared and provided by the Franchisor may include such prices.

8.4     ***Program Changes***.  Franchisor may from time to time, by written notice to Franchisee, add to, delete, modify or otherwise change the Program, including without limitation by deleting or adopting new or modified Marks, new or enhanced services, and new techniques in connection therewith. Franchisee will, at its own cost, within a reasonable amount of time following receipt of such notice, accept, implement, use and display all such changes.

8.5     ***Purchase Arrangements and Rebates***.  Franchisor reserves the right to negotiate and to enter into purchase arrangements and rebate agreements with suppliers of products or services used in the Program, including products or services that must be purchased by Franchisee.  Should Franchisor receive any discounts, rebates, or other monetary compensation from vendors, then Franchisor shall contribute one

DocuSign Envelope ID: E878DB2C-95CF-4659-8031-64CF0644C631

half of all amounts actually received by Franchisor to the Franchise Promotional Fund. The other half shall be retained by Franchisor.

## 9.     CUSTOMER METHODS OF PAYMENTS; PAYMENTS TO SUPPLIERS

9.1     *Credit Cards and Other Methods of Payment*.  Franchisee will maintain arrangements with Visa, MasterCard, American Express, Discover and additional or replacement credit card and debit card issuers or sponsors nominated by Franchisor from time to time, in order that the Franchised Business may accept customers' credit cards, debit cards, checks and other methods of payment. Whenever Franchisor designates a new payment system or financial institution for the Program, Franchisee agrees to adopt the designated system promptly.

9.2     *Payments to Suppliers*.  Franchisee will make all payments to Franchisor and suppliers when due and provide proof of payment to Franchisor upon request. Franchisee acknowledges that failure to timely pay a supplier could harm the reputation of the Program and the relationship of Franchisor and its other franchisees with such supplier.  If Franchisee fails to pay any supplier in full when due, then Franchisor shall have the right, but not the obligation, to pay all or any portion of the sum due, together with accrued interest and penalties. If Franchisor makes any such payment, then Franchisor may invoice Franchisee for such payment and Franchisee shall reimburse Franchisor immediately upon receipt of the invoice, or Franchisor may withhold and pay to the supplier such sums from any monies owed to Franchisee by Franchisor or third parties, which such monies pass through Franchisor.

## 10.     RECORDS AND REPORTING

10.1     *Sales Records*.  Franchisee shall keep true and accurate records and books of account in relation to the Franchised Business, including daily records of services to individual customers and of Gross Revenue, in such form and detail as Franchisor in writing requires from time to time.

10.2     *Preservation of Records*.  Franchisee shall keep and preserve for a period of at least 36 months after the end of each year all books and records (including point of sale records, computer generated records and evidence of all sources and amounts of individual sales and Gross Revenue) related to such year.

10.3     *Weekly, Monthly, and Annual Reporting*.  Franchisee shall report to Franchisor as follows:

(a)     On the first Tuesday following the week for which the Royalty payment is due, Franchisee shall provide Franchisor with a report in electronic form ("Report") containing:

(i) a correct and complete statement of all sales and Gross Revenue for the preceding Monday through Sunday time period; and

such other financial information as Franchisor may require from time to time.

The Report shall contain all information noted therein and shall be certified as correct by Franchisee. Upon request by Franchisor, Franchisee will supply copies of some or all of the sales records (in all relevant media) related to the period being reported on. With each Report, Franchisee shall pay to Franchisor the Royalty payable for such period in compliance with Section 4.2.

(b)     monthly profit & loss statements and balance sheets using the format designated by Franchisor; and

DocuSign Envelope ID: E878DB2C-95CF-4659-8031-64CF0644C631

(c)     within 90 days after the end of each fiscal year of Franchisee, Franchisee shall submit to Franchisor (in electronic form whenever possible) the following information concerning such fiscal year, certified as correct by Franchisee:

(i)   a statement of Gross Revenue and individual products sold for such year as finally adjusted and reconciled after the close and review of Franchisee's books and records for the year. If such statement discloses any underpayment of Royalties for such year, then Franchisee shall pay to Franchisor, at the time of submitting such statement, the amount of such underpayment. Any overpayment disclosed by such statement shall be credited to Franchisee's Royalty account by Franchisor;

(ii)  complete financial statements, including balance sheet, income statement and statement of changes in financial position, all prepared in accordance with U.S. generally accepted accounting principles applied on a basis which is consistent with prior fiscal years of Franchisee;

(iii) Federal and State tax returns; and

(iv)  such other reports and financial information (including up-to-date personal financial information concerning guarantors of Franchisee, if applicable) as Franchisor may reasonably require from time to time.

10.4    ***Inspection and Audit Rights***.  Franchisor and any of its representatives shall be entitled, during the regular business hours of the Franchised Business and without undue disturbance to it, to enter the premises of the Franchised Business to inspect and take copies of all paper and electronic records of Franchisee relating in any way to the Franchised Business, whether or not of a financial nature, all without prior notice to Franchisee. Franchisor may cause its auditor to conduct an audit of the Franchised Business for any fiscal year of Franchisee or any calendar year or time period. Franchisee consents to the Franchisor directly contacting and obtaining information from any creditors or suppliers of the Franchisee. Upon request by Franchisor, Franchisee will: (i) allow Franchisor and its representatives access to at all reasonable times; or (ii) forward to Franchisor any and all business and financial records of the Franchised Business, including financial statements, accounting records, federal and state income, sales, business and occupation and other tax returns of Franchisee at any time and the opportunity to take copies thereof at Franchisor's expense. If any such audit reveals a material deficiency (3% or more error), whether monetary or otherwise, then the Franchisee shall reimburse the Franchisor for the reasonable costs of the audit and any related enforcement.

10.5    ***Notice to Meet Standards***.  Should any inspection or audit reveal any non-compliance with the Program or failure to meet the standards of operation, management, production, employee training, service, cleanliness, environmental safety, consistency, quality control or advertising and promotion set by Franchisor from time to time, then Franchisee shall immediately upon receipt of notice from Franchisor specifying the particulars of the non-compliance or failure by Franchisee, do all things necessary to correct the non-compliance or failure, in addition to co-operating with the representatives of Franchisor in respect of any training or retraining determined necessary by Franchisor.

10.6    ***Corporate Records***.  If Franchisee is an entity, Franchisee will complete and remit Franchisor's company information form, and provide such other information and certificates regarding the company structure of Franchisee as required by Franchisor, and Franchisee agrees to update such information from time to time.

DocuSign Envelope ID: E878DB2C-95CF-4659-8031-64CF0644C631

## 11.   MANAGEMENT AND EMPLOYEES

11.1   ***Management Personnel.*** Franchisee or, if Franchisee is an entity, its managers, key owners and key management personnel (or any replacement(s) approved in writing by Franchisor) shall complete initial training to the satisfaction of Franchisor prior to the Scheduled Opening Date, unless waived in writing by Franchisor in its sole discretion for any particular person(s). Once approved, Franchisee will cause Management Personnel to participate, on a full-time working basis (i.e., a minimum of 40 hours per week), in the management and operation of the Franchised Business. Franchisee shall verify that all Management Personnel have the legal right to work in the United States.

The Management Personnel named first in Attachment 1 shall be the initial general manager of the Franchised Business (hereinafter called the "General Manager," which term shall include every other person who in the future acts as a general manager of the Franchised Business). Franchisee shall ensure that every person who acts as General Manager from time to time is not (while so acting) engaged in any retail business activity other than the Franchised Business. Like other initial Management Personnel, the General Manager must participate on a full time basis (i.e., a minimum of 40 hours per week) in the operation of the Franchised Business.

11.2   ***Employees.*** Franchisee will hire all employees of the Franchised Business, and shall be responsible exclusively for payment of wages, benefits, statutory remittances and compliance with other terms and conditions of their employment and for the proper training of them in the operation of the Franchised Business. Franchisee will designate a senior locksmith to attend training who is then responsible for certifying all future locksmiths hired. At the direction of Franchisor, Franchisee will cause such employees as may be designated by Franchisor who are not involved in initial training to complete training programs developed by Franchisor. Franchisee will be solely responsible for all direct and indirect costs of such training in accordance with sections 14.1 and 14.2. Franchisee shall verify that all employees have the legal right to work in the United States.

11.3   ***Salesperson.*** Franchisee agrees to hire and maintain a full time sales person (40 hours per week) on field sales activities. If and when your business grows to the point that you have five Vehicles in service, you agree to hire and maintain a second full time sales person. We reserve the right to vary these requirements in the Manual.

## 12.   LICENSE, USE OF MARKS AND COPYRIGHTED MATERIALS, CONFIDENTIAL INFORMATION AND KNOW-HOW

12.1   ***Nature of Permission.*** The permission granted by this Agreement is to use the Program, Intellectual Property, and the Confidential and Proprietary Material only in connection with operation of one Franchised Business (unless otherwise agreement in writing) during the Term. Nothing in this Agreement shall give Franchisee any other right, title or interest in or to any part of the Program, Intellectual Property, or the Confidential and Proprietary Material. Franchisee acknowledges that Franchisee's use of the Program, Intellectual Property, and the Confidential and Proprietary Material and any goodwill established by such use inures to the exclusive benefit of Franchisor. You may not directly or indirectly oppose our right to our trademarks, trade names, trade secrets or business techniques that are part of our business.

12.2   ***Use of Name and Marks.*** Franchisee shall operate the Franchised Business continuously throughout the Term and any duly exercised Renewal Term under the name The Flying Locksmiths (including use of ™ or ® as appropriate) or such alternate name or names as Franchisor may direct in accordance with the provisions of the Operations Manual, or in such manner as may be approved in advance in writing by Franchisor from time to time, and Franchisee's name shall be clearly marked on all documented and electronic representations of the Franchised Business as well as on all Franchisee's advertising, stationery, business cards, purchase orders, sales slips, checks, and other business documents

-14

DocuSign Envelope ID: E878DB2C-95CF-4659-8031-64CF0644C631

in a manner specified or approved by Franchisor and which clearly indicates that Franchisee is the person, firm or corporation, as the case may be, operating the Franchised Business pursuant to permission from Franchisor. Franchisee shall use ®, TM or some other symbol directed by Franchisor, to indicate to the public that each of the Marks is a trademark belonging to Franchisor and shall in such usage clearly indicate this by using the phrase "*Trademark rights owned by The Flying Locksmiths, Inc.*" or some other phrase designated or approved by Franchisor. Franchisee shall not use, as part of the corporate name of any corporation or other business entity which may operate the Franchised Business (or any other corporation or business entity in which Franchisee has any interest), any of the Marks or any variation or derivative thereof or any word or phrase or combination of words confusingly similar thereto, nor may Franchisee use the Marks in connection with the sale or offering for sale of any item which has not been properly approved for sale pursuant to this Agreement. All provisions of this Agreement applicable to the Marks shall apply to any additional proprietary trade and service marks and commercial symbols hereafter authorized by Franchisor for use by Franchisee from time to time.

You cannot use any of the Marks as a part of any corporate name with any prefix, suffix or other modifying words, terms, designs or symbols. In addition, you may not use any name or mark associated with the sale of any unauthorized product or service in any other manner not explicitly authorized in writing by us.

12.3    ***Use of Copyrights***. Franchisee acknowledges that Franchisor is the owner of the copyright in the Operations Manual and all other systems, binders, videotapes, software, and printed materials which from time to time form part of the Program (as well as all revisions and additions of or to any of the foregoing), which is all part of the Confidential and Proprietary Material. Franchisee acknowledges that Franchisee's right to use the Confidential and Proprietary Material is derived solely from this Agreement and is limited to the conduct of business by Franchisee pursuant to and in compliance with this Agreement and all applicable specifications, standards and operating procedures prescribed in writing by Franchisor during the Term and any exercised Renewal Term. Any unauthorized use of any of the Confidential and Proprietary Material by Franchisee shall be an infringement of the rights of Franchisor-in and to the Confidential and Proprietary Material and shall constitute a breach of this Agreement. Franchisee agrees not to contest or oppose, nor to assist anyone else to contest or oppose, Franchisor's application for registration or protection of any of copyright or trademark in the United States or elsewhere. Franchisee will ensure that all Confidential and Proprietary Material used by Franchisee bear whatever notice, may be prescribed from time to time in writing to Franchisee by Franchisor.

12.4    ***Notification of Infringement***. Franchisee shall notify Franchisor immediately upon learning of any apparent or potential infringement of or challenge or claim to any of the Intellectual Property or any of the Confidential and Proprietary and Franchisee shall not communicate with anyone other than Franchisor and its legal counsel in connection with any such infringement, challenge or claim. Franchisor shall have sole discretion to take such action as it deems appropriate and the right to control exclusively any litigation or other proceeding arising out of any such infringement, challenge or claim, and Franchisee agrees to execute all documents, to render such assistance and to do all acts and things as may, in the opinion of Franchisor or its legal counsel, be necessary or advisable to protect and maintain the interests of Franchisor in any such litigation or other proceeding or otherwise to protect and maintain the interests of Franchisor and its franchisees in the Intellectual Property and the Confidential and Proprietary Material.

12.5    ***Act in Derogation of Franchisor's Rights***. Franchisee acknowledges that all goodwill and ownership rights arising out of the use by Franchisee of the Program, Intellectual Property, and the Confidential and Proprietary Material shall accrue solely to Franchisor and the Program as a whole, and that now and hereafter Franchisee shall assert no claim to any goodwill by virtue of the permitted use thereof. Franchisee will not dispute or impugn the validity of any of the Intellectual Property or Confidential and Proprietary Material or the rights of Franchisor thereto, or do or assist others to do or permit any act or thing to be done in derogation of same. Franchisee will take such action (including

DocuSign Envelope ID: E878DB2C-95CF-4659-8031-64CF0644C631

signature and assistance in preparation of documents or the giving of testimony) as may be requested by Franchisor to evidence, transfer, vest or confirm the Company's rights and ownership in the Intellectual Property, the Confidential and Proprietary Material, and any other part of the Program. If Franchisor is unable for any reason to secure Franchisee's signature to fulfill the intent of this paragraph, then Franchisee irrevocably appoints the Franchisor and its authorized agents as agent and attorney in fact, to transfer, vest or confirm Franchisor's rights and to execute and file any such applications and to do all other lawful acts to further the intent of this Section with the same legal force as if done by Franchisee.

12.6   ***Changes in Marks and Copyrighted Materials.***  If Franchisor deems it advisable to modify or discontinue use of any of the Intellectual Property or Confidential and Proprietary Material, or to adopt for use in the Program any additional or substitute marks or copyrights, then Franchisor shall give written notice thereof to Franchisee whereupon Attachment 2 hereto shall be deemed to be amended accordingly and Franchisee shall promptly comply with such amendment. All provisions of this Agreement applicable to Intellectual Property and/or Confidential and Proprietary Material shall apply to all additional, substituted or modified Intellectual Property and/or Confidential and Proprietary Material hereafter adopted by Franchisor or its Affiliates and authorized for use by Franchisee by written notice.

12.7   ***Use of Know-How.***   Franchisee acknowledges that Franchisor possesses know-how comprised of methods, techniques, specifications, materials, procedures, information, systems and knowledge of and experience in the provision of the goods and services through the Franchised Business (collectively, the "Know-How"). This Know-How is part of the Confidential and Proprietary Material. Franchisor will disclose the Know-How to Franchisee in the training program, the Operations Manual and in guidance furnished to Franchisee during the Term and any exercised Renewal Term. Franchisee will not acquire any proprietary interest in the Know-How or any part of it, other than the right to use it in the development and operation of the Franchised Business during the Term and any duly exercised Renewal Term, in full compliance with this Agreement. Franchisee acknowledges that the Know-How is proprietary and, except to the extent that it is or becomes generally known in the locksmith industry, the Know-How and every part of it comprises a valuable trade secret of Franchisor.

12.8   ***Confidential Information.***   Franchisee acknowledges that the designs, materials and other features of the Program, as well as the Confidential and Proprietary Material, which includes, but is not limited to, the Know How, supplier lists, product ingredients, production methods, equipment used, and related techniques, procedures, methods, financial information, passwords, systems and format now and hereafter comprising the Program, which is revealed to Franchisee, is confidential information. This confidential information is revealed in strictest confidence to Franchisee and Franchisee covenants to keep and respect the confidence so reposed. Franchisee shall neither use nor permit any of its directors, officers, shareholders, employees, agents or other representatives to use for any purpose inconsistent with this Agreement nor reveal to any person, firm or corporation, both while this Agreement is in force and for an unlimited time thereafter, any confidential information which Franchisee has acquired through or as a result of its relationship with Franchisor. Franchisee will cause the employees of the Franchised Business to sign a form of confidentiality covenant prepared by Franchisor.

12.9   ***Proprietary Rights to Program and Operations Manual.***   Franchisee acknowledges that Franchisor is the sole and exclusive owner of all proprietary rights in and to the Program and that the information revealed in the Operations Manual constitutes Confidential and Proprietary Information and copyrighted material.  Without the prior written consent of Franchisor, which Franchisor can withhold in its sole and absolute discretion, Franchisee shall not use the contents of the Operations Manual for any purpose not related to this Agreement, shall not disclose the contents of the Operations Manual to any person (except to employees of Franchisee on a need to know basis for purposes related solely to the operation of the Franchised Business) and shall not publish, reprint or reproduce the Operations Manual in whole or in part for any purpose. Franchisee shall take all safeguards and precautions specified by Franchisor from time to time or as would be expected to be exercised by a careful person entrusted with

DocuSign Envelope ID: E878DB2C-95CF-4659-8031-64CF0644C631

valuable property of another, to protect and maintain the confidentiality of the Operations Manual. The covenants contained in this Section 12.9 will survive the termination of this Agreement for such period of time as such information remains confidential to Franchisor and does not fall into the public domain. Franchisor reserves the right at any time upon written notice to Franchisee to more particularly specify or define any items of information or materials which Franchisor considers to be confidential information for the purposes of the ongoing application and survival of Franchisee's covenants herein. Franchisee hereby acknowledges that the Operations Manual is loaned to Franchisee and shall at all times remain the sole and exclusive property of Franchisor, and upon the expiration or termination of this Agreement for any reason whatsoever, Franchisee shall forthwith return the Operations Manual together with all copies of any portion of the Operations Manual which Franchisee may have made, to Franchisor. Franchisee acknowledges and agrees that Franchisor may make additions, deletions and other revisions to the Operations Manual from time to time, in its sole discretion.

## 13.   FURTHER OBLIGATIONS OF FRANCHISEE

13.1     ***Compliance with Operations Manual***.  Franchisee shall conduct the Franchised Business strictly in accordance with all of the provisions set out in the Operations Manual, as amended from time to time. In particular, Franchisee shall promptly adopt and use exclusively the specifications, standards, methods and policies contained in the Operations Manual, now, and as they may be modified by Franchisor from time to time.

13.2     ***Signage***.  Any signage procured for the Franchised Business will conform to Franchisor's specifications. Franchisor will provide written specifications for such signage to Franchisee upon request. When signage is procured pursuant to a lease, the lease must be assignable to Franchisor and Franchisee will submit such lease to Franchisor for its written approval prior to executing it.

13.3     ***Standards of Service***.  Franchisee and employees of the Franchised Business will at all times give prompt, courteous and efficient service to customers, and will, in all dealings with customers, suppliers and the public, adhere to the highest standards of honesty, integrity, fair dealing and ethical conduct. Franchisee will respond to customer, supplier and public complaints in a prompt, courteous and efficient manner.

13.4     ***Taxes and Rents***.  Franchisee will pay in a timely manner all local, state and federal sales, business, property, goods and services taxes and all other taxes, rates, levies and fees levied or assessed by any governmental authority directly or indirectly in connection with the Franchised Business.

13.5     ***Compliance with Laws***.  Franchisee will operate the Franchised Business in strict compliance with all applicable laws and regulations.

13.6     ***Sufficient Staff***.  Franchisee will at all times employ a sufficient number of properly trained, courteous and service oriented staff to properly operate the Franchised Business during normal business hours.

13.7     ***Inspection Rights***.  Franchisee authorizes Franchisor and its representatives to enter the Franchised Business at any reasonable time or times to inspect the store and the inventory, fixtures, furnishings, and equipment therein, to confer with or otherwise contact Franchisee's employees, to examine and inspect the operation of the Franchised Business and in all respects to determine compliance with this Agreement (including the Operations Manual).

13.8     ***No Solicitation of Employees***.  Franchisee will neither employ nor solicit employment of anyone who is employed by Franchisor, any Affiliate of Franchisor, any other franchisee of the Program or any other franchisee of another system operated from time to time by Franchisor or any of its Affiliates,

DocuSign Envelope ID: E878DB2C-95CF-4659-8031-64CF0644C631

without the prior written consent of the employer, unless the employee in question has ceased to be employed by such employer for a period of 90 days.

13.9     **_Hazardous Materials_**. Franchisee will not deal in any way with any hazardous materials in the operation of the Franchised Business.

13.10     **_Use of Media_**. Franchisee agrees that for purposes of advertising and public relations related to the Program, Franchisor may make, reproduce and publish in good taste photographs, videos and other media utilizing the Franchised Location and the employees and customers of Franchisee on an individual or collective basis. Franchisee will cooperate with Franchisor in this regard.

13.11     **_Insurance_**. Franchisee will ensure that the following insurance coverages are placed and maintained during the entire Term and any duly exercised Renewal Term:

    (a)     reasonable comprehensive public liability and property damage insurance, including personal and bodily injury liability, contractual liability, employers' liability, and owners' and contractors' protective insurance coverage with respect to the activities conducted by Franchisee and any employee, agent or other person performing work on behalf of Franchisee with respect to the Franchised Business, with a policy limit of not less than $2,000,000 general liability coverage (including personal injury) or such greater amount as may be specified in writing by Franchisor from time to time and not less than $1,000,000 per occurrence for personal and bodily injury liability and not less than $100,000 per occurrence for damage to rental premises or such greater amount as may be specified in writing by Franchisor from time to time, and not less than $5,000 medical coverage for any one person or such greater amount as may be specified in writing by Franchisor from time to time;

    (b)     reasonable products liability/completed operations insurance with a policy limit of not less than $2,000,000; and

    (c)     reasonable business interruption insurance in respect of the Franchised Business with a policy limit not less than that which may be prescribed by Franchisor from time to time.

    (d)     Owned and non-owned vehicle liability insurance with a policy limit of not less than $1,000,000 per occurrence or such other amount as may be specified in writing by Franchisor for any vehicle used to any extent in the Franchised Business; and

    (e)     workers' compensation as required by local law.

The insurers, amounts and types of insurance shall be subject to prior written approval of Franchisor, which Franchisee will seek in a timely fashion. Franchisor may from time to time require that Franchisee cause such coverages to be added to or otherwise amended in accordance with recommendations of Franchisor's independent insurance advisor. The foregoing insurance coverages, as so amended from time to time, are hereinafter called the "Coverages."

Franchisor, acting reasonably, may elect, at any time, upon the recommendation of its independent insurance advisor, to require Franchisee, either individually or as part of a group of franchisees, to place the Coverages (or any them) through Franchisor, in which case Franchisee will pay its proportionate share (with other franchisees of the Program) of all costs thereof, upon receiving invoice(s) therefor.

All policies of insurance for the Coverages shall expressly include Franchisee, Franchisor, and Franchisor's Affiliates, as "franchisor/additional insured" and shall require the insurers to defend Franchisee

DocuSign Envelope ID: E878DB2C-95CF-4659-8031-64CF0644C631

and Franchisor, jointly and severally, in all claims and actions to which the Coverages are applicable. Such policies shall require provision of 30 days' notice to Franchisor prior to any termination.

Within 10 days of entering into any policy of insurance, and from time to time as such policies are renewed or entered into, Franchisee shall cause insurer to forward a certificate of insurance directly to Franchisor confirming the terms and coverages set forth in this Section 13.

Franchisee understands and acknowledges that Franchisor is not an insurance broker. Nothing done by Franchisor pursuant to this Section 13.11 shall constitute an assurance that Franchisee has adequate insurance for its assets, business and potential liabilities at the Franchised Business and Franchisee may place additional insurance as it sees fit, upon the advice of its own insurance broker.

13.12  ***Tools, locksmith equipment, inventory and vehicle***.  Franchisee must purchase items which conform with Franchisor's specifications and/or vendor designations. Franchisor will provide written specifications and any vendor designations for such items in the Operations Manual.

13.13  ***Fixtures and Equipment***.  Franchisee must purchase (or, if appropriate, lease) the required fixtures, equipment and other items as set forth in the Operations Manual.

13.14  ***Maintain Minimum Capital***.  Franchisee will maintain, throughout the Term and any exercised Renewal Term, sufficient capital to operate the business and which amount may be determined by the Franchisor from time to time. Capital shall be calculated as the aggregate amount of cash in share capital and shareholders' loans maintained by a corporate Franchisee or cash contributed to the Franchised Business in the case of a personal Franchisee.

13.15  ***Grand Opening***.  Franchise shall hold a Grand Opening following the opening of the Franchised Business.  The general requirements for the Grand Opening are set forth in the Operations Manual. Franchisor must pre-approve Franchisee's proposed Grand Opening budget and plan.

## 14.  TRAINING AND FURTHER OBLIGATIONS OF FRANCHISOR

***14.1  Training***.  Franchisor shall provide one initial training and certification session of 5 days of technical training for a lead locksmith and 5 days of business operations training for Franchisee. Within 30 days of signing this Agreement, Franchisee shall provide Franchisor a list of those attending training. The majority of the training will be held in the state of Massachusetts or at such another location the Franchisor selects.  The scheduling of the actual training will be done so as to occur within 60 days of Franchisee's planned opening. The format and content of the training program will be determined solely by Franchisor. All expenses incurred by Franchisee and other trainees in connection with such training including without limitation those related to transportation, accommodation, meals and other living expenses, wages and other employment benefits shall be at the sole expense of Franchisee. Franchisor will not provide wages or employee benefits to Franchisee or other trainees during or with respect to the training period. Franchisee must attend and successfully complete initial training to Franchisor's satisfaction.

***14.2  Retraining and Subsequent Training***. In the event that Franchisee is not operating the Franchised Business in full accordance with the Program and this Agreement, which determination Franchisor shall make in its sole discretion, Franchisor shall have the right to require retraining of the Franchise, or the representatives and employees of Franchisee.  Franchisee shall pay Franchisor $300 per day per person for this retraining.  Franchisee is responsible for all out-of-pocket costs incurred in connection with such retraining, including all transportation, lodging and meal expenses.  Any manager that Franchisee subsequently hires must also satisfactorily complete all or part the training and certification program. Franchisee must pay $300 per day per person for tuition and training materials. Franchisee is responsible for all out-of-pocket costs incurred in connection with such retraining, including all transportation, lodging and meal expenses.

DocuSign Envelope ID: E878DB2C-95CF-4659-8031-64CF0644C631

14.3   ***Initial and Ongoing Information, Goods and Services***.   Franchisor shall provide to Franchisee:

(a)   one Operations Manual on loan.  This may be by online access with a password as opposed to a "hard copy" of the manual;

(b)   additional training materials developed by Franchisor from time to time;

(c)   marketing materials and other sales aids developed by Franchisor from time to time (at Franchisee's expense);

(d)   promotional advice and recommendations at the time when the Franchised Business opens for business and ongoing promotional advice and recommendations on a reasonable basis thereafter; and

(e)   inclusion of franchisee's location on The Flying Locksmiths website.

14.4   ***Continuing Consultation, Advice, and Activities***

(a)   As and to the extent required in Franchisor's sole discretion, Franchisor shall provide regular consultation and advice to Franchisee in response to Franchisee's inquiries about specific administrative and operating issues that Franchisee brings to Franchisor 's attention. Franchisor shall have sole discretion to determine the method for communicating the consultation or advice, which may differ from the methods used for other franchisees. For example, and without limitation, consultation and advice may be provided by telephone, in writing (in which case Franchisor may furnish the information electronically), on-site in person, or by other means.

(b)   If Franchisee requests additional on-site instruction and assistance after the Opening Date, Franchisor may in its discretion furnish such training under the terms and conditions mutually agreed.

(c)   Franchisor may implement a mystery shopper program using the services of an outside mystery shopper company to perform regular mystery shopper visits at the Franchised Business in order to provide Franchisor and Franchisee with critical feedback and insight into the effectiveness of Franchisee's operations from a customer's perspective.

(d)   In addition to additional training, Franchisor may conduct an annual meeting at a location that Franchisor selects (the "Annual Meeting") to address recently-implemented changes in the System and other topics of common interest to franchisees, including, without limitation, new merchandising approaches, changes in goods and services, vendor relationships, industry trends, customer relations, personnel administration, local advertising and promotional strategies, and competitive changes.  If Franchisor chooses to conduct an Annual Meeting, Franchisor will determine the content, location and length of the Annual Meeting; provided, however, the Annual Meeting shall not exceed 3 days in any 12 Calendar Month period.  Franchisor may require the attendance of Franchisee's key personnel at one or more Annual Meetings, provided, however, Franchisor shall not require that more than 2 persons attend the Annual Meeting.   Franchisee shall pay the transportation, lodging, personal expenses and salary for each employee who attends an Annual Meeting.

DocuSign Envelope ID: E878DB2C-95CF-4659-8031-64CF0644C631

(e)     As to the extent required in Franchisor's sole discretion, Franchisor will investigate and conduct market research; monitor the activities of competitors; and continue to evaluate additional products and suppliers then incorporated into the Program in order to maintain and enhance the reputation and demand for The Flying Locksmiths products.

## 15.     TERMINATION BY FRANCHISEE

15.1     *No Right to Terminate Contact.*  Franchisee may not terminate this Agreement unless otherwise provided by law.

## 16.     REMEDIES UPON DEFAULT BY FRANCHISEE

16.1     *Definition of "Material Default."*  For the purposes of this Agreement, the phrase "Material Default" shall mean any one of the following defaults:

(a)     failure to pay any sum due to Franchisor, or any Affiliate or nominee of Franchisor, Franchisee's landlord, any governmental authority, or supplier of any item of supplies for a period of 30 days after written notice of such default has been delivered by Franchisor to Franchisee;

(b)     failure to comply with any other obligation of Franchisee contained in this Agreement or any other agreement between Franchisee and Franchisor or any Affiliate or nominee of Franchisor for a period of 30 days after written notice of such default has been delivered by Franchisor to Franchisee; provided, however, that if the nature of such default is such that it cannot be cured within a 30 day period, and Franchisee takes reasonable action to cure such default immediately upon receiving such notice and diligently continues to do so, then Franchisee shall have such additional period of time as is reasonably necessary to cure such default;

(c)     failure to commence operation of the Franchised Business on the Scheduled Opening Date as provided herein or doing anything or omitting to do anything which causes the Franchised Business to be closed for business or otherwise not operating in full compliance with this Agreement for five (5) consecutive Business Days or any five (5) Business Days in any 30 consecutive day period, without the prior written consent of Franchisor, unless the Franchised Business ceased operation for reasons not related to a breach of this Agreement by Franchisee including force majeure, strike, fire, natural disaster, or any other cause beyond Franchisee's control and not caused or continued, directly or indirectly, by an act or omission of Franchisee or any of its employees, directors, officers, members, agents or other representatives; provided that Franchisee will diligently employ all reasonable measures to resume the Franchised Business as soon as possible;

(d)     failure to remain in good standing under all leases, or doing or omitting to do anything else which gives anyone the right to terminate a lease or take possession of the premises or equipment;

(e)     (i) Franchisee becoming insolvent in that it is unable generally to pay its bills as they become due, (ii) Franchisee sells or purports to sell or transfer or otherwise loses possession or ownership or control of all or a substantial part of the assets used in the Franchised Business, (iii) Franchisee allows any item of personal property used in the Franchised Business to become attached, executed against or levied upon, without obtaining the release of such attachment, execution, distress, levy, sequestration or extent within 10 days, (iv) Franchisee allows any judgment to be entered against Franchisee or any of its Affiliates of which Franchisee has notice (actual or constructive) arising out of or relating to

DocuSign Envelope ID: E878DB2C-95CF-4659-8031-64CF0644C631

operation of the Franchised Business without satisfying such judgment or securing it by payment into court within 30 days, or (v) Franchisee is enjoined from operating the Franchised Business and such injunction is not dismissed, stayed or set aside within 30 days;

(f)    an assignment or attempted assignment, at law or at equity, of this Agreement by Franchisee, including an involuntary assignment under applicable matrimonial laws, in whole or in part, without obtaining the prior written consent of Franchisor as required by this Agreement;

(g)    Franchisee or any of its directors, officers, members, employees, agents or other representatives attempts to (or actually does) assign, transfer or convey any part the Program, Intellectual Property, and/or Confidential and Proprietary Material, including any copyrighted material; if Franchisee or any of its directors, officers, members, employees, agents or other representatives breaches confidentiality provisions concerning any of the foregoing; or if Franchisee or any of its directors, officers, members, employees, agents or other representatives uses or permits the use of any of the foregoing in a manner or at a location not authorized in advance in writing by Franchisor;

(h)    30 days after Franchisee's receipt of notice from Franchisor, Franchisee continually failing to offer for sale any approved product or service, or offering to sell any product or service from the Franchised Business that is not part a product or service designated or approved in writing by Franchisor;

(i)    intentionally falsifying, misrepresenting or misstating to Franchisor any information contained in a financial statement, report or other document which Franchisee provides to Franchisor whether prior to or after the execution of this Agreement;

(j)    Franchisee engaging in misleading advertising or operating the Franchised Business in a dishonest, illegal or unethical manner, or having its business license for the Franchised Business suspended or revoked;

(k)    Franchisee failing to rectify diligently any order issued by a governmental authority concerning breach of any health, safety or other regulation or legal requirement applicable to the Franchised Business within the time frame required by the government authority;

(l)    a personal or entity Franchisee or any director, officer, or member of an entity Franchisee being convicted of an offence which in the reasonable opinion of Franchisor could bring the Program, any of the Intellectual Property, or any other part of the goodwill established thereby into disrepute;

(m)    Franchisee receives three (3) or more notices of default under this Section 16.1 or Section 16.2 in any 12 month period, whether or not such defaults are cured after notice; and

(n)    Any other reason permitted by law.

Any of the defaults which do not have an opportunity to cure specified, shall be deemed incurable.

16.2    ***Cross Default***. If Franchisee, a member of its management, or any business entity in which one or more of Franchisee, and a member of its management personnel has a controlling interest, is a franchisee pursuant to another franchise agreement with Franchisor respecting another Franchised Business, a default under such other franchise agreement shall constitute a default under this Agreement, and should such other franchise agreement for any reason be terminated, Franchisor may, at is option, terminate this Agreement.

DocuSign Envelope ID: E878DB2C-95CF-4659-8031-64CF0644C631

For purposes of this Section 16.2, the term franchise includes master franchises and multi-unit franchise agreements.

16.3    ***Termination for Material Default***.   If Franchisee commits any Material Default under this Agreement, Franchisor may terminate this Agreement immediately upon giving written notice to Franchisee.   In the event of any such default, Franchisor may exercise any and all rights and remedies available to Franchisor under law, including all rights and remedies provided to Franchisor under this Agreement, the Guarantee and the Security Agreement.

16.4    ***Appointment of Receiver or Receiver-Manager***.   Without limiting the foregoing, upon a Material Default by Franchisee, Franchisor may in writing appoint a receiver or receiver-manager (in either case, the "Receiver") of the assets of Franchisee and may remove any Receiver so appointed and appoint a replacement from time to time. A Receiver shall be deemed the agent of Franchisee and Franchisor shall not be responsible for any misconduct or negligence on the part of the Receiver. The Receiver shall have power to:

   (a)    enter upon and take possession of the all equipment, inventory and all other assets used in or offered for sale by the Franchised Business (collectively the "Assets") with power to exclude Franchisee, its employees, agents and other representatives therefrom, without becoming liable as a creditor in possession;

   (b)    preserve, protect and maintain the Assets and make such replacements thereof and repairs and additions thereto as Franchisor may deem advisable;

          sell, lease, assign or otherwise dispose of or concur in selling, leasing, assigning or otherwise disposing of all or any part of the Assets, whether by public or private sale or lease or otherwise, in such manner, at such price as can be reasonably obtained therefor and on such terms as to credit and with such conditions of sale and stipulations as to title or conveyance or evidence of title or otherwise as to Franchisor may seem reasonable, provided that Franchisee will not be entitled to be credited with the proceeds of any such sale, lease or other disposition until the monies therefor are actually received; and

   (c)    exercise all other rights and remedies provided to Franchisor by this Agreement to the extent permitted by law or to such lesser extent permitted by its appointment, the Receiver shall have all the powers of Franchisor hereunder, and in addition shall have power to carry on the Franchised Business of Franchisee and for such purpose from time to time to borrow money either secured or unsecured.  Subject to applicable law and the claims, if any, of the creditors of Franchisee ranking in priority to the security constituted by this Agreement, all amounts realized from the disposition of the Assets pursuant to this Agreement will be applied as Franchisor, in its sole discretion, may direct as follows:

   (i)    in or toward payment of all costs, charges and expenses (including legal fees and disbursements on a solicitor and his own client basis) incurred by Franchisor in connection with or incidental to:

          (1)    the exercise by Franchisor of all or any of the powers granted to it pursuant to this Agreement; and

          (2)    the appointment of the Receiver and the exercise by the Receiver of all or any of the powers granted to the Receiver pursuant to this Agreement, including the Receiver's reasonable remuneration and all out goings properly payable by the Receiver.

DocuSign Envelope ID: E878DB2C-95CF-4659-8031-64CF0644C631

(ii)   in or toward payment to Franchisor of all interest referred to in this Agreement    and unpaid;

(iii)  in or toward payment to Franchisor of all principal and other monies (except interest) due as provided or referred to in this Agreement; and

(iv)   any surplus will be paid to Franchisee.

If the amounts realized from the disposition of the Assets are not sufficient to pay Franchisee's obligations in full to Franchisor, then Franchisee will immediately pay to Franchisor the amount of such deficiency.

16.5   *Other Remedies for Material Default*.   In the event of a Material Default of this Agreement, and in addition to the other remedies provided in this Agreement or under applicable law, Franchisor may:

(a)   bring such action for injunctive or other similar relief as may be necessary to compel Franchisee to comply with Franchisee's obligations contained or referred to in this Agreement;

(b)   without waiving any claim for default hereunder and without prior notice to Franchisee, take whatever steps Franchisor deems necessary to cure any default by Franchisee hereunder for the account of and on behalf of Franchisee, and Franchisee hereby irrevocably appoints Franchisor as its attorney to do so, and the related expenses incurred by Franchisor shall be due and payable forthwith by Franchisee upon demand and shall be deemed to be an amount owing to Franchisor hereunder; and/or

(c)   without waiving any claim for default hereunder and without prior notice to Franchisee, enter upon any premises upon which the Franchised Business is conducted without being liable to Franchisee in any way for such entry, for the purposes of securing the return of any of Franchisor's property, performing or compelling performance of Franchisee's obligations to Franchisor and protecting Franchisor's rights upon expiration or termination of this Agreement;

16.6   *Damages based on Material Default*.  In the event of a termination of this Agreement by Franchisor based on a Material Default, Franchisor shall have the right to claim and recover damages from Franchisee and such damages shall include, without limitation, loss of the benefit of Franchisor's bargain hereunder. It is acknowledged by Franchisee that the benefit of Franchisor's bargain hereunder shall include the Royalties which Franchisor would have expected to receive for the unexpired balance of the Term (or Renewal Term, if it is then in force) to a maximum of $50,000.

16.7   *Telephone Numbers, Websites, and Domain Names*.   Upon expiration or earlier termination of this Agreement, with respect rights to the telephone or facsimile numbers, websites, and domain names which are utilized in connection with the Franchised Business, Franchisee hereby irrevocably authorizes Franchisor to do whatever is necessary (including executing documents in the name of Franchisee) to transfer all rights to such items to Franchisor or an assignee of Franchisor. Further, Franchisor will itself execute similar documents if any vendor of these services so requests. Franchisee shall not use any personal/residential telephone numbers in the operation of the Franchised Business. If Franchisee does so, those numbers will be subject to the provisions of this Section 16.7.

16.8   *Remedies Cumulative*. The rights and remedies of Franchisor contained in this Section 16 and elsewhere in this Agreement or in a document referred to in this Agreement are cumulative and no

DocuSign Envelope ID: E878DB2C-95CF-4659-8031-64CF0644C631

exercise or enforcement of any right or remedy by Franchisor shall preclude its exercise or enforcement of any other right or remedy to which Franchisor is entitled by law, in equity or otherwise.

17. **SECURITY INTEREST**

*Grant of Security Interest.*  Franchisee hereby grants to Franchisor a security interest in all of Franchisee's interest in all leasehold improvements, furniture, furnishings, fixtures, equipment, inventory and supplies located at or used in connection with the Franchised Business, now or hereafter leased or acquired, together with all attachments, accessions, accessories, additions, substitutions and replacements therefore, and all cash and non-cash proceeds derived from insurance or the disposition of such collateral, to secure payment and performance of all debts, liabilities and obligations of any kind, whenever and however incurred, of Franchisee to Franchisor. Franchisee agrees to execute and deliver to Franchisor in a timely manner all financial statements and other documents necessary or desirable to evidence, perfect and continue the priority of such security interests under the Uniform Commercial Code.  For such purposes, the address of Franchisee and Franchisor are as stated in this Agreement.  If Franchisee is in good standing, Franchisor agrees, upon request, to execute subordinations of its security interest to suppliers, lenders and/or lessors furnishing equipment or financing for the Franchised Business.

18. **FRANCHISEE'S OBLIGATIONS UPON EXPIRATION OR TERMINATION**

18.1     *Payment of Accounts.*  Within 15 days after expiration or termination of this Agreement (or on such later date as such debts are due), Franchisee will pay, by bank draft, all outstanding Royalties, Franchise Promotional fees, and all other amounts payable by Franchisee (whether to Franchisee or its Affiliate) together with accrued interest charges thereon in accordance with Section 23.2.

18.2     *Discontinuance.*  Upon expiration or termination of this Agreement, Franchisee shall immediately discontinue use of the Intellectual Property (including the Marks), the Operations Manual, the Confidential and Proprietary Material and all other materials provided by Franchisor such as advertising materials and training materials, trade secrets, systems, methods of operation, software, passwords, and the format and goodwill of the Program.  Franchisee shall also forthwith change the color scheme of the Franchised Location to one that differentiates it from the color scheme of the Program and shall remove all signage related to the Program from the Franchised Business. Franchisee shall not thereafter operate or do business under any name or in any manner that might tend to give the general public the impression that Franchisee is directly or indirectly associated, affiliated, licensed by or related to Franchisor or the Program, and Franchisee shall not, directly or indirectly, use any Intellectual Property (including the Marks) or any other name, logo, signage, symbol, insignia, slogan, advertising, copyright, copyrighted materials, design, trade secret, process, system, method of operation or format confusingly similar to those used by the Program.  Franchisee acknowledges the proprietary rights of Franchisor as set out in this Agreement and agrees to return to Franchisor the Operations Manual, all advertising and training materials and all other confidential information relating to the Program, as well as all other property of Franchisor, forthwith upon expiration or earlier termination of this Agreement. Additionally, Franchisee shall, upon termination or expiration of this Agreement, promptly remove any signage from the Franchised Business and any other premises from which the Franchised Business is conducted which uses the Intellectual Property (including the Marks) or otherwise and refers, directly or implicitly, to the Program.

18.3     *Power of Attorney.*  Following expiration or earlier termination of this Agreement, Franchisor may execute in Franchisee's name and on Franchisee's behalf all documents necessary or advisable in Franchisor's judgment to terminate Franchisee's use of the Marks and Franchisor is hereby irrevocably appointed as Franchisee's attorney to do so, and such appointment, to the extent permitted by applicable law, shall survive the incapacity or death of an individual Franchisee.

DocuSign Envelope ID: E878DB2C-95CF-4659-8031-64CF0644C631

19.   **RENEWAL**

If Franchisee is in full compliance with this Agreement, has not at any time committed any Material Default that has not been remedied and meets Franchisor's then current standard requirements for franchisees, and the Franchisee has not been habitually in breach of this Agreement, then Franchisor will enter into renewals under the then current franchise agreement(s).  Renewals are granted upon the following terms and conditions:

(a)   Franchisee must give written notice of the right of renewal to Franchisor not more than 9 calendar months nor less than 6 calendar months prior to expiration of the Term (or first renewed term);

(b)   Franchisee shall execute Franchisor's then current form of franchise agreement which shall include Franchisor's then current rates and then current definitions and shall, within 30 days prior to expiration of the Term, pay to Franchisor a non-refundable renewal fee of $2,500 to reimburse the Franchisor's costs associated with the renewal of this Agreement and in lieu of paying the then-standard franchise fee.  This fee is charged at each of the renewals;

(c)   Franchisee shall execute and, if Franchisee is an entity, shall cause its owners to execute a general release, in a form provided by Franchisor, of any and all claims against Franchisor and its Affiliates and their respective officers, directors, members, shareholders, employees, agents and other representatives with respect to the Term; and

(d)   at the time of execution of a renewal franchise agreement, Franchisee shall not have an uncured notice of a default under this Agreement or any other agreement or obligation Franchisee may have with Franchisor including, but not limited to, all obligations to pay Royalties and other amounts; responsibilities to comply with the Operations Manual, including trade name and logo guidelines, and so forth.

20.   **ASSIGNMENT OR TRANSFER**

20.1   ***Assignment or Transfer by Franchisee.***   Franchisee acknowledges that the rights and duties created by this Agreement are personal to Franchisee and that Franchisor has entered into this Agreement in reliance upon the individual or collective character, skill, aptitude, attitude, business ability and financial capacity of Franchisee (or its principals, in the case of a corporate Franchisee). Therefore, except as expressly provided herein, neither this Agreement nor any of the rights and privileges of Franchisee contained herein, nor the Franchised Business or any part of it, nor any share or interest in Franchisee (if an entity) may be voluntarily, involuntarily, directly or indirectly (including by operation of law) assigned, sold, pledged, hypothecated, subdivided, sublicensed, optioned, diluted (such as by stock issuance or sale) or otherwise transferred or encumbered, at law or at equity. Any assignment or transfer not expressly permitted by this Agreement shall constitute a breach of this Agreement and shall be of no force and effect, and shall not be effective to convey any interest in this Agreement or the Franchised Business.

Without limiting the foregoing, Franchisee shall not assign or transfer, in whole or in part, Franchisee's interest in this Agreement or the Franchised Business except upon the terms and conditions provided in this Section 20. Any such assignment or transfer shall require the prior written consent of Franchisor, which Franchisor will not withhold unreasonably. Franchisor may refuse to consent to an assignment or transfer if any Material Default has occurred and has not been remedied. By way of illustration and not limitation, Franchisor may withhold its consent if the proposed assignee or transferee does not meet Franchisor's then current requirements for its new franchisees, is and will remain involved in any way in another business similar to the Franchised Business, is not in Franchisor's opinion financially and operationally capable of performing the then current obligations of System franchisees, or has had

DocuSign Envelope ID: E878DB2C-95CF-4659-8031-64CF0644C631

previous business experience or lack of experience which, in the judgment of Franchisor, suggest that the proposed assignee or transferee may not be a suitable franchisee of the Program. Franchisor's consent to any assignment or transfer shall not constitute a waiver of any claim, demand, action or cause of action which it may have against Franchisee, and shall not constitute a release of any third party guarantee or covenant for performance of this Agreement by Franchisee.

2.0.2   *Transfer of Interest in Corporate Franchisee*.  Without limiting the foregoing section, in the event that Franchisee is a corporation, partnership or other form of business organization, any material change in the legal or beneficial ownership of Franchisee, whether by agreement, court order, or by operation of law will be deemed to be an assignment or transfer of this Agreement by Franchisee. For the purposes of this paragraph, a material change in ownership will be any cumulative change in the legal or beneficial ownership of voting shares (or comparable voting units) representing more than 20 percent of all outstanding voting shares (or comparable voting units).

20.3   *Conditions of Consent*.  Any consent given to Franchisee to assign, transfer, sell or otherwise alienate Franchisee's interest in this Agreement and the Franchised Business shall be subject to the following conditions (none of which limit in any way the discretion of Franchisor to grant or reasonably withhold its consent to any proposed assignment or transfer):

(a)   Franchisee shall submit all proposed advertisements for the sale of the Franchised Business to Franchisor for prior written approval, and Franchisor shall approve the material terms and conditions of any proposed transfer or assignment;

(b)   Franchisee shall pay a non-refundable transfer fee of $5,000, of which $2,500 shall be payable upon the Franchisee's declaration of an intent to sell the Franchised Business, to reimburse Franchisor for its costs and expenses associated with reviewing and processing the application and providing training to the assignee;

(c)   Franchisee and assignee or transferee shall execute Franchisor's then current form of assignment of franchise agreement or, at the election of Franchisor, the assignee or transferee shall execute Franchisor's then current form of franchise agreement for a term equal to the remainder of the Term;

(d)   Franchisee shall return to Franchisor the Operations Manual and all other manuals and materials provided hereunder, for re-issuance to the assignee or transferee;

(e)   Franchisee and its principals shall each execute a release in the form provided by Franchisor and described in Section 20.5. Notwithstanding an assignment or transfer, Franchisee shall not be released by Franchisor;

(f)   The assignee or transferee and its designated management personnel shall have completed to Franchisor's satisfaction Franchisor's then-current training program;

(g)   all obligations of Franchisee under this Agreement and under all documents relating hereto and any or all other agreements then in effect between Franchisor or its nominee and Franchisee shall be in good standing; and

(h)   the assignee shall execute Franchisor's then current form of guarantee.

20.4   *Transfer to an Entity by Personal Franchisee*.  If Franchisee is an individual, then his or her assignment of this Agreement to an entity formed solely for the purpose of owning and operating the Franchised Business pursuant to this Agreement, including but not limited to a corporation, limited liability company, limited liability partnership, limited partnership or any other form of entity, shall not be deemed

DocuSign Envelope ID: E878DB2C-95CF-4659-8031-64CF0644C631

to be an assignment of this Agreement, on condition that at least 15 days prior to an assignment being effected, Franchisee provides full written details of the proposed assignment to Franchisor and both Franchisee and proposed assignee certify in such writing that:

(a)   Franchisee has, and will retain at all time during the Term and any exercised Renewal Term legal and beneficial ownership of not less than 75% of the outstanding voting equity of the assignee entity;

(b)   Franchisee is and will remain the principal officer, chairman, director, member, partner, manager of the assignee entity;

(c)   all equity holders (both legal and equitable), members, partners, managers, directors and officers of the assignee entity will forthwith sign Franchisor's then current form of guarantee whereby they will, among other things, jointly and severally guarantee performance of this Agreement by the entity;

(d)   notwithstanding the assignment, the assignor shall remain liable, jointly and severally with the assignee entity and guarantors, for all obligations of Franchisee contained herein, and concurrently with the assignment, the assignor will execute and become bound by the Franchisor's then-current form of guarantee;

(e)   the assignor assigns to the assignee all or any portion of the Agreements entered into between the Franchisor and assignor including without limitation, all franchise agreements;

(f)   the assignor assigns to the assignee all Assets, leases, intangibles (including without limitation, insurance contracts), and all other assets held by the assignor that are necessary for or used in the Franchised Business; and

(g)   the assignee has no material liabilities that would affect the ability of the assignee to carry on the Franchised Business.

Additionally, the provisions of subsections 20.3(b) to (f) above shall apply, with the necessary changes, to the proposed assignment.

   20.5   ***Franchisee's Release of Claims***.  It shall be a condition of Franchisor's consent to any assignment that Franchisee and its principals each deliver to Franchisor a complete release of all claims against Franchisor and its Affiliates and their respective directors, officers, shareholders, members, managers, partners, employees, agents and other representatives in respect of all obligations arising under or pursuant to this Agreement, such release shall be in a form provided by Franchisor.

   20.6   ***Death, Incapacity or Permanent Disability***.  In the event of the death or permanent disability of a personal Franchisee (or a principal of Franchisee where Franchisee is an entity or other entity and its principal is the manager of the Franchised Business), then Franchisee or estate of a deceased personal Franchisee shall have the right, within six (6) months after such event, to assign this Agreement to an assignee who is, in Franchisor's opinion, financially and operationally capable of performing the obligations of Franchisee hereunder, provided that each of the conditions set out in Section 20.3 are fulfilled to the reasonable satisfaction of Franchisor. For the purposes of this Section 20.6, permanent disability means the inability of the personal Franchisee or principal to manage effectively the day-to-day operation of the Franchised Business for a period of 30 days. During any period of disability (permanent or otherwise) or pending assignment or in the event of death as aforesaid, in the event the Franchisee does not or is unable to replace the General Manager as required by Section 11.1, Franchisor may appoint a competent and trained manager to operate the Franchised Business for the account of Franchisee.  The substitute manager shall be deemed for all purposes to be the agent or employee of Franchisee. Franchisor shall not be liable

DocuSign Envelope ID: E878DB2C-95CF-4659-8031-64CF0644C631

to Franchisee or to any creditor of the Franchised Business for any debt, obligation, contract, loss or damage incurred, or for any purchase made during any period in which the Franchised Business is so managed.

20.7 *Right of First Refusal.* If Franchisee or its shareholders shall at any time determine to sell, assign or transfer this Agreement or an interest in the Franchised Business or any equity interest in Franchisee (if an entity), then Franchisee shall provide Franchisor with a copy of the written offer from a fully disclosed purchaser. Franchisor shall have the right, exercisable by written notice delivered to Franchisee within 15 days from the date of delivery of a bona fide offer, to purchase such interest for the price and on the terms and conditions contained in such offer, provided that Franchisor may substitute cash for any form of payment proposed in such offer and shall have not less than 60 days to prepare for closing. Franchisor may, at closing, pay any of Franchisee's trade creditors out of the purchase price, and set off against the purchase price any unpaid debts of Franchisee to Franchisor. If Franchisor does not exercise its right of first refusal, Franchisee (or other vendor) may complete the sale to such purchaser pursuant to and on the terms of such offer, subject to compliance with the consent and approval requirements of this Section 20; provided, however, that if the sale to such purchaser does not complete within 90 days after delivery of such offer to Franchisor, or if there is a material change in the terms of the sale, then Franchisor shall again have a new right of first refusal as herein provided.

20.8 *Assignment by Franchisor.* This Agreement may be assigned in whole or in part by Franchisor and, if Franchisor makes a full assignment to a third party and the third party agrees in writing to assume all of the obligations and liabilities of Franchisor hereunder, then Franchisor shall automatically be released from all obligations and liabilities hereunder. A partial assignment by Franchisor may include an assignment of the Royalties payable by Franchisee.

20.9 *Legend on Share Certificates.* If Franchisee is an entity, Franchisee shall cause all shares of its capital stock, unit certificates or similar agreements or indications of ownership; the following legend, with necessary changes:

The Company and the securities evidenced by this certificate are subject to, and the disposition and transfer of such securities are restricted by, a franchise agreement dated as of *10/24/2018*, between the Company and TFL Franchise Systems LLC, a Massachusetts limited liability company, a copy of which may, at the request of any shareholder of the corporation, be examined at the principal business office of the Company during normal business hours.

## 21   NON-COMPETITION

21.1 *In Term Competition Restriction.* Except as expressly permitted by this Agreement or by any other written agreement between Franchisor and Franchisee, during the Term or an exercised Renewal Term, Franchisee, or any of Franchisee's officers, directors, or managers, shall not directly or indirectly engage in the provision of locksmith or security goods or services, including doors, video cameras, and access control, in the United States. During the same time period, Franchisee also agrees not to take any steps to interfere with Franchisor's relations with National Accounts. And Franchisee agrees not to sell or transfer subscription based contracts made available to Franchisee by Franchisor to competitors in the United States.

21.2 *Post-Term Competition Restriction.* Except as expressly permitted by this Agreement or by any other written agreement between Franchisor and Franchisee, for a period of 18 months after expiration of the Term or an exercised Renewal Term, Franchisee, or any of Franchisee's officers, directors, or managers, shall not directly or indirectly, engage in the provision of locksmith or security goods or services, including doors, video cameras, and access control, at or within 20 miles of Franchisee's location or within 20 miles of any other franchisee of Franchisor. This Section 21 shall also continue to apply to Franchisee in the case of any assignment of this Agreement or any sale of the Franchised Business. During the same

DocuSign Envelope ID: E878DB2C-95CF-4659-8031-64CF0644C631

time period, Franchisee also agrees not to take any steps to interfere with Franchisor's relations with National Accounts.

21.3  *Application.*  This Section 21 shall survive the expiration or sooner termination of this Agreement and any assignment, transfer or sale hereunder. Franchisee acknowledges that by reason of the unique nature and considerable value of the Marks and the business reputation associated with Franchisor and the Program, including methods of operating, format and related proprietary rights and by reason of Franchisee's knowledge of and association and experience with the Program, the provisions of this Section 21 are reasonable and commensurate for the protection of the legitimate business interests of Franchisor, its Affiliates and franchisees.

## 22.    FRANCHISEE ACKNOWLEDGMENTS

22.1  *Acknowledgments.*  Franchisee acknowledges and agrees as follows:

(a)    Potential Earnings. The success of the Franchised Business to be established hereunder will, to a great extent, be dependent upon the personal time and efforts contributed by Franchisee and Franchisee's employees (as well as Franchisee's partners or directors if Franchisee is a partnership or a corporation). Neither Franchisor nor anyone else has represented, warranted or guaranteed to Franchisee that Franchisee will enjoy financial success in owning and operating the Franchised Business.

(b)    No Representations or Projections. Except as may be disclosed in Item 19 of the disclosure document, neither Franchisor nor anyone else has made any representation, warranty or guarantee regarding the level of Gross Revenue, net income or profit margins which may be achieved at the Franchised Business. The results achieved at the Franchised Business will be particular to the Franchisee. Franchisee accepts the risk of the Franchised Business not achieving the levels of Gross Revenue and net income during the Term which Franchisee at the Effective Date hopes to achieve.

(c)    Review of Documents and Time for Careful Consideration. Franchisee acknowledges that he, she or it has received, has had ample time to read and study, and has read and studied this Agreement and fully understands its provisions. Franchisee further acknowledges that he, she or it has had an adequate opportunity to be advised by legal counsel and accounting professionals of his, her or its own choosing regarding all aspects of this Agreement and the relationship created thereby.

(d)    Injunctive Relief. Franchisee acknowledges that certain breaches of this Agreement would result in loss to Franchisor for which Franchisor could not be adequately compensated in damages by a monetary award. Accordingly, Franchisee agrees that in the event of any such breach of this Agreement, Franchisor shall, in addition to all the remedies available to Franchisor at law or in equity, be entitled as a matter of right to a restraining order, injunction (including an interim injunction), decree of specific performance or otherwise, without the need to post any bond or other security in connection therewith, to ensure compliance by Franchisee with the provisions of this Agreement and preservation, of Franchisor's proprietary rights.  Franchisee waives the requirement that Franchisor post bond on any temporary restraining order, preliminary, or permanent injunction.

(e)    Responsibility for Investigations, Permits, Etc. Franchisee acknowledges that it is solely responsible for investigation of all regulations applicable to the Franchised Business and for obtaining all necessary permits to operate the Franchised Business, and Franchisor makes no representation as to such regulations, if any, or that such licenses or permits are available, nor has Franchisor undertaken any such investigation on its own.

DocuSign Envelope ID: E878DB2C-95CF-4659-8031-64CF0644C631

## 23.   MISCELLANEOUS

23.1   *Indemnity by Franchisee*.  Except as otherwise provided in this Agreement, Franchisee agrees to indemnify and save harmless Franchisor, its subsidiaries, Affiliates, shareholders, directors, officers, employees, agents, assignees and other franchisees from and against, and to reimburse them for, all liabilities, obligations, and consequential damages, taxes, costs, losses and actual legal expenses incurred by them in connection with any claim, litigation or other action or proceeding arising out of the operation of the Franchised Business by Franchisee. Franchisee shall be responsible for and shall pay and satisfy any judgment or settlement that may arise out of any such claim, litigation, action or proceeding. Without limiting the generality of the foregoing, Franchisee agrees that if Franchisor is made a party to any lawsuit or any other action or proceeding in connection with the Franchised Business or the activities of Franchisee or any of its Affiliates, Franchisor may, at its sole option, either (a) permit Franchisee to conduct the defense or prosecution of the matter at the cost of Franchisee; or (b) take conduct of the defense or prosecution, in which case all expenses thereof will be borne or reimbursed by Franchisee. This indemnity shall continue in full force after termination or expiration of this Agreement.

23.2   *Interest on Overdue Amounts*.  All payments required to be made by Franchisee to Franchisor under or pursuant to this Agreement shall bear simple interest from and after their respective due dates until paid in full at the rate of ten percent (10%) per annum or such other rate as Franchisor may specify in writing from time to time or the maximum rate permitted by law if lower.

23.3   *Application of Payments*.  Franchisor shall have sole discretion to apply any payments made by Franchisee to any past due indebtedness of Franchisee, including but not necessarily limited to Royalties, Franchise Promotional Fund, purchases from Franchisor, or any of its Affiliates, interest or other indebtedness.

23.4   *Parties are Independent Contractors*.  The parties intend by this Agreement to establish the relationship of franchisor and franchisee, each as an independent contractor, and it is not the intention of either party to establish a fiduciary relationship, to undertake a joint venture, to make Franchisee in any sense an agent, employee, Affiliate, associate or partner of Franchisor or to confer on Franchisee any authority to act in the name of or on behalf of Franchisor.

23.5   *Conformity with Laws*.  If any court order, statute, law, by-law, ordinance or regulation promulgated by any competent authority requires a longer or different notice period than that specified herein, the notice period shall automatically be deemed to be amended so as to conform with the minimum requirements of such statute, law, by-law, ordinance, regulation or court order.

23.6   *Additional Franchises*.  Franchisee acknowledges that Franchisor may from time to time grant franchises for additional Franchised Businesses under terms that may differ materially from the terms of this Agreement and that consequently Franchisor's obligations and rights with respect to its various franchises may from time to time differ materially from those provided in this Agreement.

23.7   *Waiver*.  Franchisor reserves the right, from time to time, to waive observance or performance of any obligation imposed on Franchisee by this Agreement. No waiver of any default of any term, proviso, covenant or condition of this Agreement by Franchisor shall constitute a waiver of any other term, proviso, covenant or condition of this Agreement.

23.8   *Entire Agreement*.  This Agreement and all exhibits to this Agreement constitute the entire agreement between the parties and supersede any and all prior negotiations, understandings, representations, and agreements. Nothing in this or any related agreement, however, is intended to disclaim the representations we made in the franchise disclosure document that we furnished to you.

DocuSign Envelope ID: E878DB2C-95CF-4659-8031-64CF0644C631

You acknowledge that you are entering into this Agreement as a result of your own independent investigation of our franchised business and not as a result of any representation about us made by our shareholders, officers, directors, employees, agents, representatives, independent contractors or franchisees that are contrary to the terms set forth in this Agreement, or in any disclosure document, prospectus, or other similar document required or permitted to be given to you pursuant to applicable law.

23.9    *Amendments.* This Agreement can be amended or added to only by a writing executed by both Franchisor and Franchisee.

23.10    *Further Assurances.* Franchisor and Franchisee will each acknowledge, execute and deliver all such further documents, instruments or assurances and will each perform such further acts or deeds as may be necessary or advisable from time to time to give full effect to this Agreement.

23.11    *Severability.* If any article, section or subsection of this Agreement or any portion thereof is determined to be indefinite, invalid, illegal or otherwise void, voidable or unenforceable, then it shall automatically be severed from this Agreement and the balance of this Agreement shall continue in full force and effect.

23.12    *Governing Law.* This Agreement is effective upon its acceptance in Massachusetts by our authorized officer. Except as to claims governed by federal law, Massachusetts law governs all claims that in any way relate to or arise out of this Agreement or any of the dealings of the parties ("Claims"). However, no laws regulating the sale of franchises or governing the relationship between franchisor and franchisee shall apply unless the jurisdictional requirements of such laws are met independently of this paragraph.).

23.13    *Jurisdiction and Venue.* In any suit over any Claims, venue shall be proper only in the state and federal courts closest to our corporate office.

23.14    *Jury Waiver.* In any trial of any Claims, you and we agree to waive our rights to a jury trial and instead have such action tried by a judge.

23.15    *Class Action Waiver.* You agree that any Claims you may have against us, including our past and present employees and agents, shall be brought individually and you shall not join with claims of any other person or entity or bring, join or participate in a class action against us.

23.16    *Punitive Damages Waiver.* In any lawsuit, dispute or claim over any Claims, you and we agree to waive our rights, if any, to seek or recover punitive damages.

23.17    *Limitation of Actions.* You agree to bring any Claims against us, if at all, within one (1) year of the occurrence of the facts giving rise to such Claims.

23.18    *Prior Notice of Claims.* As a condition precedent to commencing an action for a Claim, you must notify us within thirty (30) days after the occurrence of the violation or breach, and failure to timely give such notice shall preclude any claim for damages.

23.19    *Internal Dispute Resolution.* You must first bring any Claim to our CEO, after providing notice as set forth in Section 23.18 above. You must exhaust this internal dispute resolution procedure before you may bring your Claim before a third party. This agreement to first attempt resolution of disputes internally shall survive termination or expiration of this Agreement.

DocuSign Envelope ID: E878DB2C-95CF-4659-8031-64CF0644C631

23.20   *Mediation.*  Before you may bring any Claim against us in court, you agree to try for a period of 60 days to mediate such claim before a mutually agreed to mediator in the city or county where our headquarters are located.  If we can not mutually agree on a mediator, you and we agree to use the mediation services of the American Arbitration Association ("AAA"), and split any AAA and mediator fees equally.

23.21   *Attorney Fees.*  If we are the substantially prevailing party as to any Claims, you agree to reimburse our costs and attorney fees incurred in pursuing or defending the Claims.

23.22   *Third Party Beneficiaries.*  Our officers, directors, members, shareholders, agents, and employees are express third party beneficiaries of the terms of these Governing Law provisions contained herein.

23.23   *Survival.*  All of the covenants contained in this Agreement that may require performance after the termination or expirations of this Agreement will survive any termination or expiration of this Agreement.

23.24   *Severability Clause.* If any covenant or provision in this Agreement is determined to be void or unenforceable, in whole or in part, it shall be deemed severed and removed from this Agreement and shall not affect or impair the validity of any other covenant or provision of this Agreement.

23.25   *Area Representatives.*   If you are or become in a territory under an Area Representative, you agree not to bring any Claims against the Area Representative.  If you breach this clause, you agree to reimburse us or the Area Representative for any legal fees and costs incurred in defending such Claims.

23.23   *Submission of Agreement.*  The submission of this Agreement to Franchisee does not constitute an offer by Franchisor. This Agreement shall only become effective when it has been executed by both Franchisor and Franchisee.


IN WITNESS WHEREOF Franchisor and Franchisee have executed this Agreement as of the Effective Date shown in Attachment 1.

DocuSign Envelope ID: E878DB2C-95CF-4659-8031-64CF0644C631

**FRANCHISEE:** _____

Name:   Toby Gilman
          _____

By:     _____

Name:   _____

By:     _____




**FRANCHISOR:**

TFL FRANCHISE SYSTEMS, LLC.,

a Massachusetts limited liability company




By:_____

 (authorized signature)

Name: _____

DocuSign Envelope ID: E878DB2C-95CF-4659-8031-64CF0644C631

## ATTACHMENT 1

### FRANCHISED BUSINESS – PARTICULARS

1.  **Franchisee:** _TOBY GILMAN_

2.  **Effective Date:** _10/24/2018_

3.  **Territory Description:**

    Territory DFW #1, see attached territory map.  Population = 1,403,340.
    Franchise Fee = $159,980.76 which includes a 5% veteran's discount

4.  **Scheduled Opening Date of Franchised Business:** 01/22/2019

5.  **Management Personnel of Franchisee: (list below)**

    Toby Gilman

DocuSign Envelope ID: E878DB2C-95CF-4659-8031-64CF0644C631

**ATTACHMENT 2**

**MARKS**

| Registration Number | Description of Mark | Principal or Supplemental Register of the United States Patent and Trademark Office | Registration Date |
|---|---|---|---|
| 4751651 |  | Principal | June 9, 2015 |
| 4811307 |  | Principal | September 15, 2015 |
| 5132846 | The Flying Locksmiths | Principal | January 31, 2017 |

DocuSign Envelope ID: E878DB2C-95CF-4659-8031-64CF0644C631

## ATTACHMENT 3

### HOLDERS OF OWNERSHIP INTEREST IN THE FRANCHISEE

**Please list ALL persons who hold any ownership interest in the franchisee:**

**\*Please note per Your Franchise Agreement, you may transfer your interest in the franchisee or any entity holding the franchise only if we approve**

Name: Toby Gilman
Position/Title: Owner/President
Home Address: 1910 PAVIA CURT
ARLINGTON, TEXAS 76006

Telephone No.: 817-797-3025
E-mail address: toby.gilman@gmail.com
Percentage of ownership: 100 %

Name:
Position/Title:
Home Address:


Telephone No.:
E-mail address:
Percentage of ownership: %

Name:
Position/Title:
Home Address:


Telephone No.:
E-mail address:
Percentage of ownership: %

Name:
Position/Title:
Home Address:


Telephone No.:
E-mail address:
Percentage of ownership %

Name:
Position/Title:
Home Address:


Telephone No.:
E-mail address:
Percentage of ownership %

Name:
Position/Title:
Home Address:


Telephone No.:
E-mail address:
Percentage of ownership %

DocuSign Envelope ID: E878DB2C-95CF-4659-8031-64CF0644C631

**EXHIBIT D**

**PERSONAL GUARANTY**

This Personal Guaranty, is made by Toby Gilman _____ ,("Guarantor"), in favor of TFL Franchise Systems, LLC, a Massachusetts limited liability company (the "Franchisor") on the date set forth below.

RECITALS

A. WHEREAS, Franchisor is entering into a Franchise Agreement dated ___10/24/2018___ ("Franchise Agreement") with _TOBY GILMAN_ ("the Franchisee");

B. WHEREAS, Guarantor is a shareholder, director, officer, member, manager, or partner of Franchisee and will directly or indirectly benefit from the Franchisor entering into the Franchise Agreement with Franchisee; and

C. WHEREAS, Franchisor is unwilling to enter into the Franchise Agreement without the Guarantor(s) providing this Personal Guaranty of Franchisee's obligations under the Franchise Agreement;

NOW, THEREFORE, to induce Franchisor to enter into the Franchise Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Guarantor hereby agrees as follows:

AGREEMENT

1. The Guaranty. Guarantor hereby irrevocably, absolutely and unconditionally guaranties the full, complete and punctual performance by Franchisee of all of the terms and conditions of the Franchise Agreement, including any amendments thereto or renewals thereof (collectively, the "Guaranteed Obligations"). The obligations and liability of the Guarantor hereunder shall be as a primary obligor under the Franchise Agreement, and not merely as a surety, and the Franchisor shall not be obliged to resort to or exhaust any recourse which it may have against the Franchisee, any third party, or any security or collateral before being entitled to bring a claim against the Guarantor.

2. Obligations Unconditional. The obligations of the Guarantor under this Guaranty are absolute and unconditional to the fullest extent permitted by applicable law, irrespective of any circumstance whatsoever (other than full payment or performance) which might otherwise constitute a legal or equitable discharge or defense of a surety or guarantor. No dealings between the Franchisor and the Franchisee of any kind, whether with or without notice to the Guarantor, shall affect the liability of the Guarantor hereunder. Without limiting the foregoing, the Guarantor hereby authorizes Franchisor, without notice or demand and without affecting Guarantor's liability hereunder, from time to time to (a) change or extend the time or manner of payment of the Franchise Agreement obligations; (b) or take and hold additional security for the payment of the Franchise Agreement, and exchange, enforce, waive and release any such security.

Additionally, Guarantor hereby waives:

DocuSign Envelope ID: E878DB2C-95CF-4659-8031-64CF0644C631

     (a)     Any right to require Franchisor to (i) proceed against Franchisee or any other guarantor of the obligations; (ii) proceed against or exhaust any security received from Franchisee or any other guarantor of the obligations; and/or (iii) pursue any other remedy in Franchisor's power whatsoever;

     (b)     Presentment, demand, protest, notice of protest, notice of dishonor and notice of non-payment and notice of acceptance of this Guaranty;

     (c)     Any right to the benefit of, or to direct the application of, any security held by Franchisor, and until all the Guaranteed Obligations have been paid and performed in full, any right to enforce any remedy which Franchisor now has or hereafter may have against Franchisee, and any right to participate in any security now or hereafter held by Franchisor; and

     (d)     Any right to receive from the Franchisor any communication whatsoever with respect to performance of the Guaranteed Obligations by the Franchisee (including any subsequently created obligation or liability of the Guarantor to the Franchisor); notice of the existence or creation of any liabilities under the Franchise Agreement and of the amount and terms thereof; and notice of all defaults, disputes or controversies between the Franchisee and the Franchisor resulting from the Franchise Agreement or otherwise, and the settlement, compromise or adjustment thereof.

     3.    <u>Continuing Guaranty</u>.  This Personal Guaranty constitutes a continuing guaranty of performance of the Guaranteed Obligations and the obligations of the Guarantor hereunder are not limited to any particular period of time but shall continue until all of the terms, covenants and conditions of the Franchise Agreement have been fully and completely performed by the Franchisee or otherwise discharged by the Franchisor, and the Guarantor shall not be released from any liability under this Personal Guaranty so long as there is any claim of the Franchisor against the Franchisee arising out of the Guaranteed Obligations that has not been fully performed, settled or discharged,  nor shall this Personal Guaranty be affected by the death, disability, dissolution, or reorganization of the Franchisee or any of its directors, officers, members, partners, managers, or shareholders, or any change in the Guarantor's financial condition or in the business or financial condition of the Franchisee or any of its directors, officers or shareholders (including by way of insolvency, bankruptcy or receivership).

     4.    <u>Subrogation</u>.  The Guarantor hereby agrees that it shall not be subrogated to any of the rights of the Franchisor until payment in full of the Guaranteed Obligations.

     5.    <u>Binding Effect of Agreements</u>.  Any account settled or stated or any other settlement made between the Franchisor and the Franchisee, and any determination made pursuant to any of the Guaranteed Obligations which is expressed to be binding upon the Franchisee shall be binding upon the Guarantor.

     6.    <u>Personal Covenants</u>.  As additional personal covenants (and without limiting the applicability of the other provisions of this Personal Guaranty), the Guarantor as primary obligor unconditionally covenants and agrees to be bound personally and to comply with all provisions of the Franchise Agreement dealing with the use of trade names and trademarks, copyrights, Confidential and Proprietary Material, compliance with laws, non-solicitation of employees, and non-competition. If the Guarantor breaches any of these provisions, then the Franchise Agreement shall be deemed to be in default and the Franchisor may exercise its remedies for default under the Franchise Agreement.

     7.    <u>Amendment</u>. The terms of this Personal Guaranty may be waived, altered or amended only by an instrument in writing duly executed by the Guarantor and the Franchisor.

     8.    <u>Severability</u>. If any provision hereof is invalid and unenforceable in any jurisdiction, then to the fullest extent permitted by law (a) the other provisions hereof shall remain in full force and effect in

DocuSign Envelope ID: E878DB2C-95CF-4659-8031-64CF0644C631

such jurisdiction and shall be liberally construed in favor of the Franchisor in order to carry out the intentions of the parties hereto as nearly as may be possible and (b) the invalidity or unenforceability of any provision hereof in any jurisdiction shall not affect the validity or enforceability of such provision in any other jurisdiction.

      9.    <u>No Waiver</u>.  No delay or refusal in exercising, any right, power or remedy hereunder shall operate as a waiver thereof.

      10.    <u>Expenses</u>.  The Guarantor will pay all reasonable expenses, including attorneys' fees, that are incurred by Franchisor in connection with the enforcement of this Agreement.

      11.    <u>Successors and Assigns</u>.  This Personal Guaranty shall be binding upon and inure to the benefit of the parties and their respective successors and assigns provided, however, that the Guarantor shall not assign or transfer his/her rights hereunder without the prior written consent of the Franchisor.

      12.    <u>Independent Advice</u>.  The Guarantor acknowledges that he/she has obtained, or has had the opportunity to obtain, independent legal advice before signing this Personal Guaranty.

      13.    <u>Governing Law, Jurisdiction and Venue</u>.   This Personal Guaranty shall be construed and interpreted according to the laws of the state of Massachusetts. The Federal and State Courts in or nearest the headquarters of TFL Franchise Systems, LLC shall have exclusive venue and jurisdiction to entertain any proceeding in respect of this Personal Agreement, and Guarantor consents to the jurisdiction and venue of such courts in all matters related to this Agreement.

      IN WITNESS WHEREOF the Guarantor has signed this Personal Guaranty as of the date set forth below:

DATED: _10/24/2018_

GUARANTOR:

By: _____

Name: _Toby Gilman_

Address: _1910 PAVIA CT., ARLINGTON, TEXAS 76006_

By: _____

Name: _____

Address: _____

DocuSign Envelope ID: E878DB2C-95CF-4659-8031-64CF0644C631

**EXHIBIT E**

**EMPLOYEE CONFIDENTIALITY AGREEMENT**

This Employee Confidentiality Agreement ("Agreement") is entered into by and between
_____ ("Employer") and
_____ ("Employee") and is effective as
of _____ , 201_.

**WHEREAS,** Employer is engaged in operation of a The Flying Locksmiths franchise (the "Franchised Business") pursuant to a Franchise Agreement between Employer and TFL Franchise Systems, LLC, (the "Franchisor");

**WHEREAS,** the Franchised Business is based on a comprehensive program (the "Program") that provides locksmith and security services and products for commercial, residential and automotive customers under the name of The Flying Locksmiths;

**WHEREAS,** the Program involves the use of Franchisor's Confidential Information (defined below) in connection with each Franchised Business;

**WHEREAS,** Employer desires to employ persons to work in the Franchised Business who will have access to Franchisor's Confidential Information;

**WHEREAS,** Employer has an obligation to safeguard Franchisor's Confidential Information;

**WHEREAS,** Employee is willing to become an employee of Employer in the Franchised Business subject to the terms and conditions set forth in this Agreement; and

**WHEREAS,** Employer is willing to hire Employee to work in the Franchised Business, but only upon the terms and conditions set forth in this Agreement;

**NOW THEREFORE,** in consideration of the mutual covenants contained in this Agreement and other good and faithful consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

**1. Franchisor's Confidential Information as Trade Secrets**

Employee understands and acknowledges that during the course of employment by the Employer, Employee will have access to and learn about confidential, secret and proprietary documents, materials and other information, in tangible and intangible form, of and relating to the Franchised Business and its existing and prospective customers, suppliers, investors and other associated third parties ("Confidential Information"). The Employee further understands and acknowledges that this Confidential Information and the Employer's ability to reserve it for the exclusive knowledge and use of the Franchised Business is of great competitive importance and commercial value to the Employer, and that improper use or disclosure of the Confidential Information by the Employee might cause the Employer to incur financial costs, loss of business advantage, liability under confidentiality agreements with third parties, civil damages and criminal penalties.

For purposes of this Agreement, Confidential Information includes, but is not limited to, all information not generally known to the public, relating directly or indirectly to the equipment, operating

DocuSign Envelope ID: E878DB2C-95CF-4659-8031-64CF0644C631

procedures, business techniques, manuals, customer lists, of the Franchise Business, or of any other person or entity that has entrusted information to the Employer in confidence.

The Employee understands that the above list is not exhaustive, and that Confidential Information also includes other information that is marked or otherwise identified as confidential or proprietary, or that would otherwise appear to a reasonable person to be confidential or proprietary in the context and circumstances in which the information is known or used.

Confidential Information shall not include information that is generally available to and known by the public at the time of disclosure to the Employee, provided that such disclosure is through no direct or indirect fault of the Employee or person(s) acting on the Employee's behalf.

## 2. Employer Owns Confidential Information

Employee understands and agrees that Confidential Information developed by Employee by virtue of Employees employment by the Employer belongs to Employer and shall be subject to the terms and conditions of this Agreement.

## 3. Nondisclosure

Employee shall not at any time or in any manner, either directly or indirectly, divulge, disclose or communicate to any unauthorized person(s) or entity any Confidential Information or use Confidential Information in an unauthorized manner. All Confidential Information shall be held by Employee in complete confidence. Such information is important, material, and confidential and gravely affects the effective and successful conduct of Employer's Franchised Business and injures Franchisor's goodwill. These provisions and restrictions apply while Employee is employed with Employer and at all times thereafter. Should Employee, at any time, cease to be an employee of Employer, Employee shall immediately return to the Employer the originals and all copies of all documents or other media containing or representing any of the Confidential Information. Breach of any of the terms of this paragraph shall be a material breach of this Agreement.

## 4. Unfair Competition

Employee shall not, for any reason, directly or indirectly:

1. During the term of employment, provide services of the type offered by Employer except on behalf of and for the benefit of Employer.

2. During the term of employment and for 12 months following the termination of employment with Employer, solicit any employee of Franchisor or Employer to terminate his or her employment relationship with Franchisor or Employer to work for a competing business or otherwise induce or attempt to induce employees to leave their employment;

3. Use any of the Franchisor's or Employer's proprietary trade secret information to solicit any of Franchisor's or Employer's clients; or

## 5. Remedies

Employee agrees that, in the event of alleged breach, Employer shall be entitled, in addition to all other available remedies, to a temporary restraining order, a preliminary injunction and other relief and that Employee waives any right to Employer's posting of a bond on such order or injunction. Employee agrees that any action taken by Employer pursuant to this Agreement shall not constitute an election of remedies.

DocuSign Envelope ID: E878DB2C-95CF-4659-8031-64CF0644C631

**6. Non-Disparagement**

Employee agrees that Employee will not at any time make, publish or communicate to any person or entity or in any public forum any defamatory or disparaging remarks, comments or statements concerning the Employer, the Franchised Business, or Franchisor's products or services or make any false statements about the Employer, the Franchised Business, or Franchisor or their employees, members, or officers.

**7. Enforcement by Franchisor**

Both Employer and Employee acknowledge and agree that this Agreement is for the benefit not only of the Employer, but also of the Franchisor. Employer and Employee each agree that Franchisor shall have the same right to enforce this Agreement as Employer has; provided only that as between Employer and Franchisor, they shall be entitled to only one recovery of damages.

**8. Miscellaneous Terms**

8.1 Non-Waiver.

No act or omission or delay in enforcing a right by either party shall waive any right under or breach by the other of this Agreement unless such party executes and delivers a written waiver. The waiver by either party of any right under or breach of this Agreement shall not be a waiver of any subsequent or continuing right or breach.

8.2 Attorney Fees.

In the event that any legal action or proceeding is commenced by Employer or Franchisor to enforce this Agreement or to determine the rights of any party, including any appeal proceeding, if Employer or Franchisor is the substantially prevailing party, they shall be entitled to their costs and attorney fees incurred in pursuing the action.

8.3 Severability.

In the event that any of the provisions of this Agreement are held to be unenforceable or invalid by a court of competent jurisdiction, the validity and enforceability of the remaining provisions shall not be affected thereby, and full effect shall be given to the intent manifested by the provisions, or portions thereof, held to be enforceable and valid, unless such invalidity shall pertain to the obligation to pay fees, in which event this Agreement shall terminate.

8.4 Survival.

Employee acknowledges and agrees that the terms and conditions of this Agreement which may require performance after the termination of this Agreement shall survive after Employee's termination.

8.5 Warranty Of Authority.

Each person signing this Agreement for or on behalf of any party to this Agreement warrants that s/he has full authority to sign and to legally bind the party.

8.6 Choice Of Law.

This Agreement shall be governed by and construed under the laws of the state in which the Franchised Business is located.

8.7 Modification.

DocuSign Envelope ID: E878DB2C-95CF-4659-8031-64CF0644C631

This Agreement shall not be modified or changed except by a written agreement executed by the parties.

EMPLOYEE: _____     EMPLOYER: _____

By: _____     By: _____
    Signature                                            Signature

                                                  _____
                                                        Title

Distribution: Copy to Employee and Copy to Employee's Personnel File

DocuSign Envelope ID: E878DB2C-95CF-4659-8031-64CF0644C631

**EXHIBIT G**

## <u>GENERAL RELEASE AND WAIVER OF CLAIMS</u>

This GENERAL RELEASE AND WAIVER OF CLAIMS ("Release") is made this _24_ day of _October_, _2018_, by ("Releasor"), with reference to the following facts:

A.    The undersigned, Releasor:

[COMPLETE AND CHECK APPROPRIATE BOX OR BOXES]

1.    [X] is the Franchisee under, and signatory to, a Franchise Agreement entered into by and between TFL Franchise Systems, LLC ("Company") and Releasor (who is identified in the Franchise Agreement as Franchisee).

2.    [X] is an employee, officer, director, member, manager, partner or owner of an interest in the equity or voting interests of the Franchisee identified in the Franchise Agreement.

B.    This Release is being executed pursuant to the requirements of the Franchise Agreement as a condition of the rights granted by Company to Franchisee, and for other good and valuable consideration, the receipt of which is acknowledged by the parties.

NOW, THEREFORE, RELEASOR AGREES AS FOLLOWS:

1.    <u>General Release</u>

Releasor, for itself, himself or herself, and, if applicable, additionally, for Releasor's Affiliates, if any, and for each of their respective officers, directors, shareholders, members, managers, trustees, partners, employees, attorneys, heirs and successors (Releasor and such other persons are collectively referred to as the "Releasing Parties"), hereby release and forever discharge Company, Company's Affiliates, and their respective officers, directors, shareholders, members, agents, employees, representatives, attorneys, successors and assigns (collectively the "Released Parties"), and each of them, from any and all claims, demands, obligations, liabilities, actions, causes of action, suits, proceedings, controversies, disputes, agreements, promises, allegations, costs and expenses, at law or in equity, of every nature, character or description whatsoever, whether known or unknown, suspected or unsuspected or anticipated or unanticipated, which any of the Releasing Parties ever had, now has, or may, shall or can hereafter have or acquire (collectively referred to as "Claims"). This Release includes, but is not limited to, all Claims arising out of, concerning, pertaining to or connected with any agreement, tort, statutory violation, representation, nondisclosure, act, omission to act, fact, matter or thing whatsoever, occurring as of or prior to the date of this Release, so that after the date of this Release, none of the Releasing Parties shall have any claim of any kind or nature whatsoever against the Released Parties, directly or indirectly, or by reason of any matter, cause, action, transaction or thing whatsoever done, said or omitted to have been done or said at any time prior to the date of this Release. The terms,

DocuSign Envelope ID: E878DB2C-95CF-4659-8031-64CF0644C631

"Company's Affiliates" and "Releasor's Affiliates," respectively include every entity that controls, is controlled by, or is under common control with Company or Releasor.

    2.    <u>Waiver Of Civil Code Section 1542   [California Releasors]</u>

This Release is intended by Releasor to be a full and unconditional general release, as that phrase is used and commonly interpreted, and to constitute a full, unconditional and final accord and satisfaction, extending to all claims of any nature, whether or not known, expected or anticipated to exist in favor of Releasor or any of the other Releasing Parties against the Released Parties regardless of whether any unknown, unsuspected or unanticipated claim would materially affect settlement and compromise of any matter mentioned herein. Releasor, for itself, himself or herself, for each of the other Releasing Parties hereby expressly, voluntarily and knowingly waives, relinquishes and abandons each and every right, protection and benefit to which Releasor or any of the Releasing Parties would be entitled, now or at any time hereafter under Section 1542 of the Civil Code of the State of California, as well as under any other statutes or common law principles of similar effect to said Section 1542, whether now or hereinafter existing under the laws of California or any other applicable federal and state law with jurisdiction over the parties' relationship. Releasor, for itself, himself or herself, for each of the other Releasing Parties, acknowledges that Section 1542 of the Civil Code of the State of California provides as follows:

> "A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or must have materially affected his or her settlement with the debtor."

In making this voluntary express waiver, Releasor acknowledges that claims or facts in addition to or different from those which are now known or believed to exist with respect to the matters mentioned herein may later be discovered and that it is Releasor's intention to hereby fully and forever settle and release any and all matters, regardless of the possibility of later discovered claims or facts. This Release is and shall be and remain a full, complete and unconditional general release. Releasor acknowledges and agrees that the foregoing waiver of Section 1542 is an essential, integral and material term of this Release and that it, he or she is entering into this Release on the advice of independent counsel.

    3.    <u>Dispute Resolution</u>.   Releasor agrees to be bound by the dispute resolution provisions set forth in the Franchise Agreement, which are incorporated herein by this reference.

    4.    <u>Release Not Admission</u>.   Releasor understands and agrees that the giving or acceptance of this Release and the agreements contained herein shall not constitute or be construed as an admission of any liability by Company or an admission of the validity of any claims made by or against Company.

    5.    <u>Authority Of Parties</u>.   Each person executing this Release on behalf of a party hereto warrants and represents that he or she is duly authorized to execute this Release on behalf of such party.

DocuSign Envelope ID: E878DB2C-95CF-4659-8031-64CF0644C631

    6.    <u>No Prior Assignments</u>.  Releasor represents and warrants that Releasor has not previously assigned or transferred, or attempted to assign or transfer, to any third party any of the Claims which are the subject of this Release, all of such Claims being released.

    7.    <u>Definitions</u>.  All capitalized terms used in this Release that are not defined in the body of this Release shall have the same meaning assigned to them in the Franchise Agreement, and the parties hereby incorporate those definitions by reference.

    IN WITNESS WHEREOF, Releasor has executed this Release on the date first shown above.

Dated: _10/24/2018_

RELEASOR:

_TOBY GILMAN_

[IF APPLICABLE]

By: _Tobin M. Gilma_

Its: _Owner/President_

Dated: _____

TFL Franchise Systems, LLC

By:_____

Title:_____

DocuSign Envelope ID: E878DB2C-95CF-4659-8031-64CF0644C631

**EXHIBIT H**
**AUTOMATIC BANK DRAFT AUTHORIZATION**

**ACH Origination Authorization**

Please complete the following with your banking information and attach a voided check:

Company Name:_____

Name of Financial Institution:_____

Address of Financial Institution:_____

Routing Number:_____

Account Number:_____

I hereby authorize TFL Franchise Systems, LLC and the financial institution named above to initiate entries to my checking or savings accounts as identified above in accordance with the terms of my franchise agreement and, if necessary, to initiate adjustments for any transactions credited in error. This authority will remain in effect until I notify either TFL Franchise Systems, LLC or the above-named financial institution in writing to cancel it in such time as to afford a reasonable opportunity to act on such instructions. I can stop payment of any entry by notifying the above-named financial institution at least 3 days before my account is scheduled to be charged. I can have the amount of an erroneous charge immediately credited to my account for up to 15 days following issuance of my statement by the above-referenced financial institution or up to 60 days after deposit, whichever occurs first.

Signature: _John M. Dilma_

Printed Name of Person Signing: _TOBY GILMAN_

Title (if any): _Owner / President_

Application Date: _10/24/2018_

Telephone Number: _817-797-2025_

Applicant's Address: _1910 PAVIA CART, ARLINGTON, TX 76006_

DocuSign Envelope ID: E878DB2C-95CF-4659-8031-64CF0644C631

## EXHIBIT F

## FRANCHISEE DISCLOSURE ACKNOWLEDGMENT STATEMENT

As you know, TFL Franchise Systems, LLC, ("Franchisor") and you are preparing to enter into a Franchise Agreement for the establishment and operation of a The Flying Locksmiths franchise. The purpose of this questionnaire is to determine whether any statements or promises were made to you, either orally or in writing, by employees or representative of Franchisor that have not been authorized or that were not disclosed in the Disclosure Document or that might be untrue, inaccurate or misleading.

Please review each of the following questions carefully and provide honest and complete responses to each question.

1.   Are you seeking to enter into the Franchise Agreement in connection with a purchase or transfer of an existing The Flying Locksmiths franchise from an existing franchisee?

No

2.   Have you received and personally reviewed the Franchise Agreement and each exhibit attached to it?

Yes

3.   Do you understand all of the information contained in the Franchise Agreement and each exhibit attached to it?

Yes

If no, what parts of the Franchise Agreement or exhibit do you not understand? (Attach additional pages, if necessary)

_____

_____

_____

4.   Have you received the Franchise Agreement you are to execute with all the blanks completed?

No

5.   Have you received and personally reviewed the Franchise Disclosure Document, which was provided to you?

Yes

6.   Do you understand all of the information contained in the Disclosure Document and any state-specific addendum that was attached to the Disclosure Document?

Yes

If no, which parts of the Disclosure Document and/or Addendum do you not understand? (Attach additional pages, if necessary)

DocuSign Envelope ID: E878DB2C-95CF-4659-8031-64CF0644C631

_____
_____
_____

7.      Have you discussed the benefits and risks of operating a The Flying Locksmiths franchise with an

        attorney, accountant or other professional advisor and do you understand those risks?

        *Yes*

        If not, do you wish to have more time to do so?

        _____

8.      Do you understand that the success or failure of your franchise will depend in large part upon

        your skills and abilities, the hours worked by you, competition from other businesses, interest

        rates, the economy, inflation, labor and supply costs, lease terms, your management ability, the

        marketplace and other economic and business factors?

        *Yes*

9.      Has any employee, broker or other person speaking on behalf of Franchisor made any written or

        oral statement or promise concerning the sales, revenues, or profits of a The Flying Locksmiths

        franchise, other than what may be stated in Item 19 of the The Flying Locksmiths FDD?

        *No*

10.     Has any employee, broker or other person speaking on behalf of Franchisor made any written or

        oral statement or promise regarding the costs you may incur in starting a The Flying Locksmiths

        franchise that is contrary to, or different from, the information contained in the Disclosure

        Document?

        *No*

11.     Has any employee, broker or other person speaking on behalf of Franchisor made any written or

        oral statement or promise concerning the likelihood of success that you should or might expect to

        achieve from operating a The Flying Locksmiths franchise?

        *No*

12.     Has any employee, broker or other person speaking on behalf of Franchisor made any written or

        oral statement, promise or agreement concerning the advertising, marketing, training, support

        services or assistance that Franchisor will furnish to you that is contrary to, or different from, the

        information contained in the Disclosure Document?

        *No*

13.     Has any employee, broker or other person speaking on behalf of Franchisor made any written or

        oral statement, promise or agreement relating to any right you may have to acquire territory in

        addition to what will be initially granted to you under the Franchise Agreement?

        *No*

DocuSign Envelope ID: E878DB2C-95CF-4659-8031-64CF0644C631

14.     Has any employee, broker or other person speaking on behalf of Franchisor made any other written or oral statement, promise or agreement relating to the The Flying Locksmiths franchise that is contrary to, or different from, the information contained in the Disclosure Document?

*No*

15.     Have you paid any money to the Franchisor concerning the purchase of this franchise prior to today?

*No*

16.     If you have answered "Yes" to any of questions 9 through 15, please provide a full explanation of your answer in the following blank lines. (Attach additional pages, if necessary, and refer to them below.) If you have answered "no" to each of the foregoing questions, please leave the following lines blank. _____

_____

_____

_____


YOU UNDERSTAND THAT YOUR ANSWERS ARE IMPORTANT TO US AND WE WILL RELY ON THEM.  BY SIGNING THIS QUESTIONNAIRE, YOU ARE REPRESENTING THAT YOU HAVE RESPONDED TRUTHFULLY TO THE ABOVE QUESTIONS.

Date: *10/24/2018*                     *John M. Gilman*
                                       Prospective Franchisee
                                       *( TOBY GILMAN )*

DocuSign Envelope ID: E878DB2C-95CF-4659-8031-64CF0644C631

## AMENDMENT TO FRANCHISE AGREEMENT

**THIS AMENDMENT TO FRANCHISE AGREEMENT** is made and entered into *on 10/24/2018* by and between TFL Franchise Systems, LLC, a Massachusetts limited liability company with its principal place of business at 100 Grossman Ave., Braintree, MA 02184 (hereinafter referred to as "Franchisor") and *Tony Gilman* hereinafter referred to as ("Franchisee").

### WITNESSETH

**WHEREAS,** Franchisor and Franchisee desire to enter into a franchise agreement of even date herewith with respect to the operation of a business which provides locksmith and security services and products for commercial, residential, and automotive customers under the name "The Flying Locksmiths" (hereinafter "the Franchise Agreement");

**WHEREAS,** Franchisee is not willing to enter into the Franchise Agreement unless it is modified as set forth herein; and

**WHEREAS,** Franchisor and Franchisee have agreed to amend the Franchise Agreement as set forth herein as a condition to entering into the Franchise Agreement and, therefore, if there is a conflict between this Amendment and the Franchise Agreements, this Amendment will prevail.

**NOW, THEREFORE,** in consideration of the mutual covenants and agreements hereinafter set forth, and other good and valuable consideration the receipt and sufficiency of which is hereby acknowledged, the parties do hereby agree as follows:

1. Acquisition of Territory- Franchisee shall acquire the territory known as DFW #1.

   (see attached map).

   The population base of 1,403,340 X .12 for a total Franchise Fee of $159,980.76 which includes a 5% veteran's discount. Franchisee shall pay a non-refundable down payment of $20,000 of the total franchise fee with the balance due of $139,980.76 upon its funding which is expected to occur on or before Dec. 15 2018 and paid within 72 hours of funding.

DocuSign Envelope ID: E878DB2C-95CF-4659-8031-64CF0644C631

**FRANCHISEE:** _____

Name: Toby Gilman
_____

By: _____

Its: _____




**FRANCHISOR:**

TFL FRANCHISE SYSTEMS, LLC.,
a Massachusetts limited liability company



By:_____
        (authorized signature)
Name: _____

DocuSign Envelope ID: E878DB2C-95CF-4659-8031-64CF0644C631



# Custom Component Detail

DFW #1

Analysis Level: ZIP

10/22/2018 11:37:05 AM

Longitude: -97.595208
Latitude: 32.481237

1 DFW

Trade Area built from components



DocuSign Envelope ID: E878DB2C-95CF-4659-8031-64CF0644C631

| ZIP | Dist | Area Name | STabbrev | Population (2017) | Total Establishments (2017) | COUNTY1 | COUNTY2 |
|---|---|---|---|---|---|---|---|
| 76044 | 4.56 | Godley | TX | 3,946 | 133 | Johnson | |
| 76049 | 5.80 | Granbury | TX | 27,579 | 922 | Hood | Parker |
| 76035 | 5.94 | Cresson | TX | 1,688 | 47 | Hood | Parker |
| 76058 | 9.63 | Joshua | TX | 18,371 | 400 | Johnson | |
| 76126 | 12.15 | Fort Worth | TX | 22,300 | 629 | Tarrant | Parker |
| 76048 | 12.78 | Granbury | TX | 24,491 | 1,219 | Hood | Somervell |
| 76036 | 13.28 | Crowley | TX | 26,348 | 510 | Tarrant | Johnson |
| 76008 | 14.49 | Aledo | TX | 16,699 | 458 | Parker | Tarrant |
| 76123 | 14.57 | Fort Worth | TX | 33,754 | 245 | Tarrant | |
| 76033 | 15.44 | Cleburne | TX | 25,545 | 1,075 | Johnson | Somervell |
| 76059 | 16.88 | Keene | TX | 4,821 | 110 | Johnson | |
| 76132 | 16.94 | Fort Worth | TX | 26,327 | 1,419 | Tarrant | |
| 76031 | 17.05 | Cleburne | TX | 17,818 | 776 | Johnson | |
| 76028 | 17.56 | Burleson | TX | 70,176 | 2,116 | Johnson | Tarrant |
| 76133 | 17.67 | Fort Worth | TX | 51,950 | 1,221 | Tarrant | |
| 76087 | 18.74 | Weatherford | TX | 30,215 | 872 | Parker | Hood |
| 76116 | 18.88 | Fort Worth | TX | 52,081 | 2,413 | Tarrant | |
| 76134 | 18.88 | Fort Worth | TX | 25,806 | 511 | Tarrant | |
| 76109 | 19.36 | Fort Worth | TX | 23,930 | 1,477 | Tarrant | |
| 76122 | 20.00 | Fort Worth | TX | 260 | 7 | Tarrant | |
| 76140 | 20.75 | Fort Worth | TX | 30,243 | 894 | Tarrant | |
| 76129 | 20.80 | Fort Worth | TX | 2,384 | 26 | Tarrant | |
| 76115 | 20.90 | Fort Worth | TX | 21,853 | 463 | Tarrant | |
| 76086 | 21.71 | Weatherford | TX | 20,050 | 1,571 | Parker | |
| 76110 | 21.77 | Fort Worth | TX | 32,631 | 1,828 | Tarrant | |
| 76009 | 22.87 | Alvarado | TX | 21,236 | 459 | Johnson | |
| 76104 | 23.77 | Fort Worth | TX | 19,103 | 1,903 | Tarrant | |
| 76119 | 24.00 | Fort Worth | TX | 46,533 | 1,125 | Tarrant | |
| 76060 | 24.87 | Kennedale | TX | 8,233 | 381 | Tarrant | |
| 76105 | 25.54 | Fort Worth | TX | 24,485 | 469 | Tarrant | |
| 76085 | 25.58 | Weatherford | TX | 11,641 | 218 | Parker | |
| 76001 | 27.65 | Arlington | TX | 32,326 | 658 | Tarrant | |
| 76016 | 27.67 | Arlington | TX | 31,820 | 856 | Tarrant | |
| 76017 | 27.78 | Arlington | TX | 46,132 | 1,273 | Tarrant | |
| 76063 | 28.10 | Mansfield | TX | 72,192 | 2,497 | Tarrant | Johnson |
| 76112 | 28.99 | Fort Worth | TX | 43,770 | 1,399 | Tarrant | |
| 76013 | 30.22 | Arlington | TX | 32,560 | 1,980 | Tarrant | |
| 76015 | 30.65 | Arlington | TX | 17,548 | 1,448 | Tarrant | |
| 76088 | 30.84 | Weatherford | TX | 12,259 | 375 | Parker | |
| 76120 | 31.03 | Fort Worth | TX | 17,528 | 351 | Tarrant | |
| 76118 | 32.22 | Fort Worth | TX | 15,564 | 559 | Tarrant | |
| 76014 | 32.92 | Arlington | TX | 36,181 | 805 | Tarrant | |
| 76053 | 33.46 | Hurst | TX | 30,063 | 1,505 | Tarrant | |
| 76012 | 33.49 | Arlington | TX | 27,535 | 1,041 | Tarrant | |
| 76010 | 34.41 | Arlington | TX | 60,928 | 1,438 | Tarrant | |

DocuSign Envelope ID: E878DB2C-95CF-4659-8031-64CF0644C631

| | | | | | | 416 | Parker | Wise |
|---|---|---|---|---|---|---|---|---|
| **76011** | 35.73 | Arlington | TX | | 26,366 | 1,890 | Tarrant | |
| **76022** | 35.75 | Bedford | TX | | 13,768 | 559 | Tarrant | |
| **76054** | 35.86 | Hurst | TX | | 12,118 | 882 | Tarrant | |
| **76006** | 36.31 | Arlington | TX | | 26,039 | 868 | Tarrant | |
| **76040** | 36.74 | Euless | TX | | 30,227 | 1,024 | Tarrant | |
| **76005** | 36.79 | Arlington | TX | | 978 | 13 | Tarrant | |
| **76021** | 37.16 | Bedford | TX | | 35,603 | 1,406 | Tarrant | |
| **76067** | 37.43 | Mineral Wells | TX | | 20,118 | 844 | Palo Pinto | Parker |
| **Totals** | | | | 1,403,340 | | 49,984 | | |

**Total number of records: 54**

DocuSign Envelope ID: E878DB2C-95CF-4659-8031-64CF0844C831

Copyright © 2018, Tactician Corp and/or its suppliers. All Rights Reserved.

Internet Marketing Solutions provided by:



URL to this report: http://localhost/MapscapeV3/1033/RPT_Detail.ASP?AttributeFile=geometrx.att&RPT_ID=8800&Homedir=C9A454B4D6134C89B11C73B4D4E68595