# Analysis of Lock Installations
# ADT-BH Management Joint Project
# "Trial" Lock Swap in DFW Metroplex
# From May to November 2019

**PART TWO - Tasks for Expert Analysis/Testimony:**
I have been asked to perform analysis and render a damages analysis, upon documentary evidence, concerning the division of payments (totaling approximately $98, 675) for two separate franchise owners who worked together on an ADT-contracted "lock swap" project at 6 apartment complexes at the following sites:
- Silverbrook Apartments – 2814 TX HWY 360, Grand Prairie, TX 75052
- Crestmont Reserve – 5050 Pear Ridge Drive, Dallas, TX 75287
- Versailles Apartments – 4900 Pear Ridge Drive, Dallas, TX 57287
- Atera Apartments – 4606 Cedar Springs Road, Dallas TX 75219
- Arbors at Forest Ridge Apts. – 2200 Forest Ridge Drive, Bedford, TX 76021
- The Venue at 8651 Apartments – 8651 Meadowbrook Blvd., Fort Worth, TX 76160

**Credentials, Supporting Documentation or Testimony reviewed, and statistical methodology applied to relevant calculations:**
1. I am CPA, licensed in the State of Texas since May of 1990. I have practiced primarily in the area of tax preparation and review with regard to Federal and State taxation for Individuals, Partnerships, Corporations. S-Corporations, Trusts, and Estates. As part of Texas licensing, I also successfully completed the Audit portion of the national CPA Exam and performed on audit engagements for two full years as a requirement of standard licensing.
2. For higher order statistical analysis testing, I am relying upon my own auditing work, as well as consultation with Don McPhee, Audit Partner, Cherry Bekaert. Don has 40 years of Audit experience, for entities of various sizes, having worked as an Audit Senior Manager with KPMG, as a State Auditor for the State of Texas, Managing Partner (Audit) for PMB Helin Donovan, and currently as Audit Partner at Cherry Bekaert.
3. Documents/Testimony examined include the following sources:
    a. The TFL Franchise Systems franchise agreement and Operations Manual;
    b. The ADT subcontractor agreement between ADT and the applicable Franchise Owners (The Flying Locksmiths of Forth Worth [Ewing franchise], and The Flying Locksmiths of Arlington/Fort Worth [Gilman franchise];
    c. All documents produced by both TFL Franchise Systems and Black 13 Enterprise under the lawsuit's various Requests fort Production; and

    d. the tally sheets of buildings, apartment numbers, door codes, installation techs, lock issues, and subsequent repairs/remediation, required by ADT regarding installation and signoff on all 6 ADT/BH Management joint projects in the DFW Metroplex.

**Conclusions Reached:**
1. No calculations were presented into evidence by TFL Franchise Systems, Additionally, TFL definitively stated that they did not take into account a significant volume of pictorial evidence (801 photos) of repaired lock installations, which they had specifically requested as evidence of Gilman's extensive repairs at the Silverbrook Apartments job site.
2. **See Spreadsheets B & C, as well as 801 evidentiary photos.** (Question for Locksmith expert: What constitutes a complete lock installation?)

*A brief explanation of the statistical analysis used:*
    a. *Any first-year staff auditor would be very knowledgeable of the basic and elementary statistical sampling required in an audit engagement in order to produce a highly reliable and accurate Audit Report which can be trusted/relied upon bankers, shareholders, creditor and investors.  In all cases, the larger the sample size, the greater reliance which can be made upon the auditor determination of accuracy.*
    b. *An "initial" sample is taken based upon the prior experience of the auditor with the particular type of entity.  For audits of critical/valuable assets, such as cash deposits or large amounts of inventory, a larger sample is typically selected to obtain a greater level of confidence in the total asset count/value*

The sample selected for this Expert Analysis was the entire population of **642 locks** required to be installed at the Silverbrook Apartments.  The reason for testing of the entire population of 642 locks, was that the original "random sample" for Silverbrook were those locks (10 in total) which had failed within the first few days or weeks after initial installation, and thus required a service call to repair.  Of these 10 failed locks, all 10 were either lacking screws or strike plates or both.  With a random sample result showing 100% errors, standard audit practice dictates that ALL 642 locks in the Silverbrook population must be checked for errors.  Thus, the Gilman franchise contacted the ADT representative (Bart Malveaux) and the Silverbrook Apartment Facilities/Security Manager (Vincent Jones) to arrange for a check of all locks, and correct/repairs of any improperly installed or defective.  The results of this complete analysis of the sample size yielded the following critical results:

1. The original premise was that the Ewing franchise properly installed 77% of the Silverbrook locks.  A basic count of the original installation does not bear out this

premise.  Before "warranty" repair, the spreadsheet shows an initial breakdown of 33.5% Gilman, 66.5% Ewing.

Once all of the "repaired locks were tallied the statistics change considerably.  As seen in Spreadsheet C, Gilman's team are credited with the installation/repair of 78.19% of all Silverbrook locks, and the Ewing team's installed lock count drops to 21.81%

Picture after picture of the completed repairs show (1) the applicable door number, (2) the missing screws and/or latches, and (3) the correct/completed installation.

2. TFL Systems has produced no documentation of having calculated any lock installation counts of its own, based upon the tally sheets, and repair logs, and pictorial evidence to which it had full access.  By giving ALL payments to Ewing, they were tacitly agreeing to let her distribute the funds according to her erroneous 77%/23% calculations.

**Other Evidence Support Re-calculation of Lock Installation "Credit"**:

*The Crestmont Reserve Apartments* **(242 locks)**

1. Apartment Manager, Jennifer Johnson, shared in an interview, prior to the start of the Versailles site project (a sister property to the Versailles), that she did NOT want The Flying Locksmiths to return to her properties for installations, as Ms. Ewing had violated serious security protocols at Crestmont.
2. An analysis of lock installation credit is in process.
3. TFL Systems has produced no documentation of having calculated any lock installation counts of its own, based upon the tally sheets, and repair logs, and pictorial evidence to which it had full access.  By giving ALL payments to Ewing, they were tacitly agreeing to let her distribute the funds according to her erroneous 77%/23% calculations.

*The Versailles Apartments* **(388 locks)**:

1. All parties agree the lock tally sheet for this apartment complex is no longer available to the applicable parties in this dispute.  (Apparently, the Apartment for Versailles, Jennifer asked to keep the original tally sheet – with all the relevant notations (bldg. number, door number, tech who installed, door codes, etc. as well as the specific doors that showed notations about missing screws and strike plates).  She promised to give all other parties (SDT, BH Management, then Gilman franchise) as full copy, but never provided said copies.
2. Jennifer Johnson, the week after installation, contacted ADT, BH Management, Gilman, Ewing, and TFL Corporate about a large number of

new door locks which were missing "strikes" affixed to the door frame opposite from the door latch.

3. Upon notification, the Gilman franchise agree to complete all warranty work, and installed 113 missing strikes.
4. Out of 388 locks, Ms. Ewing had claimed installation by her techs of 77%, or 299 locks (with 23% only credited to Gilman's tech).
5. Since Gilman and his tech, David Revilla, completed all repairs, , 113 locks should be taken from Ewing's lock count, and transferred to Gilman's tally sheet. The adjusted tally should reflect Ewing – 186 locks 47.94%), and Gilman – 202 locks (52.06%).
6. TFL Systems has produced no documentation of having calculated any lock installation counts of its own, based upon the tally sheets, and repair logs, and pictorial evidence to which it had full access.  By giving ALL payments to Ewing, they were tacitly agreeing to let her distribute the funds according to her erroneous 77%/23% calculations.

*The Atera Apartments* **(380 locks)** *and the The Venue at 8651 Apartments* **(328 locks)**:

1. Interviewing Yessika Rogriguez, the Apartment Manager of Atera Apartments, she corroborated Mr. Gilman's claim that she was very insistent about the speedy completion of all lock installs on her property, and was quite upset when a 1.5 week "break" in installations occurred halfway through, as ADT had not ordered and supplied the correct amount of required Privacy Locks that were needed to outfit the whole complex.
2. In order to assuage Ms. Rodriguez's concerns about "quick-as-possible" installation on this job site, Mr. Gilman elected to implement an assembly line production strategy.  This involved the two most experienced techs (David Revilla and Adras Bodolai, of the Gilman franchise) drilling out all required holes for electronic lock and privacy lock installations. Then, the less experienced techs (from the Ewing franchise) would follow behind and begin installing the locks in the properly-placed holes.  Once Revilla and Bodolai had drilled all necessary holes, they too would circle back and join into the installation process as well.
3. Even though the tally sheets reflected each tech that finished a particular lock, it is it would be necessary to assign some portion of EVERY installation to Revilla and Bodolai, to accurately reflect their contributions to the most difficult part of the installation process.
4. Based upon how well this assembly line production strategy increased the efficiency of lock installations at Atera, Mr. Gilman elected to employ the same strategic approach at The Venue apartments.

5. Now, while it would be anyone's guess as to how much exact credit that each tech should have received at these two apartment complexes, a differing method for lock credit at the two locations would seem **reasonable**.
6. TFL Systems has produced no documentation of having calculated any lock installation counts of its own, based upon the tally sheets, and repair logs, and pictorial evidence to which it had full access.  By giving ALL payments to Ewing, they were tacitly agreeing to let her distribute the funds according to her erroneous 77%/23% calculations.

*The Venue Apartments* **(328 locks)**  **[See Schedule D]**
1. The original lock installation Tally Sheet for this complex, shows only 7 installation errors which were repaired onsite before this projected reached completion.
2. In addition, the Tally Sheet shows that the Gilman techs installed 29.88% of all locks (98 total), while the Ewing techs completed installation of 70.12% (or 230) of all locks.  Once again, these numbers do not support the 77%/23% split calculation that Ewing reported to TFL Franchise Systems.
3. TFL Systems has produced no documentation of having calculated any lock installation counts of its own, based upon the tally sheets, and repair logs, and pictorial evidence to which it had full access.  By giving ALL payments to Ewing, they were tacitly agreeing to let her distribute the funds according to her erroneous 77%/23% calculations.

Final note:  the Arbor, Atera, and Crestmont original tally sheets have become available, and detailed statistical spreadsheets are currently in preparation.

Signed by: *[signature: John M. Gilman]*
May 31, 2024