UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| **BLACK 13 ENTERPRISE, INC.** | § | |
|     Plaintiff, | § | |
| | § | |
| v. | § | Case No. 1:21-cv-10877 |
| | § | |
| **TFL FRANCHISE SYSTEMS, LLC,** | § | |
|     Defendant. | § | |

## MOTION FOR SUMMARY JUDGMENT

COMES NOW Plaintiff Black 13 Enterprises, Inc. to file this Motion for Summary Judgment ("Motion") against Defendant TFL Franchise Systems, LLC.

SUMMARY - Plaintiff purchased a Flying Locksmith franchise in the DFW area in what Plaintiff has recognized as a fraudulently induced sale. This sale was followed by contract breaches on the part of the franchisor. Concurrently with the franchisor's fraud and contract breaches, a second local franchisee in the area defrauded Plaintiff with the tacit assistance of the franchisor.

Plaintiff seeks rescission of the franchise agreement as well as fraud and contract damages.

### I.    FACTUAL BACKGROUND

**A.    The franchise agreement formation and start up process**

1.    From August through October of 2018, Plaintiff's owner, Toby Gilman ("Gilman"), began a discussion with Geoff Batchelder, Franchise Development Consultant for TFL Franchisor. The discussion included the history of Flying Locksmiths, the availability of open territory in the Dallas-Fort Worth metroplex area, the TFL Franchise Disclosure Document, and territory mapping, which included a discussion of the cost of varying population sizes. Exhibit A ¶ 2.

2.    Gilman performed due diligence regarding the TFL franchise and the requirements to operate a locksmith business in Texas, learning of the regulatory hurdles, and that he would need

assistance because he was not licensed to operate without oversight by a licensed qualified manager. Batchelder and other agents of TFL Franchisor assured Gilman that they could assist him with these matters, promising him a licensed overseer that could ensure fast startup. Exh. A ¶ 3.

3.     On October 24, 2018, discussions between Gilman and TFL Franchisor agents led up to Gilman's decision to purchase a TFL Franchise covering a portion of the DFW area. Gilman signed the contract on October 24, 2018 ("Franchise Agreement"), paying an initial $20,000 deposit and then the remainder of the purchase price, totaling $159,780. Exhibit A ¶ 4.

4.     Batchelder withheld a material fact regarding the unavailability of any licensing slots in the State of Texas, nor did he share anything about the very lengthy process to obtain licensing under the Texas Department of Public Safety and obtaining the rights to legally operate a locksmith business in Texas. Gilman was instead led to believe that the process of getting licensed would be minimal and easily achieved. Exhibit A ¶ 5.

5.     Batchelder also withheld key information about TFL Franchisors' lead assignment policies; Gilman could have purchased a much smaller territory and still have enjoyed first rights to all leads in the southern half of DFW based on TFL Franchisors' lead assignment policies. Gilman was led to believe that the only way he would receive adequate leads was to purchase a much larger—and correspondingly more expensive—territory than he truly needed. Only after he paid for the territory and was receiving training in Braintree, Massachusetts, around March 24, 2019, did Plaintiff learn that he would have received the leads he needed irrespective of whether he had paid for the entire territory, as his purchased area would have been closest to the unclaimed areas where the leads originated. Exhibit A ¶ 6.

6.     After payment of the deposit on October 24, 2018, Gilman was provided with a copy of the Flying Locksmiths Operation Manual. Pages 12-18 contain a very specific pre-opening

checklist outlining a series of sequential steps for Plaintiff to execute in order to open his territory for business within 12-14 weeks—at the outside. Gilman worked very diligently to attempt to open by January 1, 2019, and prepared an annual budget for 2019, based upon that goal and as required by United Midwest Savings Bank, Gilman's SBA Loan processor. Exhibit A ¶ 7.

7. Step six of the week one to-do list from the Flying Locksmiths Operation Manual included a line item that simply read, "Obtain State Required Locksmith License (if applicable)". There was no mention in the Operation Manual or corporate presentations that TFL Franchisor was limited in the number of franchise owners it could assist through the licensing process in the State of Texas, nor were any of the many steps necessary to becoming licensed as a locksmith in Texas detailed or even outlined. TFL Franchisor agents characterized the licensing process as relatively mundane drudgery, a process through which TFL Corporate could and would assist Gilman, a misimpression which was supported by existing relationships between other TFL franchisees and TFL Franchisor that Gilman observed. Exhibit A ¶ 8.

8. Encountering great difficulty with the process required by the State of Texas to obtain a locksmith license, Gilman sought assistance from Deb Breen, TFL's Master Franchise Developer for all of Texas, and from TFL COO Brett McMenimon. Exhibit A ¶ 9.

9. On November 1, 2018, McMenimon informed Gilman that the complexity of Texas regulations was a known challenge, that TFL Corporate had three individuals who were licensed to supervise, and that each supervisor could supervise a maximum of three franchise owners. Gilman would be the tenth franchise in Texas to need such assistance and there existed no one in Texas qualified to fill the supervisory role. Exhibit A ¶ 10.

10. Upon additional inquiry, Gilman learned that no one at TFL Franchisor could guess when a new licensing slot would open and be awarded to Gilman so that he could legally open his

business when he had expected and planned to do so, based on the instructions given to him from TFL Franchisor, though he had paid a considerable sum for the franchise and incurred significant costs following their instructions and ultimately would not be able to operate until April 1, 2019, many months later than expected. Exhibit A ¶ 11.

11. From December 15, 2018, through March 22, 2019, Deb Breen sought to have the Texas DPS certify that she had the requisite number of years of experience in five enumerated locksmith and private security areas, in order to be licensed in her own right without having to be under Brett McMenimon's "management" license. Additionally, Deb Breen was required to pass the Texas DPS licensing exam. She expressed two major concerns: (1) she would not give up her subordinate, supervised status under Brett McMenimon until she passed the exam, since her licensing would lapse within sixty days if she did not pass the exam and was no longer under Brett's supervision; and (2) she asked Brett what his "Plan B" was to get Gilman properly and effectively licensed, should she fail the licensing exam. Brett could not respond with any definitive "Plan B," so Gilman had to assume that there was not one contemplated at that time.  Exhibit A ¶ 12.

12. Because TFL Franchisor had assured Gilman that TFL Franchisor could assist him with the regulatory supervision but did not have sufficient "open slots" among its supervisors, Gilman was unable to be supervised—and thus unable to operate legally—until April 1, 2019, when Breen no longer needed regulatory supervision, and Gilman's organization could take her place on TFL's list of supervised companies. Exhibit A ¶ 13.

13. During this wait, Gilman continued to follow the 12-14 week opening timeline prescribed in the TFL Operating Manual in order to open his business with an office, employees, inventory, and vehicles, etc., on January 1, 2019; completing every step except the regulatory hurdle of a valid Texas Private Security/Locksmith license, which he could not obtain without TFL

Franchisor's promised oversight and assistance. Exhibit A ¶ 14.

14. Because Gilman could not open until such time as space was made in the TFL Franchisor supervisor matrix, Gilman incurred all of the costs of operating a business but was unable to earn income for three months. These costs included such overhead as his office lease, inventory purchase requirements, van lease requirements, and payroll to keep experienced technicians he had hired to meet the requirements of his Franchise Agreement. Gilman was forced to incur more than $80,000 in expenses in the first quarter of 2019, during which time he could not legally operate. Exhibit A ¶ 15.

15. TFL Franchisor represented that it would assist Gilman with regulatory hurdles, which Gilman reasonably believed because TFL Franchisor was assisting several other Texas TFL franchisees at the time. Exhibit A ¶ 16.

16. TFL Franchisor's representations were deliberate and incorrect. TFL Franchisor did not assist Gilman with regulatory hurdles until early 2019, which resulted in an insurmountable loss of capital and working relationships with locksmithing professionals. Exhibit A ¶ 17.

17. Had TFL Franchisor honestly informed Gilman that it could not give him the assistance that it was giving nine other franchise owners when Gilman was conducting his due diligence, he could have delayed the opening of his business to avoid these losses, and would not have suffered the described losses. Instead, TFL Franchisor misrepresented their intentions and capabilities to Gilman and Gilman acted on those misrepresentations, to his detriment. Exhibit A ¶ 19.

**B.    Casey Ewing and TFL Systems, Inc.**

18. In early 2019, TFL Franchisor acquired ADT as a national account to fit apartment complexes with "Smartlocks" that included a lock change paid at $25 per lock. In April of 2019, Gilman was notified that his territory would be participating in an initial trial of the ADT contract

that included changing door locks for six apartment complexes in and near his territory for $25 per lock. Exhibit A ¶ 20.

19.     When the six jobs were about to commence in the DFW Metroplex, Bart Malveaux, Operations Manager-National Accounts at ADT LLC, called Robert Ferguson, Franchise Owner, of TFL-North Dallas, to ask Ferguson to provide a single point of contact. Contrary to the practices required in the signed Franchise Agreement between Plaintiff and TFL, Ferguson recommended Casey Ewing, owner of TFL FW, to Malveaux as that single point of contact.

20.     None of the six apartment complexes where work was performed in the DFW Metroplex are in TFL FW's territory. However, three of the complexes are in Plaintiff's territory. Under the terms of the Franchise Agreement, "exclusive ownership" of a territory conveys exclusivity and refusal rights to franchisees for business in their purchased territory. However, because Plaintiff was new to the TFL system, TFL Franchisor decided that Ewing and TFL FW would manage the work at these six complexes and handle the distribution of funds.

21.     Though TFL Franchisor was aware that TFL FW had attempted to defraud TFL Franchisor before these events, TFL Franchisor did not make Gilman or Black 13 aware of that past behavior. Had Black 13 been made aware of those past events, Black 13 would not have agreed to work with TFL FW.

22.     On April 22, 2019, Gilman met with Casey Ewing, TFL FW's manager, and ADT's Bart Malveaux for the project's first installation on the first apartment complex, Crestmont Reserve.

23.     TFL FW and Plaintiff, through Ewing and Gilman, agreed to work together on the six apartment complexes, paid at $25 per lock installed, and divide payment based on the number of locks installed by each franchise's technicians.

24.     On April 23, 2019, Ewing, Gilman and David Revilla, a Black 13 technician, met Malveaux

at Crestmont again to install two demo locks. The parties discussed that some doors would need additional work and considered a two-tier pricing system in which ADT would pay $45 for more difficult installations. Ewing committed to Malveaux that she would ensure that four experienced technicians would be on site when work began at Crestmont. When she made that statement, she had only one employee, and that one employee quit on May 13, 2019.

25.     Around May 1, 2019, TFL and ADT through Meshel Harvey, Primary Acct. Contact for ADT Natl. Acct., TFL Systems Customer Care Center, and Malveaux, confirmed the two-tier pricing of $25 for easy installs and $45 for difficult installs; work was set to start on the first work order at Crestmont the week of May 20, 2019. Based on later calculations on partial payments, TFL FW added additional fees to its invoices for these projects that have never been supported by any notification provided to Plaintiff.

26.     On May 20, 2019, Gilman and his tech Revilla began work at Crestmont. Ewing showed up with four or five day laborers, none of whom had any locksmith training or experience. Ewing had performed no background checks regarding these individuals, contrary to the requirements of the Franchise Agreement and the even more stringent requirements included in the ADT Vendor Agreement.

27.     From May 20, 2019, through July 18, 2019, Gilman and Ewing worked at six apartment complexes installing door locks for ADT. It was apparent that Ewing was "gaming" the system to maximize her income by recklessly installing as many locks as quickly as possible, while using a revolving door of untrained day laborers, providing sub-standard customer service, installing a multitude of incomplete and incorrectly installed Smartlocks, and refusing to take troubleshooting calls for various apartment managers regarding incorrect lock installation.

28.     In Mid-June 2019, once Gilman was made aware of many missing strike plates at the

Versailles complex, Gilman alerted TFL Franchisor and set about replacing all missing strike plates without any financial assistance from Ewing or TFL Franchisor. Near the end of all six work projects, Gilman also alerted TFL Franchisor to the details of the shoddy work performed by Ewing and her day laborers. Additionally, Gilman also serviced more than 30 emergency calls at the six locations, and subsequently forwarded all repair requests to Steve Quinn, Director of Sales for TFL Franchisor. Ewing refused to respond to any of these emergency calls unless ADT or the relevant apartment manager agreed to pay her more money.

29.     On July 16, 2019, ADT's Harvey received a request from Versailles Manager Jennifer Johnson, ADT Executive Joe Diaz, ADT's Malveaux, and Eva Cruz from BH Management Executive, to conduct a "walkthrough" to inspect locks that Johnson, ADT, and BH Management had observed were improperly and ineffectively installed. TFL Franchisor sent Quinn as its representative. Ewing was not invited, as Johnson did not want her on site.

30.     On July 19, 2019, Quinn, Meshel, and Gilman had a conference call to discuss Gilman's e-mail of July 18, 2019, about Ewing. Quinn and Harvey both stated several times that Ewing's behavior was appalling and unacceptable. They and TFL Franchisor all expressed a commitment to ensure that Plaintiff was compensated fairly on the six projects, for fixing the incorrectly installed locks, and seeking to maintain TFL's commitment and reputation with ADT.

31.     Quinn, as a manager for TFL, asserted that an equal division of all funds received from ADT for these six projects would be most appropriate, as the best practice for handling large projects requiring multiple neighboring franchisees should be paid equally as a general rule.

32.     On July 22, 2019, Quinn and Gilman met for three hours with all the interested parties from Versailles, ADT, and BH Management, and found that ADT and Versailles management were dissatisfied with the Smartlock and Privacy deadbolts installed on about 75% of all doors. A plan

was discussed to remedy this complaint at a certain cost in September 2019.

33.  Quinn was able to see for himself that Ewing's day laborers had left screws out of the locks, and discarded strike plates from doors. Both conditions threatened near- and long-term lock failures and compromised door security.

34.  By August 6, 2019, Ewing had received at least two payments on two of the projects from ADT for work performed over the prior month. Quinn scheduled a conference call to help Ewing and Gilman work out a fair and equitable division of ADT payments for all six ADT work projects, inviting TFL Franchisor representatives to attend the conference call, including Buzz McMenimon, CEO; Meshel Harvey, ADT's primary contact for TFL; Paul Lynch, TFL Controller; Tess Blackstead and Kristin Jones, TFL call center representatives; and, Deb Breen, Texas Master Franchise developer.

35.  Gilman and Ewing gave contrary versions of the dispute. Gilman sought an even split, based on the circumstances as they developed, but Ewing did not agree. Though TFL has the authority to manage large projects under the Franchise Agreement, they concluded that "Casey [Ewing] and Toby [Gilman] need to work this out between themselves." The conference call concluded with Quinn asking Ewing to present her case to TFL Franchisor by August 8, 2019.

36.  Quinn, as agent for TFL, followed up this call with an e-mail that included both Gilman and Ewing, stating that since Ewing had already collected $20,000 in ADT payments, and had given nothing owed to Gilman, the next $20,000 collected by TFL Franchisor from ADT would be sent to Gilman. Gilman relied on this promise to continue working with TFL and ADT, but the $20,000 never arrived.

37.  Following the group conference call, Gilman contacted Paul Lynch, TFL Corporate Controller, to request all copies of relevant ADT paperwork (POs, Invoices, payments received to

date, etc.), as he had never been copied on any of these ADT contractual documents. Gilman had no clear idea what the total amount of money involved was. Gilman subsequently learned on September 6, 2019, during a conference call that the total of all invoices from the six ADT projects was $98,795.

38. On August 9, 2019, Lynch refused to give Gilman copies of the requested ADT documents, and directed Gilman to request copies from Ewing, who repeatedly refused to provide them. Around this time, Gilman informed ADT of the existence of numerous improperly installed locks potentially numbering in the hundreds at Silverbrook Apartments; TFL Franchisor had charged ADT fees for installations which were woefully inadequate, enriching themselves at the expense of ADT and Black 13.

39. On August 12, 2019, Ewing provided a nine-word response to Quinn's repeated requests for information regarding Ewing's understanding of the split of payments from ADT between Gilman and Ewing, asserting that Gilman would only get 23% of all funds from ADT's payments on the six projects, providing no supporting calculations or documentation.

40. On August 14, 2019, while attending the annual TFL Convention in Las Vegas, Gilman inquired about Quinn's prior corporate commitment to pay Gilman the "next $20,000" to come in from ADT; Lynch stated that TFL had received funds from ADT but "decided to hold all funds from distribution, until you [Gilman] and Casey [Ewing] work out an agreement."

41. On August 28, 2019, Gilman spoke to Quinn, who promised that TFL would issue Gilman a check for at least 23% of all the ADT funds received no later than Friday, August 30, 2019, since Ewing had already agreed to at least that amount being paid to Gilman.

42. Again, Gilman relied on the promises of TFL and continued to work; however, no check was issued to Gilman on Friday, August 30, 2019.

43. Again, on September 3, 2019, Gilman received an e-mail from Lynch, stating that TFL Franchisor would be calculating an amount and issuing a check to him, but no check was ever sent by TFL Franchisor or received by Gilman.

44. On September 6, 2019, a conference call was held with Quinn, Lynch, and Buzz McMenimon, Director of Marketing for TFL Franchisor, to inform Ewing and Gilman that all ADT funds received by TFL Franchisor to date (approx. $55,000), would be given to Ewing according to prior precedent and they would depend on Ewing to make fair payments to Gilman.

45. Five minutes after this conference call ended, McMenimon called Gilman directly to say that he had to do the "corporate thing" on the phone call, based upon legal advice. But McMenimon added that he and the rest of TFL corporate stood fully behind Gilman and believed Gilman had received a raw deal from Ewing. McMenimon ended by stating he would bring 100% of corporate resources to bear to support Gilman in any lawsuit brought against Ewing.

46. On September 17, 2019, TFL Franchisor issued an update to the TFL Operations Manual, adding a new section that better defined the exclusivity rights of a franchise owner in an "exclusive territory." The update included an exception permitting a franchisee to violate another franchise's territory three times per year based on various circumstances.

47. On several occasions in late September and early October of 2019, with the permission of BH Mgmt., ADT, and Silverbrook apartment management, Gilman and his two techs revisited the Silverbrook apartment complex to repair all of the shoddy and incomplete Smartlock installation work of Ewing's day laborers. Ewing had claimed a 77% / 23% split of payments in her favor on all six ADT projects. However, the tally sheets Gilman completed, along with pictures taken (nearly 800 "before" and "after" pictures), show that Gilman and his crew were responsible for completing 55.25% of all locks installed out of the total of 646.

48.    Since the events of this dispute, TFL Franchisor has taken possession of vans leased to Black 13 but appears to continue holding Black 13 responsible for the leases.

## II.    SUMMARY JUDGMENT STANDARD

49.    Summary judgment is proper when the pleadings, depositions, admissions, disclosure materials on file, and affidavits, if any, "show[…] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a), (c)(1).

50.    Under this standard, "[i]f the nonmoving party puts forward materials that create [*8] a genuine issue of fact about a dispute's arbitrability, the district court 'shall proceed summarily' to trial to resolve that question." *Id.* (citing 9 U.S.C. § 4; *Neb. Mach. Co., Inc. v. Cargotec Sols., LLC*, 762 F.3d 737, 744 (8th Cir. 2014)). In conducting this review, the Court "construe[s] the record in the light most favorable to the non-moving party and draw[s] all reasonable inferences in its favor." *Id. Vaiano v. United Nat'l Corp.*, Civil Action No. 24-cv-10002-ADB, 2024 U.S. Dist. LEXIS 85831, at *7-8 (D. Mass. May 13, 2024).

## III.   CAUSES OF ACTION

### A.    Rescission against TFL Franchisor

51.    A court may exercise its equitable discretion and rescind an agreement upon a showing of fraud, accident, mistake, or other grossly inadequate conduct. *P.L.A.Y., Inc. v. NIKE, Inc.*, 1 F. Supp. 2d 60, 65 (D. Mass. 1998) (Citing *Kannavos v. Annino*, 356 Mass. 42 (1969)). A plaintiff may predicate a rescission action where the defendant fraudulently misrepresented material facts to induce the plaintiff to enter into an agreement. *McGrath v. C.T. Sherer Co.*, 291 Mass. 35 (1935).

52.    On October 24, 2018, Black 13 and TFL Franchisor formed the Franchise Agreement; a copy of that contract is attached as Exhibit A and incorporated by reference. Exhibit A ¶ 4.

53.    As set forth above, TFL Franchisor made fraudulent misrepresentations to Black 13

regarding its operations, including representations that it provided regulatory supervision satisfying Texas authorities, that it would pay Plaintiff for work done in its territory and manage national projects so Plaintiff would be paid for its work. Exhibit A ¶ 5 and Exhibit A ¶ 17.

54. However, TFL Franchisor failed to provide the regulatory framework assistance that many other TFL franchisees had received, failed to properly manage the ADT national account, and failed to pay Plaintiff for its work. Exhibit A ¶ 5 and ¶ 17.

55. Plaintiff was substantially harmed when it obtained loans and purchased equipment and vehicles based on the promises of TFL Franchisor, as its failure to perform its promises resulted in Plaintiff's inability to operate its business from January of 2019 until April of 2019 even though Plaintiff was able and ready to perform in January of 2019. Exhibit A ¶ 15.

56. Plaintiff had no knowledge that TFL Franchisor's representations were false until Gilman had paid for his franchise and began his training as a franchisee. Exhibit A ¶ 5.

57. The resulting conditions made continuation of the franchise relationship untenable. Plaintiff ran out of working capital in December of 2019, and Defendant TFL terminated the Franchise Agreement in January of 2020.

58. Plaintiff seeks rescission of the Franchise Agreement and damages from TFL to restore it to its previous condition, including refund of the franchise fees and all costs suffered by Plaintiff in reliance on the promises inherent in the relationship with TFL, including special damages due to expenditures of equipment, trucks, and leases as required under the Franchise Agreement. Exhibit A ¶ 17 and ¶ 19. The sum thus sought is $159,780 for the initial franchise fees, as well as the $80,000 in expenses in the first quarter of 2019, for a total of $239,780, plus attorney fees.

59. Plaintiff has suffered irreparable harm in that he has paid for equipment and taken loans and is now unable to pay back these loans. Additionally, his credit has been ruined.

**B.     Fraud**

   i.     Fraudulent misrepresentation

60.    To establish a claim for fraudulent misrepresentation, a plaintiff must prove that the defendant made a false representation of a material fact with knowledge of its falsity for the purpose of inducing the plaintiff to act thereon, and that the plaintiff relied upon the representation as true and acted upon it to his detriment. *Danca v. Taunton Savings Bank*, 385 Mass. 1, 8 (1982).

61.    Where a claim involves nondisclosure of a fact, it is actionable as fraud when there is a duty to disclose. *Stolzoff v. Waste Sys. Int'l., Inc.*, 58 Mass. App. Ct. 747, 755, (2003). The defendant has a duty to disclose "where (i) there is a fiduciary or other similar relation of trust and confidence, (ii) there are matters known to the speaker that he knows to be necessary to prevent his partial or ambiguous statement of the facts from being misleading, or (iii) the nondisclosed fact is basic to, or goes to the essence of, the transaction. *Id.*

62.    As set forth herein, TFL Franchisor made several fraudulent misrepresentations to Black 13. Specifically, TFL Franchisor falsely represented that it would provide regulatory supervision satisfying Texas authorities, that it would pay Plaintiff for work done in its territory and manage national projects so Plaintiff would be paid for its work. Exhibit A ¶ 5 and ¶ 16-17.

63.    When TFL Franchisor made these representations, it knew they were false or made the representations recklessly, as a positive assertion, and without knowledge of their truth. TFL Franchise also concealed material information regarding its ability to provide regulatory supervision. Exhibit A ¶ 17.

64.    As TFL Franchisor intended, Black 13 relied on these material representations and omissions to its detriment when it entered into the Franchise Agreement, which caused it injury.

65.    As a proximate and foreseeable result of TFL Franchisor's fraudulent conduct, Black 13 has been damaged, for which sums Black 13 hereby sues, in an amount that exceeds the minimum

jurisdictional limits of this Court. Black 13 seeks its actual, special and consequential damages it sustained, including out-of-pocket and benefit-of-the-bargain damages, plus pre- and post-judgment interest at the highest rate allowed by applicable law. Exhibit A ¶ 14, ¶ 17, and ¶ 19.

  ii.      Fraud by nondisclosure.

66.      TFL Franchisor's wrongful conduct described above constitutes fraud by nondisclosure. TFL Franchisor had a duty to disclose material facts to Black 13 based on (i) its relationship with Black 13 (as an interested party); (ii) TFL Franchisor's discovery of new information that made a prior representation misleading or untrue; (iii) TFL Franchisor's creation of a false impression by making a partial disclosure; and (iv) TFL Franchisor's voluntary disclosure giving rise to a duty to disclose the whole truth.

67.      TFL Franchisor concealed material facts from Black 13 with knowledge that Black 13 was ignorant of the facts and did not have an equal opportunity to discover them, including the prior negative experiences of TFL FW's attempted fraud on TFL Franchisor.

68.      TFL Franchisor was deliberately silent when it had a duty to speak. By failing to disclose the facts, TFL Franchisor intentionally induced Black 13 to enter into the Franchise Agreement.

69.      Black 13 justifiably relied on the nondisclosures and was induced to enter into the Franchise Agreement. As a proximate and foreseeable result of TFL Franchisor's fraudulent nondisclosures, Black 13 has been damaged and therefore sues for an amount within this Court's jurisdiction. Black 13 seeks actual, special, and consequential damages, including out-of-pocket and benefit-of-the-bargain damages, plus pre- and post-judgment interest. Exhibit A ¶ 19.

  iii.      Damages

70.      Plaintiff seeks damage under fraud for all its losses, for a total of $239,780 for the fees and operating costs, the $20k for the lock dispute, plus attorney fees.


### C. Breach of contract against TFL Franchise

71. All conditions precedent to Black 13's right to bring this action have been performed, been waived, or have been excused.

72. "To succeed in a breach of contract action, a claimant must demonstrate (1) that the parties reached a valid and binding agreement, (2) that one party breached the terms of the agreement, and (3) that the other party suffered damages from the breach." *Yellin & Hyman, P.C. v. Ellis & Assocs.*, 2001 Mass. Super. LEXIS 232, *10 (2001).

73. Black 13 entered into an enforceable Franchise Agreement contract with TFL Franchisor in which TFL Franchisor agreed to pay Plaintiff for the work it performed. TFL Franchisor also agreed to provide regulatory supervision, as it did for its other Texas franchisees. Black 13 fully performed under the terms of the Franchise Agreement. However, TFL Franchise breached the Franchise Agreement by (i) refusing to timely provide regulatory supervision pursuant to Texas law; (ii) refusing to ensure proper payment for work performed on the ADT accounts; and (iii) failing to manage the ADT national account by ensuring fair payment.

74. Additionally, TFL failed to adjudicate fairly the dispute concerning the lock payment work for the six apartments described above, even after TFL informed Plaintiff that TFL would ensure that Plaintiff received at least the next $20,000.

75. As a proximate and foreseeable result of TFL Franchisor's breaches of the Franchise Agreement, Black 13 has been damaged, for which sums Black 13 hereby sues, in an amount that exceeds the jurisdictional limits of this Court. Black 13 seeks its actual, special and consequential damages it sustained, including out-of-pocket and benefit-of-the-bargain damages, plus pre- and post-judgment interest at the highest rate allowed by applicable law, including Plaintiff seeks damage under fraud for all its losses, for a total of $239,780 for the fees and operating costs, the $20k for the lock dispute, plus attorney fees.

## IV. DAMAGES

76. <u>Rescission</u> - Plaintiff seeks rescission under Massachusetts law, which is aimed at restoring the parties to their original positions and may include attorneys' fees. The equitable nature of rescission places it within the court's discretion, considering the total circumstances of the dispute [Astra USA, Inc. v. Bildman, 455 Mass. 116](), [Morris v. Ramos, 1988 Mass. App. Div. 16](), [Coggins v. New Eng. Patriots Football Club, 397 Mass. 525](). As described above, Plaintiff's claim for damages under rescission is $239,780, plus attorney fees.

77. <u>Fraud</u> – As described above, Plaintiff invested $239,780 in reliance on the promises of TFL and its agents, for which Plaintiff sues under fraud. Additionally, of that amount, $159,780 was paid directly to Defendant, and no reasonable person could say any benefit was provided to Plaintiff, and which was paid to Defendant based on Plaintiff's reliance on Defendant's knowingly false statements.

78. <u>Breach of Contract</u> -  Plaintiff seeks the $239,780 as economic damages which resulted from Defendant's breach of the parties' contract for initial fees, as well as $20,000 for the lock work done at the aforementioned apartments.

## V. PRAYER

**WHEREFORE**, the Plaintiff requests the following:

a) Judgment ordering rescission of the Franchise Agreement with TFL Franchisor, declaring it void and excusing both parties from all future obligations under the contract;
b) Judgment against TFL Franchisor for break of contract;
c) Judgment against TFL Franchisor for fraud;
d) Prejudgment interest as provided by law;
e) Post-judgment interest as provided by law;
f) Costs of suit; and
g) Such other relief to which plaintiff may be justly entitled.

Respectfully submitted,

NORRED LAW, PLLC
/s/ Warren V. Norred
Warren V. Norred, Texas Bar Number 24045094, wnorred@norredlaw.com
515 E. Border Street; Arlington, Texas 76010
P. 817-704-3984; F. 817-524-6686

Exhibit A: Declaration of Gilman
    Exhibit A-1: "How to be a Locksmith"
    Exhibit A-2: Franchise Agreement
Exhibit B: Declaration of Warren V. Norred
    Exhibit B-1: Case time and task report
    Exhibit B-2: Search of "locksmith" in MA legislative records